IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

ALIA SALEM AL-SABAH,
The State of Kuwait
Qurtaba Area
Block: 1
Street: 1
Home: 2

          Plaintiff,

     v.

WORLD BUSINESS LENDERS, LLC
191 Hudson Street, 33rd Floor
Jersey City, NJ 07302
Serve on Resident Agent:
       CSC-Lawyers Incorporating Service
       7 St. Paul Street, Suite 820
       Baltimore, Maryland  21202

ROBERT "BOBBY" WILLIAMS,
c/o World Business Lenders, LLC
2535 E. Southlake Blvd., Suite 270
Southlake, Texas  76092

UPTOWN COMMERCIAL CAPITAL
6932 Greenville Avenue, #134
Dallas, TX  75231
info@uptowncommercialcapital.com

KENNETH WILLIAMS,
3324 McKinney Avenue, Apt. 801
Dallas, Texas  75204
info@uptowncommercialcapital.com

SHARESTATES INVESTMENTS, LLC,
11 Middle Neck Road, Suite 400A
Great Neck, New York 11021
Serve on Resident Agent:
       A Registered Agent, Inc.
       8 The Green, Suite A
       Dover, Delaware  19901

Civil Action No. 1:18-cv-2958

IRM PLAZA, LLC
68-60 Austin Street
Forest Hills, New York  11375
Serve on Resident Agent:
    Ilya Mikhailov
    68-60 Austin Street
    Forest Hills, New York 11375

        Defendants.

## COMPLAINT

Plaintiff, Alia Salem Al-Sabah ("Ms. Al-Sabah"), by counsel, for her Complaint against the Defendants, World Business Lenders, LLC ("WBL"), Robert Williams ("Bobby Williams"), Uptown Commercial Capital ("Uptown"), Kenneth Williams ("Kenneth Williams"), Sharestates Investments, LLC ("Sharestates"), and IRM Plaza, LLC ("IRM") states as follows:

## INTRODUCTION

1.    This Complaint alleges a conspiracy in which the Defendants herein – "hard money" loan brokers and lenders – conspired with Jean P.M. "Mohammed" Agbodjogbe ("Agbodjogbe"), a Senegalese national living in Baltimore, to steal millions of dollars from the Plaintiff, Ms. Al-Sabah.

2.    The facts alleged in this Complaint are augmented by those set forth in the Amended Complaint against Agbodjogbe, one of his wives, and several entities Agbodjogbe created in furtherance of the scheme, presently pending before this Court in case number 17-cv-730-ELH.  (*See Al-Sabah v. Agbodjogbe, et al.*, No. 17-730, Doc. No. 76 (D. Md. filed Nov. 22, 2017).)

3.    Intending to partner with Agbodjogbe in charitable endeavors, and also to invest in real estate and businesses opportunities in Maryland and New York, Ms. Al-Sabah, over the course of nearly two years, transferred millions of dollars into accounts controlled by

Agbodjogbe or entities he controlled (although Ms. Al-Sabah believed that the money was being transferred to entities she controlled or in which she had a 50/50 interest).  The money was transferred to the United States for the purpose of purchasing and rehabilitating real property – an apartment for her daughter's use in New York City, land in suburban Baltimore for use as a Muslim burial facility, and various commercial sites in Baltimore.

4.      Instead of purchasing the properties for her account, as Ms. Al-Sabah directed, Agbodjogbe surreptitiously purchased the properties in the names of entities he clandestinely controlled, or, in one instance, in his own individual capacity, all without Ms. Al-Sabah's knowledge, authorization, or consent.

5.      After the acquisitions closed, Agbodjogbe, with the active aid and assistance of the Defendants named herein (as revealed by discovery undertaken in 17-cv-730), secured mortgage loans through which he eventually extracted virtually all of the equity in the properties. The "hard money" loans through which the Defendants undertook this fraud and effected the conspiracy were on terms so commercially unreasonable that the Defendants had to know that Agbodjogbe's claims to own the properties were false.  On information and belief, Defendants knew that Agbodjogbe was not the true, legitimate, or equitable owner of the properties securing the loans.  Indeed, some of the loans were made after the lenders had actual knowledge of Ms. Al-Sabah's contentions, in case number 17-cv-730, that Agbodjogbe was a fraudster.

6.      Defendants knew that Agbodjogbe could not possibly repay the loans according to the credit terms extended.  Defendants facilitated and made the loans anyway, because they were charging hundreds of thousands of dollars in commissions, usurious interest, late fees, penalties, and other amounts; and the lenders set aside any concerns they had about

Agbodjogbe's ability to repay the loans because they were content to foreclose on the properties, which more than adequately secured the loans, in the event that the loans were not refinanced.

7.       The proceeds of the loans have largely disappeared.  Although some portion of the millions in cash extracted from the properties was used to build out an operating restaurant on York Road in the Govans neighborhood of Baltimore City (a property now worth a fraction of the amount Agbodjogbe claims to have invested in it) and another restaurant location on Howard Street in downtown Baltimore (which has never opened, despite years' worth of renovations); and a seven-figure total was pocketed by the lenders and brokers; much of the extracted equity remains unaccounted for.

8.       Agbodjogbe told various persons – his accountant, one of his attorneys, the IRS, and one or more of the Defendants – that the transfers from Ms. Al-Sabah were "gifts" to Agbodjogbe.  Agbodjogbe never suggested as much to Ms. Al-Sabah, and never communicated or memorialized that contention in any way that got back to her, or was likely to.  Ms. Al-Sabah learned of this contention just prior to filing suit against Agbodjogbe.

9.       The Defendants questioned the veracity of Agbodjogbe's "gift" explanation, but suspended their disbelief (and customary/businesslike underwriting protocols) in favor of participating in the spoils of the fraudulent conspiracy.

10.      The Defendants could have prevented most, if not all, of the damage to Ms. Al-Sabah by making a simple phone call to her asking her to verify that, as Agbodjogbe pretended, she had inexplicably showered millions of dollars on him as "gifts."  The brokers and lenders knew that Ms. Al-Sabah funded "Agbodjogbe's" purchases of the various properties, and they knew that it made no sense that he would, in any legitimate fashion, buy the properties with cash and then mortgage the purchase money right back out of them.  They knew that the loan scheme

could not serve a legitimate purpose.  They could have exposed Agbodjogbe's fraud.  Instead, sensing opportunities to line their own pockets, they joined and facilitated the fraudulent scheme, setting in motion the series of transactions that have left Ms. Al-Sabah with next to nothing to show for her millions of dollars in investments.

## PARTIES

11.     Ms. Al-Sabah is a citizen and resident of Kuwait.  Ms. Al-Sabah is engaged in a number of charitable pursuits throughout the world.  Her charitable activities include providing support for schools, medical clinics, water projects, food campaigns, and medical campaigns in Africa.  Ms. Al-Sabah has also supported charitable causes in the United States, such as facilitating construction of an Islamic burial center and cemetery in the Denver, Colorado area. The beneficiaries of her efforts include the poor, those without access to proper nutrition and medical treatment, and Syrian refugees.  Although well-traveled and well-educated, Ms. Al-Sabah had little prior experience in business, and particularly little experience in business as conducted in the United States through wire transfers and limited liability corporations.  As a result, she relied on Agbodjogbe to direct her in the proper logistics and details of these transfers and transactions.

12.     WBL is a Delaware limited liability company with its principal place of business in New Jersey.

13.     Bobby Williams is or was an employee of WBL and, on information and belief, is domiciled in the State of Texas.

14.     Uptown purports to be a business entity with operations New York, New York.

15.     On information and belief, Kenneth Williams is the alter ego/owner/principal of Uptown and is domiciled in the State of Texas or the State of New York.

16.    Sharestates is a Delaware limited liability company with its principal place of business in New York.

17.    IRM is a New York limited liability company with its principal place of business in New York.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000 and is between citizens of the United States and a citizen of a foreign state.  This Court also has jurisdiction to order declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

19.    This Court has personal jurisdiction over the defendants pursuant to the Maryland long-arm statute, Maryland Courts & Judicial Proceedings Code, section 6-103, in that each of the defendants has:  contracted to supply goods, food, services, or manufactured products in the State; caused tortious injury in the State by an act or omission in the State; and/or has an interest in, uses, or possesses real property in the State.  Each Defendant has purposefully availed himself or itself of the benefits and privileges of the laws of the State of Maryland, namely by profiting from mortgage loans secured by real property located in Maryland.

20.    Venue is proper in the District of Maryland because a substantial part of the events giving rise to the claims in this civil action occurred in this judicial district.  28 U.S.C. § 1391.

## FACTUAL BACKGROUND

21.    On June 30, 2014, while in Baltimore, Maryland to visit her daughter, Ms. Al-Sabah purchased $8,000.00 of Halal food as a donation to members of a nearby Mosque that

recently had its kitchen destroyed by a fire.  Ms. Al-Sabah purchased the food from Nailah's

Kitchen, a Halal restaurant owned by Jean Agbodjogbe ("Agbodjogbe").  Agbodjogbe

introduced himself to Ms. Al-Sabah and, apparently sensing an opportunity, set out to gain

Ms. Al-Sabah's trust and entice her to "invest" with him.

22.     To this end, after returning to Kuwait, Ms. Al-Sabah received regular

communications from Agbodjogbe confirming that the meals she purchased had been prepared

and delivered as she requested.  Agbodjogbe gained Ms. Al-Sabah's trust by discussing their

shared Muslim faith and falsely claiming a shared desire to continue charitable work for the

Baltimore community.

23.     On information and belief, given Ms. Al-Sabah's initial charitable contribution,

Agbodjogbe saw an opportunity and embarked on a fraudulent scheme to convince Ms. Al-Sabah

to send him money under the false representation that it would be used for charitable purposes,

but which would instead be misappropriated for Mr. Agbodjogbe's own personal benefit.

24.     Agbodjogbe's first step in this fraudulent scheme was to convince Ms. Al-Sabah

to partner with him in his fledgling restaurant business by falsely representing that the profits

from the restaurant could provide a way for the two of them to continue doing charitable work

together.  Ms. Al-Sabah trusted Agbodjogbe's representations that she would be a part owner and

that Agbodjogbe was committed to using the restaurant as a way to raise funds to contribute to

charitable causes.

25.     Agbodjogbe lied about making Ms. Al-Sabah a part owner.  Mr. Agbodjogbe's

claims that he was intent on doing charitable work were also false.  Instead, on information and

belief, Ms. Agbodjogbe's intent was to take Ms. Al-Sabah's money under this false pretense and

then misappropriate it to himself.

26.     After some discussions, Ms. Al-Sabah agreed to invest in Agbodjogbe's restaurant business in return for a fifty percent (50%) ownership interest in the operating entity, N&A Kitchen, LLC ("N&A").  Ms. Al-Sabah's understanding was that her share of the profits from N&A would be used for charitable purposes.

27.     With this charitable purpose in mind, and relying upon Agbodjogbe's false representations that she would be a part owner, Ms. Al-Sabah agreed to wire money to Mr. Agbodjogbe.  Specifically, by mid-October 2014, Ms. Al-Sabah had wired $150,000 to an account controlled by Agbodjogbe (although Ms. Al-Sabah understood it to be for an entity in which she and Agbodjogbe then shared ownership) for the express purpose of funding her share of the restaurant business.  Ms. Al-Sabah sent the money with the understanding and belief that her share of the profits from N&A would be used for charitable purposes.

28.     Although N&A initially was set up as a 50/50 enterprise, Agbodjogbe never followed through on that ownership structure, and eventually subverted it to an LLC in which he was the sole member.  Similarly, and unbeknownst to Ms. Al-Sabah, Agbodjogbe formed another entity, N&A Kitchen II, LLC ("N&A II"), with himself as its sole member, that he used in furtherance of his scheme.

29.     Over the next several months, through frequent communication regarding their charitable activities and the restaurant, Agbodjogbe continued to cultivate Ms. Al-Sabah's trust and confidence.  For instance, he frequently referred to her as his "Muslim sister," shared about his Muslim faith and attempts to convert his father and wife to the faith, exhibited a (false but convincing) passion for charity work, and repeatedly declined any compensation for his efforts to assist her.  These actions and others, along with their seemingly successful and ongoing

collaboration on the restaurant, nourished Ms. Al Sabah's sense of trust and common purpose with Agbodjogbe.

30.     Seizing on the trust he had inspired in Ms. Al-Sabah, Agbodjogbe expanded the scope of his fraudulent scheme.  In late 2014, Agbodjogbe recommended that Ms. Al-Sabah invest in the redevelopment of properties in Baltimore's "Howard Street Corridor," an area of the city rife with urban decay.  After further discussions between the two, and based on the trust that Agbodjogbe had manipulatively cultivated, Ms. Al-Sabah determined that she would make personal investments in the Howard Street Corridor. As with the profits from her purported interest in N&A, Ms. Al-Sabah's intent and understanding was that a portion of the income from her investments would be earmarked for charitable endeavors in the Baltimore area.  Agbodjogbe repeatedly misrepresented to Ms. Al-Sabah that this was his intent and understanding as well.

31.     Because Ms. Al-Sabah wished to remain anonymous, Agbodjogbe recommended that she establish an investment entity to hold her personal investments.  Relying on Agbodjogbe's recommendation, Ms. Al-Sabah asked Agbodjogbe to form 9 Jewels, LLC ("9 Jewels") as a vehicle for the purchase of investment properties.  Ms. Al-Sabah was to be 9 Jewels' sole member.  Agbodjogbe represented that by creating 9 Jewels, she would be the beneficial owner of all property purchased by 9 Jewels.

32.     Agbodjogbe told Ms. Al-Sabah that he formed 9 Jewels on Ms. Al-Sabah's behalf and that Ms. Al-Sabah was the sole member and owner of 9 Jewels.  Once again, Agbodjogbe lied.  Instead, he formed 9 Jewels for his personal/individual exclusive benefit, with himself as the sole member.  The 9 Jewels formation paperwork was filed with the State of Maryland in early March 2015.

33.     From September 2014, throughout 2015, and into 2016, Agbodjogbe repeatedly misrepresented to Ms. Al-Sabah that she was a 50% owner of N&A and that she was a 100% owner of 9 Jewels.  He never mentioned N&A II.

34.     Still unaware of Agbodjogbe's usurpation of her membership interests in N&A and 9 Jewels, and relying on Agbodjogbe's investment recommendations, Ms. Al-Sabah wired Agbodjogbe approximately $3,130,941.34.53 across several transactions between October 2014 and June 2015.  Ms. Al-Sabah directed Agbodjogbe to use these funds to purchase and renovate certain investment properties in Baltimore's Howard Street Corridor in the name of 9 Jewels.  Ms. Al-Sabah did so based upon Agbodjogbe's representations that profits generated by those properties would be hers.

35.     Using the funds entrusted to him by Ms. Al-Sabah, Agbodjogbe purchased, among other properties and things:

    a.   327 N. Eutaw Street in the name of N&A on or about February 11, 2015 for $180,000;

    b.   400 N. Howard Street in the name of N&A on or about March 17, 2015 for $139,000; and

    c.   306-10 N. Howard Street in the name of 9 Jewels on or about March 19, 2015 for $545,000 (collectively the "Howard Street Properties").

36.     Following these purchases, Agbodjogbe told Ms. Al-Sabah that she was the beneficial owner of the Howard Street Properties.  But again Agbodjogbe was lying.  And, Agbodjogbe actively concealed the fact that he had actually purchased the Howard Street Properties using entities he alone controlled, and that Ms. Al-Sabah, on paper, did not have any membership interest in 9 Jewels or N&A.

37.     After purchasing the Howard Street Properties, Agbodjogbe used some of the money Ms. Al-Sabah invested to retain various contactors, architects, and construction companies to renovate 306-10 N. Howard Street and 327 N. Eutaw Street.  However, Agbodjogbe also used some of the money that Ms. Al-Sabah entrusted to secretly purchase real estate in his own name that he never discussed with Ms. Al-Sabah.

38.     On or about, January 28, 2015, without Ms. Al-Sabah's explicit or implicit permission, Agbodjogbe used some of the funds entrusted to him by Ms. Al-Sabah for purchasing and improving the Howard Street Properties to purchase a personal residence in his own name at 103 Mt. Wilson Lane, Pikesville, Maryland 21208 for $469,000.00 (the "Pikesville Home").  Ms. Al-Sabah was not aware of Agbodjogbe's purchase of the Pikesville Home and did not authorize Agbodjogbe to use her money for that purpose.

39.     Similarly, on August 20, 2015, without advising Ms. Al-Sabah, and without her permission, Agbodjogbe used Ms. Al-Sabah's money to purchase the real property at 5722 York Road in Baltimore, Maryland (together with the Howard Street Properties and the Pikesville Home, the "Maryland Properties") for $525,000 in the name of 5722 York Road, LLC, an entity that Agbodjogbe had formed with himself as the sole member.  Ms. Al-Sabah did not know about the formation of 5722 York Road, LLC, and did not approve the use of her money to purchase real property in its name.

40.     Reasonably believing that Agbodjogbe had purchased all of the Howard Street Properties through 9 Jewels, and that she owned and controlled 9 Jewels, Ms. Al-Sabah provided an additional $2,051,363.19 from August 2015 to April 2016 for the purpose of completing the renovation of those properties.

41.     In total between October 2014 and April 2016, Ms. Al-Sabah wired to Agbodjogbe or entities he surreptitiously controlled over $5 million for the express purpose of purchasing and improving properties that Ms. Al-Sabah reasonably believed she owned.  Ms. Al-Sabah never intended any of these transfers as gifts to Agbodjogbe.  To the contrary, in making these transfers, Ms. Al-Sabah relied upon Agbodjogbe's representations that the money would be used to purchase properties in her name and renovate properties she owned through her wholly owned investment vehicles.  At no point did Ms. Al-Sabah know or have reason to know that Agbodjogbe fraudulently titled the Maryland Properties in the name of entities he owned, nor did she know Agbodjogbe had misappropriated certain funds to purchase property in his own name.

42.     Based on her (misplaced) trust in Agbodjogbe, in July 2015 Ms. Al-Sabah asked Agbodjogbe to assist her in locating and purchasing an apartment in New York City for her daughter to live in while pursuing her graduate studies in New York City.  Desiring to protect her privacy, Ms. Al-Sabah directed Agbodjogbe that she wished to purchase the property through 9 Jewels, which Ms. Al-Sabah reasonably believed was her wholly-owned investment vehicle. Indeed, Agbodjogbe had represented that Ms. Al-Sabah was the sole member and owner of 9 Jewels, and Ms. Al-Sabah had reasonably believed Agbodjogbe's representation.

43.     Agbodjogbe worked with a realtor in New York City to locate multiple prospective properties that Ms. Al-Sabah might purchase.  After Ms. Al-Sabah toured a condominium located at 325 Fifth Avenue, Apartment 11C (the "NY Property" and together with the Maryland Properties, the "Properties") in person, Ms. Al-Sabah told Agbodjogbe to purchase the NY Property through 9 Jewels, which Ms. Al-Sabah reasonably believed was her wholly owned investment vehicle.

44.     To fund the purchase of the NY Property, Ms. Al-Sabah wired the purchase amount of $2,110,000.00 in separate transfers on July 15, 2015 and August 6, 2015.

45.     Agbodjogbe completed the purchase of the condominium through 9 Jewels on or about September 3, 2015.  Agbodjogbe subsequently told Ms. Al-Sabah that she was now the owner of the NY Property (through 9 Jewels) and that her daughter could move into the NY Property.  Once again, Agbodjogbe fraudulently concealed that he was in fact the sole member of 9 Jewels, and thus had fraudulently titled ownership of the NY Property in an entity he owned.

46.     Based on her reasonable reliance on Agbodjogbe's misrepresentations that she owned 9 Jewels, and therefore, the NY Property, Ms. Al-Sabah had her daughter move into the NY Property as Ms. Al-Sabah had planned from the beginning.

47.     As a result of condominium association rules which required a lease for non-owner occupants of all condominiums, Ms. Al-Sabah's daughter signed a lease with 9 Jewels that had her paying monthly "rent" in an amount equal to the monthly condominium fees and taxes.

48.     Having fraudulently titled the Properties in his own name or in the name of entities he fraudulently controlled, Agbodjogbe embarked on the next phase of his scheme – extracting as much equity as possible from the Properties using fraudulently obtained mortgage loans.  This undertaking (the "Conspiracy") required the active assistance of the Defendants.

49.     In furtherance of the Conspiracy, and soon after 9 Jewels purchased the NY Property, Agbodjogbe attempted to obtain conventional "cash out" mortgages on the Properties. However, on information and belief, Agbodjogbe was unable to obtain a mortgage on the Properties from a reputable lender because such lenders were subject to well-established underwriting policies in the mortgage industry that would have exposed his scheme and the fact

that he did not own the properties.  Any lender would have recognized the ownership sham in the course of ordinary underwriting due diligence.

50.     Among other things, well-established underwriting policies in the mortgage industry provide that when underwriting a mortgage, a lender must assess whether the prospective borrower has the financial ability to repay a loan.  In making this assessment, the lender must determine the source of funds that the borrower will use to repay the loan.  As a result, a lender normally requests that a prospective borrower provide proof of income in the form of pay stubs, W-2s, and/or bank or business records evidencing a recurring income stream from legitimate, verifiable sources.

51.     In addition, and as relevant in this case, when a lender observes that a prospective borrower has received large cash transfers into his or her bank accounts, the lender must ensure that those funds belong to the prospective borrower and not someone else, and that they are neither loans nor from illegitimate or unlawful sources.  The customary method for verifying that deposits in a prospective borrower's bank account belong to that borrower is to contact (with the borrower's consent) the person or entity that transferred those funds to the prospective borrower to obtain a letter or other written verification that the transferor of the funds in question disclaims any right to them (*e.g.*, that the funds belong to the prospective borrower and not the transferor).

52.     Therefore, because a reasonably diligent lender would have required confirmation from Ms. Al-Sabah that the wire transfers to Agbodjogbe were gifts (which would have resulted in Ms. Al-Sabah discovering Agbodjogbe's fraud), on information and belief Agbodjogbe knew from the outset, or promptly discovered, that he had to secure mortgage loans on the Properties from lenders willing to join his fraudulent scheme by intentionally and knowingly "looking the other way" where the Al-Sabah wire transfers were concerned.

14

53.     To find a lender willing to facilitate his scheme, Agbodjogbe enlisted Kenneth Williams, a "hard money" loan broker with Uptown.  Uptown's website contains the following description of its business:

> We fund loans through private sources such as Private Equity Funds, Hedge Funds, and other direct lending sources not otherwise directly available to Small Business Owners.  Our capital relationships, in-house underwriting, and process/technology can reduce the process by weeks and result in the best fit.  ***We start where the banks stop, funding deals banks don't understand or approve.***

(emphasis added).  Indeed, Agbodjogbe's proposed transactions were transactions that reputable "banks don't understand or approve."

54.     Consistent with its "hard money" reputation, Uptown and Kenneth Williams operate on the internet without revealing the address of any fixed base of operations.

55.     When presented with "Agbodjogbe's" portfolio of unencumbered real estate purchased with cash within the last year, a reasonable broker or lender would have investigated the source of Agbodjogbe's funds.  Indeed, given Agbodjogbe's relatively modest cash flow from his restaurant operations from a single location in Baltimore, Kenneth Williams should have known that Agbodjogbe used some other source of money to acquire the properties that he was attempting to mortgage.

56.     On information and belief, Kenneth Williams was aware that the real estate in question had been purchased using Ms. Al-Sabah's money, and nevertheless agreed to work to obtain mortgages on those properties for Agbodjogbe without contacting Ms. Al-Sabah to confirm that the money she provided was gifted to Agbodjogbe, as Agbodjogbe has claimed (then and subsequently).  Further, on information and belief, Kenneth Williams—acting at all times in both his individual capacity and on behalf of Uptown—and Agbodjogbe conspired to conceal their fraudulent activities from Ms. Al-Sabah.

57.     As a commercial loan broker specializing in "hard money" loans, Kenneth Williams knew which lenders would be willing to relax (or ignore) underwriting norms in order to ensure that he and Agbodjogbe profited from a fraudulently obtained loan. One of the individuals with whom Kenneth Williams had such a relationship was Bobby Williams, then affiliated with WBL.

58.     On October 6, 2015, just over a month after Agbodjogbe had purchased the NY Property on behalf of Ms. Al-Sabah (but titled it in the name of 9 Jewels), Kenneth Williams e-mailed Bobby Williams to ask whether WBL could use the NY Property, 306-10 N. Howard Street, 327 N. Eutaw Street and/or 5722 York Road as collateral for a business loan. Kenneth Williams explained that the value of Agbodjogbe's real estate was over $3.3 million, and that Agbodjogbe would like to avoid using the NY Property as collateral if possible.

59.     On information and belief, Kenneth Williams and/or Agbodjogbe told Bobby Williams that these properties were purchased with Ms. Al-Sabah's money. Further on information and belief, Bobby Williams knew or should have known that Ms. Al-Sabah did not gift the money and/or Properties to Agbodjogbe and that Ms. Al-Sabah was unaware of Agbodjogbe's fraud and the ongoing Conspiracy. With this knowledge, on information and belief, Bobby Williams agreed to join the Conspiracy and assist Agbodjogbe and Kenneth Williams in extracting equity from the Properties by committing mortgage fraud.

60.     To this end, Bobby Williams and Kenneth Williams assisted Agbodjogbe in applying for and obtaining preliminary approval for a loan from WBL secured by 306-10 N. Howard Street. WBL's preliminarily approval letter indicated that as part of the underwriting process further documentation was necessary from Agbodjogbe.

61.     Specifically, as part of its due diligence in underwriting a mortgage, WBL's underwriting guidelines required that a prospective borrower provide proof of their ability to repay a loan.  Consistent with this requirement, WBL required that Agbodjogbe provide his bank records (and those of the entities he controlled) in order to prove that he had the ability to repay the loan for which he applied.

62.     As a preliminary matter, Agbodjogbe's bank records covering the relevant time frame were characterized by frequent large transfers between accounts, large incoming and outgoing wire transfers, and an unusually large number of significant cash withdrawals in the form of cashier's checks, all in the accounts of a person/business with modest cash flows not nearly sufficient to support the scale of the wire transfers, deposits, and withdrawals included in those account records.  To anyone taking a reasonable look at these transfers in conjunction with any loan for which Agbodjogbe applied, the transfers would have been inconsistent, in timing and amount, with any revenues that Agbodjogbe could possibly have been generating at the relevant times from any restaurant or other business operation with which he claimed to be associated.  In fact, Agbodjogbe's financial records and his history of large cash transactions were so suspect that at least one (and possibly all four) of his prior banks closed his accounts based on suspicions that he was engaged in money laundering.  As a result, Agbodjogbe switched banks four times over a two-year period.  Any reasonable lender would have viewed Agbodjogbe's bank records and frequent changing of banks as a major red flag.

63.     Not surprisingly, upon reviewing Agbodjogbe's bank records, WBL observed that Agbodjogbe, via 9 Jewels and N&A, had received many large international wire transfers in the past year from a foreign account.  On December 28, 2015, WBL's underwriters informed Bobby

Williams that Agbodjogbe would have to prove where those wire transfers were coming from, and why.

64.     On information and belief, when Bobby Williams told Kenneth Williams and Agbodjogbe that WBL was asking for documentation about the wire transfers, Kenneth Williams, Bobby Williams, and Agbodjogbe agreed that Agbodjogbe should lie to WBL's underwriting department in an attempt to conceal Ms. Al-Sabah's connection to Agbodjogbe, the length and significance of her business relationship with Agbodjogbe, and/or her intent as the source of the funds.

65.     In furtherance of the Conspiracy, according to Agbodjogbe's sworn testimony, Bobby Williams coached Agbodjogbe "off the record" on exactly what to say to WBL's underwriting department in order to avoid disclosing Ms. Al-Sabah's role as the sole source of funding for the properties, thereby getting his loan application approved, although they understood that doing so required Agbodjogbe to lie to WBL's underwriting department.  The common goal was to avoid having WBL underwriting ask to speak to Ms. Al-Sabah, because if WBL had contacted her to ask about a loan to be secured by the properties, Ms. Al-Sabah would have discovered the fraudulent scheme.

66.     On information and belief, and based on Agbodjogbe's sworn testimony, Bobby Williams coached Agbodjogbe on how to lie to WBL's underwriting department because, upon a successful funding of the loan, he would receive a sizable commission.

67.     Likewise, on information and belief, Kenneth Williams was aware of and agreed to assist in helping Agbodjogbe lie to WBL, because he also stood to receive a sizeable broker's fee if a loan was funded.

68.     In January 2016, WBL's underwriting department called Agbodjogbe to discuss his loan application and, in particular, the large wire transfers he had received from Ms. Al-Sabah dating back to September of 2014—an amount totaling over $7.1 million.  In particular, WBL wanted to know how Agbodjogbe had purchased 306-10 N. Howard Street in cash (*i.e.*, without financing).

69.     Audio recordings of the phone call between WBL and Agbodjogbe obtained in discovery by Ms. Al-Sabah reveal that Agbodjogbe repeatedly lied to WBL's underwriter/interviewer.  Emails and other records obtained from WBL confirm that WBL learned of Mr. Agbodjogbe's many misrepresentations.  Moreover, Agbodjogbe's sworn testimony is that he did not tell the truth during his phone calls with WBL's underwriting department because he was coached by Bobby Williams on what to say in order to obtain a loan for which he would not have qualified if he had told the truth.

70.     Agbodjogbe's explanation to WBL of the wire transfers he had received was not credible, objectively or to the underwriter interviewing him.  Agbodjogbe first told WBL that the wire transfers were from an "investor he worked with overseas."  When WBL's underwriter asked for more information about the "investor," Agbodjogbe explained that his "investor" was "more of a business partner," and that his "business partner" had provided all of the funds he used to purchase "all of the properties," but "had no ownership" interests in any of the properties.

71.     When WBL's underwriter pressed Agbodjogbe further, he changed his explanation again, this time explaining that his "business partner" was actually a "personal friend" who was a member of a royal family. Agbodjogbe then explained that he received large wire transfers from his investor/business partner/personal friend every six months, and was expecting to receive $850,000 by July 2016.

19

72.     In addition to his in-credible and ever-changing explanation of the wire transfers, and based on the specific instructions that he received from Bobby Williams, Agbodjogbe misrepresented several other facts regarding his relationship with Ms. Al-Sabah and his claimed ability to repay a potential loan in order to have WBL's underwriting department approve his loan application.

73.     For instance, Agbodjogbe misrepresented that he had a "12-year personal relationship" with the person who sent him the wire transfers, even though, by that point, he had known Ms. Al-Sabah for less than two years.

74.     Likewise, when WBL asked Agbodjogbe about his plans for the proceeds of the loan for which he was applying, Agbodjogbe responded that he was going to use $200,000 of loan proceeds to replenish his children's education savings account(s), from which he had borrowed funds to cover expenses in his restaurant business.  In fact, Agbodjogbe's children did not have a savings account – then or ever – and he had lied about having access to such funds. WBL's underwriters knew or should have known that Agbodjogbe's story about the children's accounts was a fiction, because despite asking for documentation showing the existence of and Agbodjogbe's access to these accounts, they never received any such documentation.

75.     WBL did not ask for the name or contact information for the person who sent Agbodjogbe the large wire transfers.  Instead, the WBL representative asked Agbodjogbe to provide his own tax returns.

76.     Similarly, WBL did not demand records of the aforementioned education savings accounts (which accounts never existed).

77.     In sum, during his January 2016 call with WBL's underwriting department, Agbodjogbe, coached by Bobby Williams, intentionally and knowingly misrepresented: 1) that

the sums he received from Ms. Al-Sabah were gifts, even though he knew they were not; 2) that

he had known Ms. Al-Sabah for 12 years, even though they originally met in June 2014; and

3) that he had borrowed and invested in his restaurant $200,000 from his children's savings

account(s), even though no such account ever existed.  On information and belief, Agbodjogbe

made each of these misrepresentations at the direction of Bobby Williams and/or Kenneth

Williams in order to achieve the Conspiracy's goal of extracting equity from the Properties by

way of fraudulently obtained mortgages.

78.     Each of the above-described misrepresentations could and would have been

exposed by even a modicum of businesslike follow-up by WBL.  On information and belief,

WBL did not undertake such follow-up efforts because they knew the results of any such follow-

up efforts would have scuttled the loan, costing WBL the considerable profits they stood to gain

from the fraudulent loan.

79.     On information and belief, WBL knew as he did so that Agbodjogbe

intentionally and knowingly misrepresented the various circumstances summarized above.

On January 22, 2016, WBL employee Yasmin Fakioglu expressed her concerns about

Agbodjogbe in an internal e-mail:

> The bank accounts provided, do not support the loan amount, as it has wires again,
> that cannot be explained. The client also had an argument with valuation stated that
> the 2nd floor [of 306-10 N. Howard Street] was A PLUS, and of course from pics
> we saw yesterday, they are not A PLUS, its not even completed. Client also stated
> that he was getting gifts and that they were reflected on his tax returns. They don't.
> Client also now is just giving us items. ***Client has been not truthful this whole
> time, and still has not been able to clear our minds behind the fact that he is
> potentially money laundering***. He has no proof on how he can afford our payments
> either.

(emphasis added). Thus, WBL knew that Agbodjogbe's story that the wire transfers from

Ms. Al-Sabah were a gift was unsupported by anything other than Mr. Agbodjogbe's say-

so, which WBL knew could not be trusted.  They suspected all along (even discussing the possibility, in internal e-mails, on January 22) that Agbodjogbe was laundering money, and yet WBL—as alleged *infra*—nevertheless chose to support the scheme by making the loans that cashed out to Agbodjogbe the equity in the properties he had fraudulently purchased using Ms. Al-Sabah's money, while also delivering hundreds of thousands of dollars in ill-gotten gains to the Lender Defendants, Kenneth Williams, Bobby Williams and others who profited from the loan closings.

80.     On January 22, 2016, Bobbie Williams emailed Agbodjogbe as follows:

> Your loan with World Business Lenders has been approved ***but the underwriting department has made a decision not to allow for the large one time deposits to be used in our internal calculations used to gauge your ability to pay back the loan going forward***. Since these deposits are not going to be considered standard business revenue we will need to base the calculation on real business revenues. Underwriting is working diligently to get this completed and funded so they will allow you to give us projected revenues expected going forward to use in their calculations.

(emphasis added).  Thus, WBL's underwriting department concluded as of that date that the wire transfers reflected in Agbodjogbe's account statements could not be relied on as evidence of his ability to repay any loan.  Agbodjogbe, despite being coached by Bobby Williams and Kenneth Williams to lie to the underwriters, did not meet even WBL's "hard money" requirements to qualify for a loan.

81.     On or around January 25, 2016, WBL called Agbodjogbe's accountant, David Leichter, C.P.A., to discuss the tax returns Agbodjogbe had provided to WBL. Mr. Leichter told WBL that the wire transfers were coming from a "princess" in Kuwait whom Agbodjogbe had met while she was visiting the US.  Mr. Leichter also told WBL that the total amount of money Agbodjogbe received in 2015 had increased substantially

from the 2014 amount and would "blow your mind." WBL did not ask Leichter for the source of his information. Had they asked that simple, obvious question, they would have been told that Leichter, having never met or spoken to Ms. Al-Sabah, was merely parroting what Agbodjogbe had told him.

82.     Presumably because WBL's underwriting department decided "not to allow for the large one time deposits to be used in [its] internal calculations used to gauge [Agbodjogbe's] ability to pay back the loan going forward," and because Agbodjogbe was unable to substantiate other lies he told regarding the $200,000 bank account he had access to and the condition of the property he intended to use as collateral, he withdrew his January 2016 loan application.

83.     Despite his inability to substantiate his many misrepresentations to WBL, Agbodjogbe renewed negotiations with WBL to secure a loan in April 2016. This time, Agbodjogbe sought to obtain a loan using the NY Property, presumably that property (which was not in the midst of renovations) was "cleaner" collateral.

84.     WBL overlooked all of the indicia of fraud that it had learned about during its discussions with Agbodjogbe in January 2016. For example, WBL ignored Agbodjogbe's highly suspect bank records, which they had previously determined included signs of "money laundering." WBL also ignored their determination that Agbodjogbe was untrustworthy; and never followed-up to confirm that Agbodjogbe had borrowed $200,000 from his children's college savings account. WBL never sought to learn the identity of or contact Ms. Al-Sabah, the "princess" they were told was the source of the large wire transfers Agbodjogbe claimed were gifts. Nor did they otherwise seek any confirmation of Agbodjogbe's relationship with "the princess" or otherwise confirm that the transfers were legitimate gifts of millions of dollars.

85.     In a Business Loan Application form signed by Agbodjogbe as of May 16, 2016, Agbodjogbe represented that N&A had monthly revenue of $150,000.  He has since testified under oath that the monthly revenue as of April 2016 was "close to" $60,000.  Both numbers are significantly overstated.  Any reasonable review of N&A's financial records, which WBL undertook (or should have, unless it was acting with willful ignorance), would have revealed to WBL that the claimed monthly revenue of $150,000 was a fiction.  They appear not to have questioned that figure at all.

86.     If WBL had sought to explore or follow-up on any of these misrepresentations in earnest, Ms. Al-Sabah would have discovered Agbodjogbe's fraud.  It is reasonable to infer from the fact that WBL did not even attempt to do this due diligence that they knew about and were willing participants in the Conspiracy to defraud the true equitable owner of the NY Property that would backstop the loan (Ms. Al-Sabah).

87.     Further evidence of WBL's fraudulent intent and participation in the Conspiracy is the additional indicia of fraud WBL learned about, and then ignored, during its underwriting investigation in April and May of 2016.  For example, WBL knew that Agbodjogbe received a wire transfer of $325,000 on April 18, 2016 from an individual identified in Agbodjogbe's April bank statement as "ALSHAIKHA ALIA SALEM AL-S."  From its underwriting call with Agbodjogbe, WBL learned that the NY Property was purchased with funds that Agbodjogbe had received from Ms. Al-Sabah.

88.     When WBL asked Agbodjogbe about the wire transfers from Ms. Al-Sabah, Agbodjogbe falsely told WBL that the wire transfers were gifts from a friend of his with whom he had "a personal relationship for more than ten years."  WBL, however, once again ignored the opportunity to contact Ms. Al-Sabah or otherwise confirm what Agbodjogbe had told them about

the nature of the funds used to purchase the property that was to collateralize the loan.  If WBL had contacted Ms. Al-Sabah, she would have learned of Agbodjogbe's fraud.

89.     Further, based on the "coaching" he received from Bobby Williams and/or Yasmin Fakioglu (both of whom knew that Agbodjogbe was not being truthful), Agbodjogbe misrepresented to WBL that he rented the NY Property to a friend of his that he had known for over 5 years and that his friend had not signed a lease.  And, Agbodjogbe misrepresented to WBL that the person living in the apartment was not related to Ms. Al-Sabah.

90.     At all times relevant to this dispute however, the occupant of the NY Property was one of Ms. Al-Sabah's daughters, who had indeed signed a lease with 9 Jewels.  On information and belief, WBL knew that Agbodjogbe was lying and that Ms. Al-Sabah's daughter was living in the apartment.  In any event, it would have been easy enough for WBL's experienced underwriters to confirm the identity of the occupant of the apartment.  On information and belief, they chose not to do so because making and closing the loan was paramount, and the loan, which was likely to be refinanced eventually, even with its usurious terms, was more than sufficiently collateralized by the market value of the property.

91.     On information and belief, WBL knew that Ms. Al-Sabah's wire transfers were not gifts to Agbodjogbe.  WBL knew that Ms. Al-Sabah had provided the purchase money for the NY Property and that Ms. Al-Sabah's daughter lived at the NY Property, a strong indicator that the true owner of the property was, in fact, Ms. Al-Sabah.  Further, given the modest income from Agbodjogbe's restaurant operations, WBL knew that the only way Agbodjogbe would be able to pay back a large mortgage on the NY Property was via refinancing, by using funds he received from Ms. Al-Sabah, or from some source other than the restaurant's recurring cash flow.

92.     Despite these facts, WBL made no effort to confirm that the money Ms. Al-Sabah had transferred to Agbodjogbe was a gift, and that more such "gifts" were promised to follow, and merely accepted Agbodjogbe's explanation without reasonable inquiry.  Instead, WBL was relying on the fact that their mortgage on the property, no matter who actually owned it, would protect WBL and transfer any loss occasioned by a default on the loan to the owner of the collateral.  They knew or should have known that the equitable owner was Ms. Al-Sabah.

93.     On May 25, 2016, WBL executed a mortgage for $600,000.00 on the NY Property (the "First WBL Mortgage").  On information and belief, WBL ignored the aforementioned indicia of fraud and joined the Conspiracy in order to profit from the usurious terms of the First WBL Mortgage.  Indeed, the terms of the First WBL Mortgage were extraordinary, projecting interest payments over the course of the two-year loan totaling more than $414,000.  On a $600,000 loan, that was an annual interest rate in excess of 34%, not including fees and costs other than interest, which further increased the effective APR.  These terms, and the dollar amount that WBL stood to gain from them, evidence WBL's clear motive to join the Conspiracy.  No rational borrower in Agbodjogbe's position, with his modest cash flow and minimal financial resources, would or could have taken on a loan according to such terms unless all concerned had no expectation that the loan would be repaid.

94.     On information and belief, both Kenneth Williams and Bobby Williams received significant commissions as a result of referring Agbodjogbe to WBL in January of 2016.  WBL also benefitted financially from the First WBL Mortgage by collecting usurious interest payments, fees, and penalties from Agbodjogbe.

95.     Almost immediately after extracting many hundreds of thousand dollars in equity from the NY Property, which subsequently "disappeared," Agbodjogbe informed WBL, on or

about May 27, 2016, that he wanted to obtain a second hard money loan secured by the NY Property.  WBL's agreement to eventually fund this additional loan is further evidence of WBL's fraudulent intent and participation in the Conspiracy beginning in May 2016.  In addition to once again ignoring the numerous red flags of which WBL already was aware of, WBL learned of several additional red flags which they likewise ignored.

96.     For instance, recorded telephone calls between WBL and Agbodjogbe in August 2016 confirm that WBL knew that Ms. Al-Sabah was the person responsible for sending the wire transfers (even though WBL knew or should have known Ms. Al-Sabah's identity in May 2016 based on her name appearing in Agbodjogbe's April 2016 bank records).

97.     These recordings also demonstrate that Agbodjogbe once again changed his story regarding his relationship with Ms. Al-Sabah.  Contrary to his prior misrepresentation that Ms. Al-Sabah was a business partner, Agbodjogbe told WBL that Ms. Al-Sabah was a "personal friend" from Kuwait that he had "known for ten years."  Agbodjogbe also told WBL that Ms. Al-Sabah gave him money whenever he needed it with "no questions asked."  On information and belief, WBL knew these representations were false, and/or willfully ignored the suspect information.  Indeed, under the circumstances known to WBL, such representations were ludicrous on their face:  Why would someone claiming "on-demand" access to hundreds of thousands (or millions) of dollars borrow money from a "hard money" lender on such onerous terms?

98.     Faced with inconsistent, often contradictory information, any commercially reasonable lender – even a "hard money" lender seeking to enter into a legitimate transaction – would have contacted Ms. Al-Sabah to confirm that the wire transfers to Agbodjogbe were gifts. WBL, evidencing its fraudulent intent, never even attempted to contact Ms. Al-Sabah or

otherwise conduct any reasonably appropriate due diligence on the wire transfers Agbodjogbe had received from her. Indeed, WBL never asked Agbodjogbe why an individual with what he claimed to be virtually unlimited access to six-figure sums "on demand" would need loans with extraordinarily high interest rates, costs, and fees that were more than fully secured by unencumbered residential real estate.

99.     Moreover, WBL never questioned why Agbodjogbe would have taken out the First WBL Mortgage, only to *immediately* tell WBL that he would be looking for more money in the future.

100.     Ignoring all of these red flags, on August 25, 2016, WBL executed a second mortgage on the NY Property for $639,528.31, which was subsequently consolidated with the First WBL Mortgage into a single $1.2 million mortgage pursuant to a Consolidation, Extension, And Modification Agreement dated August 26, 2016 (the "Second WBL Mortgage"). As a result of the Second WBL Mortgage, after paying for the initial loan and various transaction fees, Agbodjogbe received cash proceeds of $549,513.06.  That sum, too, subsequently disappeared.

101.     Once again, WBL's motivation for joining the conspiracy and turning a blind eye to Agbodjogbe's fraudulent scheme was the money it stood to make on the usurious terms of the Second WBL Mortgage.  Indeed, the terms of the Second WBL Mortgage were equally extraordinary, requiring interest payments over one year totaling more than $675,000.  On a $1.2 million loan, that was an annual interest rate in excess of 56%, not including fees and costs other than interest, which further increased the effective APR.  These lucrative terms—from WBL's vantage point—evidence WBL's clear motive to join the Conspiracy, as no reasonable transaction could proceed in good faith pursuant to those terms.  WBL knew, or should have known, that Agbodjogbe's claim of ownership to NY Property was false.

102.    Kenneth Williams received a commission in connection with the second mortgage due to his original referral of Agbodjogbe to WBL in December 2015.

103.    On information and belief, knowing that Agbodjogbe could not repay the Second WBL Mortgage, WBL, Bobby Williams, Agbodjogbe, and Kenneth Williams almost immediately began conspiring as to how they could keep the Conspiracy moving forward while continuing to profit from and minimize their risk in the undertaking.

104.    WBL was motivated to have Agbodjogbe refinance the NY Property so it could recoup the principal it had advanced in addition to collecting six-figure prepayment penalties from Agbodjogbe.  Kenneth Williams was also motivated to refinance the NY Property because it presented another opportunity to receive a broker fee.

105.    To this end, Agbodjogbe and Kenneth Williams went about seeking a new lender that would, like WBL, ignore the clear signs of fraud in exchange for Agbodjogbe agreeing to usurious loan terms.

106.    On October 27, 2016, Kenneth Williams e-mailed Sharestates to see if it would be willing to refinance the NY Property.  On November 1, 2016, Sharestates provided a Loan Term Sheet to Kenneth Williams that contemplated a $1.54 million loan at 11% interest and 4 points, and included an origination fee for Sharestates of $61,600.

107.    Sharestates, like WBL, has underwriting guidelines[1] of its own that require it to verify a prospective borrower's ability to repay a loan.  Given the modest income Agbodjogbe's

---

[1]    Sharestates website states that some of the factors it considers in its underwriting decision include the loan-to-value of a prospective loan, lien priority, the borrower's track record, the borrower's experience, the borrower's credit score and whether the borrower will execute a personal guarantee.  *See* https://www.sharestates.com/faq/sharestates-underwriting-process/.  There is no way that Agbodjogbe could have met any of these requirements relating to his personal creditworthiness.  Only the value of the NY Property and the first lien position would have favored making the loan, and even at that, only if Agbodjogbe was the true owner of the property, which Sharestates failed to reasonably investigate.

restaurant business generated, the two recent loans from WBL, and the willingness to pay $150,000 in prepayment penalties on the Second WBL Mortgage, Sharestates should and would have had serious doubts as to Agbodjogbe's ability to repay such a large loan.  It is therefore reasonable to infer that prior to funding any loan on the NY Property, Sharestates knew or should have known everything WBL had learned about Agbodjogbe.

108.    Sharestates also knew that just a year earlier, the NY property had been purchased with cash, ostensibly by Agbodjogbe, who was, as of October 2016, seeking to extract cash equal to 75% of its value.  And Sharestates knew that the cash used to purchase the NY Property came from Ms. Al-Sabah.

109.    Despite knowing these facts, Sharestates did not attempt to contact Ms. Al-Sabah.

110.    The terms of the Sharestates loan were commercially unreasonable.  First, as a result of the prepayment penalties Agbodjogbe had to pay WBL in order to refinance the NY Property and the other transaction costs, Agbodjogbe received *zero proceeds* from a refinance of the Second WBL Mortgage even though the principal value of the new mortgage with Sharestates would be $322,000 more than the Second WBL Mortgage. Second, the Sharestates loan required monthly *interest only* payments at the fixed rate of eleven percent per annum on the full principal balance—or approximately $14,951.67 per month—and a balloon payment for the entire principal balance on January 1, 2018.

111.    Agbodjogbe's willingness to agree to these terms was another red flag that any reasonably diligent lender would have investigated further to determine whether there was underlying fraudulent activity involving the property.

112.    Sharestates had also obtained a copy of the lease indicating that Ms. Al-Sabah's daughter was living in the apartment.  Thus, Sharestates knew that the person living in the NY

Property had the same surname as the person that Sharestates knew (or should have known) had transferred millions of dollars to Agbodjogbe, including the funds used to purchase the NY Property.  A reasonable conclusion to reach from these two facts is that Ms. Al-Sabah likely was the true owner of the NY Property.  Sharestates, however, made no attempt to contact Ms. Al-Sabah (or her daughter) to confirm whether she was aware of the loan transactions and had, in fact, gifted to Agbodjogbe the purchase money for the apartment securing the mortgage.

113.    Sharestates did not reasonably investigate how Agbodjogbe/9 Jewels was able to purchase a $2.11 million Manhattan apartment in cash, how Agbodjogbe would pay for a new $1.522 million loan on the NY Property using only funds from his restaurant operation, and why Agbodjogbe was obtaining a third "hard money" loan on the NY Property in the course of seven months.  It is reasonable to conclude that the reason Sharestates did not investigate these issues is because Sharestates knowingly joined and participated in the Conspiracy to convert the fraudulent apartment purchase into cash for Agbodjogbe and profits for Sharestates.

114.    Notwithstanding these numerous indicia of fraud and its failure to investigate, on December 14, 2016, Sharestates executed a mortgage in the amount of $1.522 million on the NY Property (the "Sharestates Mortgage").

115.    As he had with the First WBL Mortgage and the Second WBL Mortgage, Kenneth Williams received a sizable commission as a result of the Sharestates mortgage.

116.    In or around the spring of 2016, Ms. Al-Sabah began to grow suspicious of Agbodjogbe's behavior and motives.  While some of the agreed-upon improvements to the Howard Street Properties had been completed, others had not commenced despite Agbodjogbe's representations otherwise.  Agbodjogbe offered a series of explanations for the delays that were misleading and lacked credibility.  As a result, Ms. Al-Sabah demanded documentation relating

to the entities purportedly formed and transactions purportedly entered into by Agbodjogbe on her behalf.

117.    Ms. Al-Sabah's multiple requests for such documentation were met with further delays and misrepresentations, the termination of the attorney assisting with the various renovation projects, and a claim by Agbodjogbe that he had contracted malaria during a trip to his home country of Senegal.  Eventually, Agbodjogbe became completely unresponsive to Ms. Al-Sabah's attempts to communicate with him.

118.    Based on her suspicions and Agbodjogbe cutting off of all communication with her, in November 2016, Ms. Al-Sabah conducted an investigation into Mr. Agbodjogbe and his businesses and discovered his fraud.  Ms. Al-Sabah subsequently confronted Agbodjogbe through her lawyer in December of 2016.

119.    By early 2017, Agbodjogbe had defaulted on a $375,000 mortgage secured by 306-10 North Howard Street and 5722 York Road.  Unable to pay that mortgage off, and motivated by the threat presented by Ms. Al-Sabah's inquiries, Agbodjogbe and Kenneth Williams conspired to extract whatever equity remained in the various properties Agbodjogbe had fraudulently titled in his name or the name of entities that he fraudulently controlled.  Agbodjogbe, through and with the assistance of Kenneth Williams, sought to obtain an even larger loan on those two properties.

120.    Fully aware that Agbodjogbe had already obtained three "hard money" mortgages on the NY Property in less than a year, Kenneth Williams approached Riverdale Funding, LLC to obtain a loan for Agbodjogbe.  Despite the fact that the current mortgage was in default, and after conducting a woefully deficient due diligence investigation of Agbodjogbe's ability to repay any loan, Riverdale approved and brokered a loan for Agbodjogbe from Woodbridge

Investment Fund IV, LLC ("Woodbridge") to refinance the existing mortgage (the "Woodbridge Mortgage").

121.     On January 5, 2017, Kenneth Williams sent an e-mail to Riverdale Funding, LLC to see if it would underwrite a "hard money" loan secured by 306-10 N. Howard Street and 5722 York Road.  Kenneth Williams indicated that Agbodjogbe needed a loan to refinance an existing mortgage that was overdue, and was looking for a loan in the range of $800,000, with $415,000 towards paying off the prior mortgage, $150,000 for completing renovations on those two properties, and the balance for "working capital."

122.     That same day, Riverdale sent an approval package for a $960,000 loan secured by 306-10 N. Howard Street and 5722 York Road.  The proposed loan included a one-year interest holdback and expired the next business day.  Kenneth Williams added 2 points to the proposed loan for his broker fee and sent the loan approval package to Agbodjogbe.  Agbodjogbe accepted the loan offer on January 6, 2017.

123.     On February 21, 2017, Woodbridge Mortgage Investment Fund IV, LLC, (one of Riverdale's capital sources that then funded the loans that Riverdale underwrote) and Agbodjogbe executed a Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement as Fixture Filing secured by 306-10 N. Howard and 5722 York Road in the amount of $960,000 (the "Woodbridge Mortgage").

124.     As he had with the previous mortgages from WBL and Sharestates, Kenneth Williams received a sizable commission as a result of the Woodbridge Mortgage.

125.     Having leveraged nearly every other piece of real estate purchased with Ms. Al-Sabah's money, and with his financial machinations caving in on him, in March 2017,

Agbodjogbe approached WBL in an attempt to obtain a cash-out financing of the Pikesville Home.

126.    By no later than March 22, 2017, WBL incontrovertibly knew that Ms. Al-Sabah had sued Agbodjogbe and his business entities for fraud (in case no. 17-cv-730-ELH) on March 17, 2017 in the United States District Court for the District of Maryland.  Further, WBL also knew that Ms. Al-Sabah had filed a Notice of *Lis Pendens* in the Circuit Court for Baltimore County, alerting potential purchasers or mortgagors of the Pikesville Home that Agbodjogbe had been sued for fraud.

127.    Notwithstanding knowledge of the red flags it learned of in 2016 and the newly acquired knowledge that Agbodjogbe had been sued for fraud in connection with the various real properties he claimed to own, on March 29, 2017, WBL executed a $360,000 mortgage on the Pikesville Home (the "Pikesville Mortgage").  Like the other "hard money" loans WBL had made to Agbodjogbe, the terms of the Pikesville Mortgage were commercially unreasonable when viewed in the context of a loan more than adequately secured by real property allegedly owned outright by Agbodjogbe and not otherwise encumbered.

128.    Once again, WBL made no effort to contact Ms. Al-Sabah.

129.    The fact that WBL funded the Pikesville Mortgage despite its actual knowledge of Ms. Al-Sabah's fraud allegations and the *lis pendens* demonstrates WBL's willing and knowing participation in the Conspiracy.  The only reason that WBL would agree to the additional $360,000 loan is if it already knew about Agbodjogbe's fraud and regarded its take from the transaction as worth the risks flagged by the *lis pendens*.  Any reasonable lender knowing what WBL knew would have conducted a thorough due diligence, including contacting Ms. Al-Sabah (the admitted/known source of the purchase money funds) to confirm Agbodjogbe in fact owned

the properties and/or was authorized to use the funds to purchase property for himself.  WBL did not do any of that.  Alternatively, WBL could have declined Agbodjogbe's loan application, thereby avoiding further dissipation of Ms. Al-Sabah's assets, but WBL chose instead to further perpetuate the scheme and exacerbate Ms. Al-Sabah's losses.

130.    On information and belief, Kenneth Williams received a sizable commission in connection with the Pikesville Mortgage.

131.    In March 2017, around the same time Agbodjogbe was scheming to mortgage the Pikesville Home, Kenneth Williams contacted Sharestates to inquire about obtaining a loan secured by 327 N. Eutaw Street.

132.    By that time, like WBL, Sharestates knew that Ms. Al-Sabah had sued Agbodjogbe and his business entities for fraud.  Sharestates also knew that Ms. Al-Sabah had filed a Notice of *Lis Pendens* in the Circuit Court for Baltimore City, alerting potential purchasers or mortgagors of 327 N. Eutaw Street that Agbodjogbe had been sued for fraud.

133.    Notwithstanding knowledge of the red flags it learned of in 2016 and the knowledge that Agbodjogbe had been sued for fraud in March of 2017, Sharestates executed a mortgage on 327 N. Eutaw in the amount of $210,000 (the "327 N. Eutaw Mortgage").  Like the other "hard money" loan Sharestates had made to Agbodjogbe, the terms of the 327 N. Eutaw Mortgage were commercially unreasonable.

134.    The fact that Sharestates funded the 327 N. Eutaw Mortgage despite the fact that they knew of Ms. Al-Sabah's fraud allegations and the *lis pendens* demonstrates Sharestates' willing and knowing participation in, and furtherance of, the Conspiracy.  The only reason that Sharestates would agree to the additional $210,000 loan is if it already knew about Agbodjogbe's fraud and regarded its putative profits from the transaction as worth the risks of entering into the

transaction with a known fraudster.  Any reasonable lender knowing what Sharestates knew would have conducted a thorough due diligence, including contacting Ms. Al-Sabah (the admitted/known source of the purchase money funds), to confirm Agbodjogbe in fact owned the properties and/or was authorized to use the funds to purchase property for himself.  Sharestates did not do any of that.  Alternatively, Sharestates could have declined Agbodjogbe's loan application, thereby avoiding further dissipation of Ms. Al-Sabah's assets, but Sharestates chose instead to further perpetuate the scheme and exacerbate Ms. Al-Sabah's losses.

135.    As he had with the earlier WBL Mortgages and the mortgage from Sharestates on the NY Property, Kenneth Williams received a sizable commission as a result of the 327 N. Eutaw Mortgage.

136.    On March 20, 2017, Woodbridge sold the Woodbridge Mortgage to IRM.

137.    In August 2017, Agbodjogbe sought to refinance the Woodbridge Mortgage, and approached IRM to negotiate a new mortgage.  By that time, IRM knew or should have known that Ms. Al-Sabah had filed a Notice of *Lis Pendens* in the Circuit Court for Baltimore City, alerting potential purchasers or mortgagors of 5722 York Road and 306-10 N. Howard Street that Agbodjogbe had been sued for fraud, and that any subsequent mortgage on those properties would be subject to the outcome of pending litigation.

138.    Notwithstanding its knowledge of the *Lis Pendens* on 5722 York Road and 306-10 N. Howard Street, IRM executed a new mortgage on 5722 York Road and 306-10 N. Howard Street in the amount of $1.5 million on August 22, 2017 (the "IRM Mortgage")—almost five months after Ms. Al-Sabah filed a Notice of *Lis Pendens* on those two properties.

139. Any reasonable lender knowing that 5722 York Road and 306-10 N. Howard Street were subject to a *Lis Pendens* would not have executed mortgages on those properties without contacting Ms. Al-Sabah to investigate whether those properties rightfully belonged to Agbodjogbe, or were among the properties in dispute in her lawsuit.

140. However, motivated by greed, IRM executed the IRM Mortgage in order to collect lucrative origination fees and interest payments. In fact, the IRM Mortgage was structured such that IRM had a "holdback" of all of the interest that was due under the note, meaning that they were guaranteed to capture the total interest due under the IRM Mortgage (unless Agbodjogbe refinanced the IRM Mortgage early).

141. With actual or imputed knowledge of the fraudulent nature of the transaction, IRM entered into the IRM Mortgage, thereby facilitating the extraction of the last bits of equity in the 306-10 N. Howard Street and 5722 York Road properties. That equity, like the other millions of dollars stolen from Ms. Al-Sabah, has since disappeared.

142. Beginning in January 2016 and continuing into 2018, the Conspirators, acting separately and together, with actual or imputed knowledge that Agbodjogbe was not the equitable owner of the Properties, initiated and perpetuated a series of connected and directly related events in which virtually all of the equity in the Properties and all of the proceeds of the loans has been dissipated, thereby causing Ms. Al-Sabah millions of dollars in compensable damages. The Properties, for which she paid millions of dollars in purchase and renovations costs, are leveraged to the point that there remains in them no value for her to recover. As of the filing of this Complaint, the NY Property is the subject of foreclosure proceedings, the consequences of which may exceed the market value of the Property. All of the loans on all of the other Properties are likewise in default and potentially (or actually) subject to foreclosure.

## COUNT I: CIVIL CONSPIRACY

### (Against All Defendants)

143.     Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

144.     On information and belief, Agbodjogbe and Kenneth Williams—acting in his individual capacity and on behalf of Uptown—(the "Core Conspirators") agreed in October 2015 to work together to extract equity from the Properties by obtaining fraudulent mortgages and further agreed to hide their fraudulent conduct from Ms. Al-Sabah.

145.     On information and belief, Kenneth Williams then recruited Bobby Williams (together with WBL, Sharestates, and IRM, the "Additional Conspirators" and each individually an "Additional Conspirator") to join and participate in the Conspiracy.  Among other overt acts in furtherance of the Conspiracy, Bobby Williams "coached" Agbodjogbe to lie to WBL's underwriting department—which, given WBL's willingness to look the other way, was easily successful—to ensure that WBL approved loans secured by the NY Property.

146.     On information and belief, at some point prior to May 2016, WBL agreed to join the Conspiracy, as evidenced by its funding of the First WBL Mortgage and the Second WBL Mortgage despite knowing of numerous significant red flags that would have placed a reasonably prudent lender on notice of the fraud.

147.     These red flags included:

a.       WBL knew that Agbodjogbe was untrustworthy based on the numerous misrepresentations he made to WBL's underwriting department.

b.      WBL knew that Agbodjogbe could not substantiate many of the claims he made to WBL, including particularly those regarding his children's savings account and his claim that he had known Ms. Al-Sabah for a decade or longer.

c.      WBL knew that Ms. Al-Sabah provided all of the funds that Agbodjogbe used to purchase all of the real estate that he purportedly owned.

d.      WBL knew or should have known that Ms. Al-Sabah's daughter was living in the NY Property.

e.      WBL knew that despite purchasing the NY Property in September 2015 in cash, and despite the fact that Agbodjogbe claimed to be expecting $850,000 from Ms. Al-Sabah in July 2016, Agbodjogbe was seeking a $500,000 loan from WBL in January of 2016.

f.      WBL knew that Agbodjogbe had received over $7 million in several wire transfers from Ms. Al-Sabah and claimed it was all a gift.

g.      WBL knew or should have known that the only "evidence" that the over $7 million from Ms. Al-Sabah was a gift was Agbodjogbe's say-so.

h.      WBL knew that the relatively modest cash flow from Agbodjogbe's restaurant operations was not enough to cover repayment of the loans WBL was extending.

i.      WBL knew that the only way that Agbodjogbe would be able to pay back the Second WBL Mortgage was by using funds he received from Ms. Al-Sabah or via a further hard money refinancing.

j.      WBL knew that Agbodjogbe's bank records reflected activity indicative of money laundering.

148.    Despite knowing of these red flags, WBL did not conduct any reasonable due diligence or investigation.  For example, WBL made no effort to contact Ms. Al-Sabah or the occupant of the NY Property.  Nor did WBL make any effort to investigate Agbodjogbe's numerous misrepresentations.  WBL did not seek any substantiation of many of Agbodjogbe's numerous claims.

149.    WBL's knowledge of the numerous red flags, combined with its failure to conduct reasonable due diligence, is evidence that WBL agreed to join and actively participated in the Conspiracy.

150.    Further proof that WBL joined the Conspiracy is the fact that it funded the Pikesville Mortgage in March 2017, despite the fact that it knew Agbodjogbe had been sued for fraud by the very same person that had sent him millions of dollars, and that Ms. Al-Sabah had placed a *Lis Pendens* on the property that WBL was using as collateral.

151.    Following the successful extraction of $1.2 million of equity from the NY Property, the Core Conspirators recruited various Additional Conspirators—namely Sharestates and IRM—to join the Conspiracy.  In turn, the Additional Conspirators agreed to join the Conspiracy in order to benefit from the lucrative broker's fees, commissions, repayment terms, fees and other amounts that they stood to receive by issuing fraudulent mortgages on the Properties with usurious loan terms.  On information and belief, the Additional Conspirators all agreed to join and continue in the Conspiracy knowing that Ms. Al-Sabah had provided the funds used to purchase the Properties, that those funds were not gifts, and that Agbodjogbe was engaging in fraud by exercising control over and extracting equity out of the Properties that he did not equitably own.

152.    Evidence of the Additional Conspirators' agreement to join the conspiracy is that they all were aware of many of the same red flags that WBL ignored.  In addition, by the time of their involvement in the Conspiracy, Agbodjogbe had already squandered hundreds of thousands dollars in fees and penalties to refinance the mortgages because he was unable to repay them. Despite these red flags, the Additional Conspirators did not conduct reasonable due diligence, and none of them contacted Ms. Al-Sabah, or even attempted to do so.

153.    The Core Conspirators and Additional Conspirators shared a common motive and goal, to extract as much money in fees, penalties, commissions and interest payments from the Properties as possible before Agbodjogbe's fraud and the Conspiracy was discovered.

154.    The Core Conspirators and Additional Conspirators each actively participated in the conspiracy and provided material support, including by concealing the transactions from Ms. Al-Sabah.

155.    As a result of the Conspiracy between Agbodjogbe, Bobby Williams, Kenneth Williams, Uptown, WBL, Sharestates, and IRM, Ms. Al-Sabah has incurred damages in an amount to be determined at trial, but believed to be no less than $7 million.  These damages include the diminution of the equity in the Properties as a result of the various mortgages Defendants have brokered and issued as well as the fees, commission, and mortgage payments that Defendants collected from Agbodjogbe, which were all paid using funds that Ms. Al-Sabah had entrusted to Agbodjogbe.

## COUNT II: AIDING & ABETTING FRAUD

### (Against All Defendants)

156.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

157.    Defendants were aware of Agbodjogbe's fraud.

158.    Each Defendant provided substantial assistance to furthering Agbodjogbe's fraud, including but not limited to the mortgage loans they provided and by keeping them concealed from Ms. Al-Sabah.

## COUNT III: FRAUD BY OMISSION

### (Against All Defendants)

159.    Each of the Conspirators knew, or willfully ignored the obvious indicia, that Ms. Al-Sabah was the equitable owner of the properties, and that Agbodjogbe had purchased them with Ms. Al-Sabah's funds, and that Agbodjogbe's claimed ownership of the Properties, as it existed on paper, was a fiction.  Each of the Conspirators, knowing with virtual certainly that Agbodjogbe could never repay the loans, knew that the lenders were relying on the market values of the Properties as the ultimate backstop to the loans, all the while charging exorbitant terms to which no bona fide borrower would have agreed.  Particularly in light of this reliance on the value of the properties in the event of foreclosure, the Conspirators, and each of them, owed a duty to the actual/equitable owner of the Properties not to proceed with transactions that the Conspirators knew were dissipating the equity on the Properties to the true owner's detriment, and owed a duty to the actual/equitable owner of the Properties (who was actually or impliedly known to them) to alert her to Agbodjogbe's efforts to fraudulent extract from her properties all of their equity and convert it to his own use.

160.    Instead of alerting the equitable owner of the Properties to the fraud then underway, the Conspirators perpetuated the fraud, causing and exacerbating Ms. Al-Sabah's damages.

## COUNT IV: CONSTRUCTIVE FRAUD

### (Against All Defendants)

161.    Each of the Conspirators knew, or willfully ignored the obvious indicia, that Ms. Al-Sabah was the equitable owner of the properties, and that Agbodjogbe had purchased them with her funds and that Agbodjogbe's claimed ownership of the Properties, as it existed on paper, was a fiction.  Each of the Conspirators, knowing with virtual certainly that Agbodjogbe could never repay the loans, knew that the lenders were relying on the market values of the Properties as the ultimate backstop to the loans, all the while charging exorbitant terms to which no bona fide borrower would have agreed.  With this actual or constructive knowledge, the Defendants engaged in transactions that were calculated to transfer from Ms. Al-Sabah, the rightful and equitable owner of the properties, to Agbodjogbe, millions of dollars of ill-gotten equity, enriching themselves in the process through fraudulent commissions, fees, charges, penalties, interest, and other sums.

162.    Defendants' participation in the fraudulent transactions have caused Ms. Al-Sabah millions of dollars in compensable damages.

## COUNT V: NEGLIGENCE

### (Against All Defendants)

163.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

164.    Under the circumstances alleged, and in the alternative, the Defendants owed to Ms. Al-Sabah a duty to alert her, as the equitable owner of the properties, to the suspicious nature of the transactions then underway.

165.     The Defendants' failure to alert Ms. Al-Sabah to the suspicious nature of the transactions in which Agbodjogbe was engaged was a breach of that duty, which caused or exacerbated millions of dollars in compensable damages.

## COUNT VI: CONSTRUCTIVE TRUST

166.     Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

167.     With full actual or constructive knowledge of Ms. Al-Sabah's equitable ownership of the various Properties, the Lender Defendants – WBL, Sharestates, and IRM – improperly obtained whatever interests they assert in the Properties.

168.     The Lender Defendants are (or should be) equitably estopped from asserting any right to foreclose on any of the Properties.

169.     Instead, the Properties, stripped of any liens asserted by the Lender Defendants or any affiliates thereof, should be placed in a constructive trust for the benefit of Ms. Al-Sabah

## COUNT VII: UNJUST ENRICHMENT

170.     Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

171.     Given their actual or constructive knowledge of her equitable ownership of the various Properties, the Lender Defendants knew that all of the sums they obtained in connection with the Properties – including commissions, fees, charges, penalties, interest, and repayment of principal – were ill-gotten gains.

172.     The Lender Defendants are (or should be) equitably estopped from retaining any such gains, all of which should be disgorged to Ms. Al-Sabah.

### COUNT VIII: QUIET TITLE/INVALIDATE LIENS ON MARYLAND PROPERTIES

173.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

174.    With full actual or constructive knowledge of Ms. Al-Sabah's equitable ownership of the various Properties, the Lender Defendants – WBL, Sharestates, and IRM – improperly obtained whatever interests they assert in the Properties.

175.    The Lender Defendants are (or should be) equitably estopped from asserting any interest in or lean on the Maryland Properties, and any such interest(s) or lien(s) should be declared invalid pursuant to Md. Real Prop. Code Ann, § 14-108, and/or at common law.

### COUNT IX: DECLARATORY JUDGMENT

176.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

177.    The fraudulent transactions in which the Conspirators have engaged have caused Ms. Al-Sabah millions of dollars in compensable damages, and has given rise to numerous disputes concerning the ownership of and interests in the various properties.

178.    As a result of these disputes between the parties in this case, an actual and justiciable controversy exists as to the true and equitable ownership of the Properties and as to the validity of the various interests asserted in the Properties by the Lender Defendants.

179.    A declaratory judgment in this case, including the entry of such injunctions as are necessary to enforce Ms. Al-Sabah's rights in the Properties, would serve a useful purpose in clarifying and settling the respective legal rights and interests of the parties in the Properties.

**COUNT X:  MORTGAGE FRAUD/CONSPIRACY TO COMMIT MORTGAGE FRAUD
IN VIOLATION OF THE MARYLAND MORTGAGE FRAUD PROTECTION ACT**
**(Against All Defendants)**

180.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

181.    The Defendants, and each of them, entered into, obtained, or facilitated mortgages on properties that they knew were not legitimately owned by Agbodjogbe.

182.    Defendants Bobby Williams and Kenneth Williams actively coached Agbodjogbe in misrepresentations that gave rise to the mortgages.

183.    The Lender Defendants knew that the mortgages they obtained and recorded were based on the false representation that Agbodjogbe was the equitable owner of the properties that were subject to such mortgages.

184.    All Defendants received proceeds or other funds in connection with a mortgage closing that each such Defendant knew resulted from Agbodjogbe's false representation(s) of ownership of the Properties, and the other misrepresentations in connection with the Properties and with Ms. Al-Sabah as detailed herein.

185.    Ms. Al-Sabah brings this claim pursuant to Md. Code Ann., Real Prop. § 7-406 and other applicable sections of the Maryland Mortgage Fraud Protection Act, and seeking all remedies available thereunder, including compensatory and treble damages, and attorneys' fees.

**COUNT XI: INVALIDATE NEW YORK MORTGAGE
DUE TO FRAUD UNDER NY REAL PROP. LAW SECTIONS 265, 266, AND 329**
**(Against Defendant Sharestates)**

186.    Ms. Al-Sabah repeats and re-alleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

187.     Ms. Al-Sabah's money was used to purchase the NY Property.  Ms. Al-Sabah believed that the purchase was being made in the name of an entity she controlled and owned. Ms. Al-Sabah is therefore the equitable owner of the NY Property.

188.     Agbodjogbe was not a valid owner of the NY Property and did not have authority to encumber the property.

189.     On December 14, 2016, Sharestates entered into a mortgage loan agreement with 9 Jewels and Agbodjogbe secured by the NY Property.

190.     Ms. Al-Sabah was not aware of the Sharestates Mortgage and did not otherwise authorize the NY Property to be encumbered by that mortgage.  The Sharestates Mortgage is void or voidable because it was entered into as part of a Conspiracy to defraud Ms. Al-Sabah.

191.     Sharestates is not entitled to bona fide encumbrancer status on the Sharestates Mortgage because it agreed to join (or at least knew of) the Conspiracy.

192.     Sharestates is also not entitled to bona fide encumbrancer status because it knew of facts that were red flags indicating fraudulent or suspicious activity that would have led a reasonable lender/mortgagee to make further inquiry into the possible fraud before entering into the mortgage agreement.  Evidence of Sharestates' knowledge or notice of the underlying fraud includes the following:

    a.    Sharestates knew or should have known that Agbodjogbe was untrustworthy based on the numerous misrepresentations he made to WBL's underwriting department.

    b.    Sharestates knew or should have known that Agbodjogbe could not substantiate many of the claims he made to WBL, including regarding his children's savings account.

c.    Sharestates knew or should have known that Ms. Al-Sabah provided all of the funds that Agbodjogbe used to purchase all of the real estate that he purportedly owned.

d.    Sharestates knew or should have known that Ms. Al-Sabah's daughter was living in the NY Property.

e.    Sharestates knew or should have known that Agbodjogbe had obtained two large mortgages on the NY Property from WBL—totaling $1.2 million—less than a year after purchasing the NY Property in cash in September 2015.

f.    Sharestates knew or should have known that Agbodjogbe had received over $7 million in several wire transfers from Ms. Al-Sabah and claimed it was all a gift.

g.    Sharestates knew or should have known that the only evidence that the over $7 million from Ms. Al-Sabah was a gift was Agbodjogbe's say-so.

h.    Sharestates knew or should have known that the modest income from Agbodjogbe's restaurant operations was not enough to cover repayment of the loans WBL was giving.

i.    Sharestates knew or should have known that the only way that Agbodjogbe would be able to pay back any of the mortgages was by using funds he received from Ms. Al-Sabah.

j.    Sharestates knew or should have known that Agbodjogbe's bank records reflected activity indicative of money laundering.

193.    These facts were clear red flags that Agbodjogbe was lying when he told Sharestates that the over $7 million he received from Ms. Al-Sabah was a gift.  These facts

would have led a reasonably prudent mortgage lender to investigate Agbodjogbe's story, including by contacting Ms. Al-Sabah, which would have uncovered/exposed the fraud.

194.     Sharestates failed to investigate these signs of fraud that would reveal the fraud. As a result, Sharestates cannot claim bona fide encumbrancer status.

195.     As a result, the Sharestates Mortgage should be declared void or invalid pursuant to N.Y. Real Prop. Law § 329.

196.     On information and belief, Sharestates, by or through its assignee, Chondrite Asset Trust, is in the process of foreclosing on the NY Property, thereby threatening to exacerbate Ms. Al-Sabah's losses and damages in connection with the NY Property.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Al-Sabah respectfully prays for the following relief and judgment:

a.     Compensatory damages reflecting the lost value of the properties fraudulently purchased with her money and titled in Agbodjogbe's name or in the name of entities he controls, in an amount in excess of $7 million;

b.     Exemplary/punitive damages in an amount to be determined at trial;

c.     Treble damages for violation of the Maryland Mortgage Fraud Protection Act, Md. Code Ann., Real Prop. § 7-401, *et seq*.;

d.     Attorneys' fees recoverable by statute and at common law, including but not limited to the fees incurred by Ms. Al-Sabah in litigating the underlying fraud claim(s) against Agbodjogbe;

e.     A declaration voiding/invalidating the mortgages, liens, and other third-party interests in or encumbrances on the various properties;

     f.      A declaration of Ms. Al-Sabah's ownership of the various Properties, unencumbered by any of the mortgages/liens that were fraudulently obtained, procured, or recorded; and

     g.      Such other and further judgments, declarations, and relief available at law, by statute, or in equity to fully and fairly compensate Ms. Al-Sabah for her damages and losses, and to punish the Defendants for their knowing and active participation in the fraudulent conduct in which they engaged.

Dated: September 25, 2018

                               /s/  Michael J. Wilson
                              Michael B. MacWilliams, Fed. Bar No. 23442
                               MBMacWilliams@Venable.com
                              Michael J. Wilson, Fed. Bar No. 18970
                               MJWilson@Venable.com
                              VENABLE LLP
                               750 East Pratt Street, Suite 900
                               Baltimore, Maryland 21202
                               T: (410) 244-7400
                               F: (410) 244-7742

                               *Attorneys for Plaintiff Alia Salem Al-Sabah*