**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ALIA SALEM AL-SABAH, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *    Civil Case No. SAG-18-2958 |
| | * |
| WORLD BUSINESS LENDERS, LLC, | * |
| *et al.*, | * |
| | * |
| Defendants. | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

On September 25, 2018, Plaintiff Alia Salem Al-Sabah ("Al-Sabah") filed an eleven-count Complaint against World Business Lenders, LLC ("WBL"), Sharestates Investments, LLC ("Sharestates"), IRM Plaza, LLC ("IRM Plaza"), Uptown Commercial Capital ("Uptown"), Kenneth Williams, and Robert "Bobby" Williams (collectively, "Defendants"). ECF 1. Al-Sabah seeks compensatory damages, punitive damages, attorneys' fees, and declaratory relief, stemming from an alleged conspiracy between Defendants and Jean Agbodjogbe ("Agbodjogbe") to defraud Al-Sabah out of over $7 million dollars that she transferred to Agbodjogbe from 2014 to 2016. *Id.* Al-Sabah initially filed suit against Agbodjogbe in this Court on March 17, 2017 ("the Agbodjogbe Lawsuit"), seeking damages arising out of the same conduct. *See* Complaint, *Al-Sabah v. Agbodjogbe*, No. SAG-17-730 (D. Md. filed Mar. 17, 2017), ECF 1.

Defendants WBL, ECF 18, Sharestates, ECF 21, IRM Plaza, ECF 29, and Bobby Williams (proceeding *pro se*), ECF 35, have all answered the Complaint. Defendants Uptown

and Kenneth Williams did not file an answer.  *See* ECF 36 (Clerk's Entry of Default).  On February 22, 2019, Al-Sabah obtained a default judgment against them.  ECF 39.

On April 2, 2019, Defendants WBL, Sharestates, and IRM Plaza[1] (collectively, for the purposes of this Opinion, "the Lender Defendants") filed a Motion for Judgment on the Pleadings.  ECF 47 ("the Motion").  Al-Sabah filed an Opposition, ECF 52, and only WBL and Sharestates replied, ECF 56.  Also on April 2, 2019, the Lender Defendants filed a Motion to Stay this case, pending the outcome of the Agbodjogbe Lawsuit.  ECF 48.  The presiding judge at that time, United States District Judge George L. Russell III, granted the motion, and stayed this case.  ECF 58.  This case was thereafter transferred to United States District Judge Ellen L. Hollander, who later transferred it, and the Agbodjogbe Lawsuit, to this Court.

On March 4, 2020, after having completed its rulings on post-trial motions in the Agbodjogbe Lawsuit, this Court entered an Order lifting the stay in this case, and reinstating the Motion for Judgment on the Pleadings.  ECF 62.  The Court also invited the parties to submit supplemental briefing regarding the Motion, which the Sharestates, ECF 72, WBL, ECF 73, and Al-Sabah, ECF 77, have provided.  The Court has reviewed all of the briefs relevant to the Motion, and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  For the reasons that follow, the Lender Defendants' Motion is granted in part and denied in part.

---

[1] At the time, IRM Plaza was represented by counsel.  However, on May 14, 2019, the Court granted IRM Plaza's counsel's motion to withdraw.  ECF 59.  IRM later retained Mr. James Sweeting, III, as counsel.  ECF 60.  Mr. Sweeting, however, also represented Agbodjogbe in the trial in the Agbodjogbe Lawsuit.  Upon this Court's reinstatement of the case, it expressed to Mr. Sweeting its concerns regarding his continued representation of both IRM Plaza and Agbodjogbe.  ECF 63.  Mr. Sweeting has since withdrawn from representing IRM Plaza.  *See* ECF 67, 69.  To date, IRM Plaza has not obtained new counsel, due in part to the ongoing COVID-19 pandemic and other exigent circumstances, *see* ECF 75, 79.  While corporations cannot proceed *pro se*, because IRM Plaza was represented by counsel through the initial briefing of the Motion and because the Motion was filed jointly with the other Lender Defendants, the Court will still consider the Motion without further delay.

## I.      FACTUAL BACKGROUND

For the purposes of this Motion, this Court will accept all well-pleaded factual allegations in the Complaint as true.  Additionally, the Court will take judicial notice of specific facts that Al-Sabah and Agbodjogbe stipulated to in the Agbodjogbe Lawsuit, as well as the verdict the jury rendered in that case.  *See* Fed. R. Evid. 201(b)-(d) (noting that the trial court, "at any stage of the proceeding," may, "on its own," take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

### A.      The Underlying Conduct Between Al-Sabah and Agbodjogbe

Plaintiff Al-Sabah is a member of the Kuwaiti royal family, and resides in Kuwait.  ECF 1, ¶ 11.  In approximately June, 2014, Al-Sabah met Agbodjogbe when Al-Sabah purchased food for a local mosque from Agbodjogbe's restaurant.  Pretrial Order, Stipulation of Fact No. 1, *Al-Sabah*, No. SAG-17-730 (D. Md. Jan. 20, 2020), ECF 228 [hereinafter "Agbodjogbe Lawsuit Pretrial Order"].  Even after Al-Sabah returned to Kuwait, she continued to receive regular communications from Agbodjogbe regarding the meals that she requested be delivered.  *Id.*, Stipulation of Fact No. 2.  Eventually, Agbodjogbe garnered Al-Sabah's trust, and convinced her to become a part owner in his restaurant, which would be named N&A Kitchen.  Together, the two would own the operating entity, N&A Kitchen, LLC, 50/50.  *Id.*, Stipulation No. 2; ECF 1, ¶¶ 23, 25-26 (the instant Complaint).  Al-Sabah understood that her 50% share of the profits would be used for charitable purposes.  ECF 1, ¶ 27.  Al-Sabah wired Agbodjogbe her agreed-upon $150,000 contribution on September 4, 2014, *see* Agbodjogbe Lawsuit Pretrial Order, Stipulation No. 3, but Agbodjogbe did not follow through on the agreed-upon 50/50 ownership

structure, and "eventually subverted [N&A Kitchen] to an LLC in which he was the sole member," ECF 1, ¶ 27.

Later, in 2014, Agbodjogbe convinced Al-Sabah to "invest in the redevelopment in properties in Baltimore's 'Howard Street Corridor,' an area of the city rife with urban decay." *Id.* ¶ 30. "[B]ased on the trust that Agbodjogbe had manipulatively cultivated," through discussions about their shared Muslim faith and passion for charitable work, "Al-Sabah determined that she would make personal investments in the Howard Street Corridor." *Id.* ¶¶ 27, 30. But since Al-Sabah "wished to remain anonymous, Agbodjogbe recommended that she establish an investment entity to hold her personal investments." *Id.* ¶ 31. Accordingly, Agbodjogbe formed 9 Jewels, LLC ("9 Jewels") for this purpose. *Id.* Agbodjogbe told Al-Sabah that she owned 9 Jewels, when in reality he was the only member of 9 Jewels; Al-Sabah lacked any ownership in the entity. *Id.* ¶¶ 31-32.

Throughout the next several months, from October, 2014, to July, 2015, Al-Sabah wired Agbodjogbe over $3.3 million, which she directed to be used "to purchase and renovate certain investment properties in Baltimore's Howard Street Corridor in the name of 9 Jewels." *Id.* ¶ 34; Agbodjogbe Lawsuit Pretrial Order, Stipulation Nos. 5-10. Specifically, Agbodjogbe, acting through N&A Kitchen, LLC, and 9 Jewels, made the following purchases of commercial real estate, all within Baltimore City, in 2015:

| Purchasing Entity | Purchase Date | Property Address | Cost |
|---|---|---|---|
| N&A Kitchen, LLC | February 9, 2015 | 327 N. Eutaw Street | $180,000.00 |
| N&A Kitchen, LLC | March 17, 2015 | 400 N. Howard Street | $139,000.00 |
| 9 Jewels | March 19, 2015 | 306-10 N. Howard Street | $545,000.00 |

Agbodjogbe Lawsuit Pretrial Order, Stipulation Nos. 20-22. Agbodjogbe paid for each of these properties in cash, and the purchases were funded solely by Al-Sabah's wire transfers. *Id.* Agbodjogbe also used funds that Al-Sabah wired to him to purchase a personal residence at 103

Mt. Wilson Lane in Pikesville, Maryland in January, 2015, for $469,990.00, in cash, *id.*, Stipulation No. 19, without Al-Sabah's permission, ECF 1, ¶ 38.

In July, 2015, Al-Sabah enlisted Agbodjogbe's assistance in finding, and purchasing, an apartment in New York City, New York, for her daughter to live in while attending school.  ECF 1, ¶ 42.  Al-Sabah "directed Agbodjogbe that she wished to purchase the property through 9 Jewels," which she still, at the time, believed she owned.  *Id.*  Agbodjogbe worked with a realtor, and located a suitable condominium located at 325 Fifth Avenue, Apartment 11C, in New York City ("the NY Condo").  *Id.* ¶¶ 43-44.  Al-Sabah wired $2.11 million to the 9 Jewels account for Agbodjogbe, representing the purchase price of the property, on August 6, 2015.  Agbodjogbe Lawsuit Pretrial Order, Stipulation Nos. 12-13.  Through 9 Jewels, Agbodjogbe completed the purchase, using the cash Al-Sabah wired, on September 3, 2015.  *Id.*, Stipulation Nos. 12-13, 24. Al-Sabah's daughter subsequently executed a lease with 9 Jewels "that had her paying monthly 'rent.'"  ECF 1, ¶ 47.

Around the same time, on August 20, 2015, Agbodjogbe purchased the commercial real estate located at 5722 York Road, through an LLC he created in his own name, 5722 York Road, LLC.  ECF 1, ¶ 39.  Al-Sabah lacked any knowledge of this purchase, or of the formation of this new LLC, *id.*, despite the fact that Agbodjogbe paid the entire purchase price of $525,000 using cash that she had previously wired him, Agbodjogbe Lawsuit Pretrial Order, Stipulation No. 23.

Thereafter, from September, 2015, to April, 2016, Al-Sabah wired Agbodjogbe a little over $2.05 million "for the purpose of completing the renovation" of the properties located at 327 North Eutaw, 306-10 North Howard, and 400 North Howard.  *Id.* ¶ 40; *see* Agbodjogbe Lawsuit Pretrial Order, Stipulation Nos. 14-18 (indicating the wire transfers).  In all, Al-Sabah wired Agbodjogbe over $7.8 million dollars from September, 2014, to April, 2016.

5

In the spring of 2016, however, Al-Sabah "began to grow suspicious of Agbodjogbe's behavior and motives." *Id.* ¶ 116. While some of the renovations had been made to the subject properties, others had not, despite Agbodjogbe's representations otherwise. *Id.* When Agbodjogbe's continued explanations proved unsatisfactory, Al-Sabah began demanding "documentation relating to the entities purportedly formed and transactions purportedly entered into by Agbodjogbe on her behalf." *Id.* Al-Sabah's initial demands were met "with further delays and misrepresentations," and eventually, by November, 2016, Agbodjogbe "cut[] off all communication with her." *Id.* ¶¶ 117-18.

On March 17, 2017, Al-Sabah filed suit against Agbodjogbe in this Court. *See* Complaint, *Al-Sabah*, No. SAG-17-730 (D. Md. filed Mar. 17, 2017), ECF 1. She sought to recover, in compensatory damages, the money that she claimed Agbodjogbe defrauded her of, and requested either a declaratory judgment that she owned the properties at issue, or imposition of a constructive trust over the properties. *Id.* Also, "[b]y no later than March 22, 2017," Al-Sabah filed a Notice of *Lis Pendens* in the Circuit Court for Baltimore County, Maryland, "alerting potential purchasers or mortgagers . . . that Agbodjogbe had been sued for fraud." ECF 1, ¶ 126.

After extensive litigation, and a nine-day jury trial, on January 31, 2020, the jury found Agbodjogbe liable for Fraudulent Misrepresentation, Fraudulent Concealment, Breach of Agency Duties, and Unjust Enrichment. Verdict Form, *Al-Sabah*, No. SAG-17-730 (D. Md. filed Feb. 3, 2020), ECF 256 at 1-2. The jury further found that Agbodjogbe conspired with the various corporate entities he solely owned – N&A Kitchen, LLC, N&A Kitchen II, LLC, 9 Jewels, and 5722 York Road, LLC – to defraud Al-Sabah. *Id.* at 3-4. In all, the jury awarded Al-Sabah $7,641,800 in compensatory damages. *Id.* at 4. By a separate Memorandum Opinion,

however, this Court denied Al-Sabah the declaratory judgment and constructive trust she sought. *See* 2020 WL 1063003 (D. Md. Mar. 4, 2020).

### B. Agbodjogbe Obtained "Hard Money" Mortgages from the Lender Defendants on the Properties Purchased with Money that Al-Sabah Provided

The gravamen of the instant suit relates to "hard money" mortgages that the Lender Defendants are alleged to have provided Agbodjogbe, through the relevant corporate entities, between 2015 and 2017. The Complaint alleges that the Lender Defendants issued Agbodjogbe, or the corporate entities that he solely owned, four different mortgages, secured by the various properties purchased with Al-Sabah's money. These actions serve as the basis for Al-Sabah's claims against the Lender Defendants. *See* ECF 1, ¶¶ 143-96.

### 1. Agbodjogbe's First Loan Application with WBL in October, 2015

Specifically, Al-Sabah alleges that in or around October, 2015, Agbodjogbe enlisted the assistance of Defendant Kenneth Williams, a "hard money" loan broker with Defendant Uptown. ECF 1, ¶¶ 53, 58. Kenneth Williams, in turn, contacted Defendant Bobby Williams, a WBL employee, to ask whether WBL would consider giving Agbodjogbe a business loan, secured by one of four properties:   the NY Condo; 327 North Eutaw; 306-10 North Howard; and/or 5722 York Road. *Id.* ¶ 58. Al-Sabah alleges, upon information and belief, that Agbodjogbe and/or Kenneth Williams told Bobby Williams that Al-Sabah had gifted Agbodjogbe the money to purchase these properties. *Id.* ¶ 59. Al-Sabah also alleges, upon information and belief, that Kenneth Williams knew, or should have known, that Agbodjogbe was committing fraud, and that Al-Sabah was unaware.[2] *Id.*

---

[2] While characterizing Agbodjogbe's actions as "fraudulent" is arguably a legal conclusion, this Court nonetheless accepts it, for as noted *supra*, the jury in the Agbodjogbe Lawsuit found that Agbodjogbe was liable for fraud.

Eventually, WBL sent Agbodjogbe a preliminary approval letter for a business loan secured by 306-10 North Howard, contingent upon further investigation through the underwriting process. *Id.* ¶ 60. Al-Sabah alleges that "well-established underwriting policies in the mortgage industry" provide that a lender must assess the prospective borrower's "financial ability to repay [the] loan." *Id.* ¶ 50. Relevant to this inquiry are the sources of the borrower's funds, which are evidenced by (1) paystubs, (2) W-2 tax forms, and/or (3) bank or business records that show "a recurring income stream from legitimate, verifiable sources." *Id.* If a lender "observes that a prospective borrower has received large transfers into his or her bank accounts, the lender must ensure that those funds belong to the prospective borrower and not someone else, and that they are neither loans nor from illegitimate or unlawful sources." *Id.* ¶ 51. Al-Sabah asserts that "[t]he customary method for verifying" such large transfers "is to contact (with the borrower's consent) the person or entity that transferred those funds to the prospective borrower to obtain a letter or other written verification that the transferor of the funds in question disclaims any right to them." *Id.* Al-Sabah alleges, upon information and belief, that Agbodjogbe sought out "hard money" lenders, like the Lender Defendants, because he would have been unable to obtain a mortgage on any of the properties from a reputable lender, given these "well-established underwriting policies." *Id.* ¶ 49.

Consistent with WBL's underwriting guidelines, it required Agbodjogbe to provide both his personal bank records, and those of the corporate entities he controlled. *Id.* ¶ 61. Those records "were characterized by frequent large transfers between accounts, large incoming and outgoing wire transfers, and an unusually large number of significant cash withdrawals in the form of cashier's checks, all in the accounts of a person/business with modest cash flows not nearly sufficient to support of" those deposits and transfers. *Id.* ¶ 62. In fact, at least one of

Agbodjogbe's prior banks closed his accounts "based on suspicions that he was engaged in money laundering." *Id.* WBL noted the number of large international wire transfers in Agbodjogbe's accounts, and informed Bobby Williams that Agbodjogbe "would have to prove where those wire transfers were coming from, and why." *Id.* ¶ 63. On information and belief, Plaintiff alleges that Bobby Williams, Kenneth Williams, and Agbodjogbe "agreed that Agbodjogbe should lie to WBL's underwriting department in an attempt to conceal Ms. Al-Sabah's connection to Agbodjogbe," and in furtherance of that agreement, Bobby Williams "coached" Agbodjogbe "on how to lie to WBL's underwriting department." *Id.* ¶¶ 64-66.

A WBL underwriter called Agbodjogbe in January, 2016 to discuss the suspect wire transfers. *Id.* ¶ 68. Agbodjogbe provided differing responses – he first said the transfers came an "investor he worked with overseas," then characterized the individual as a "business partner" who "'had no ownership' interests in any of the properties." *Id.* ¶ 70. Agbodjogbe later characterized the "business partner" as a "personal friend" who "was a member of a royal family" that he had a twelve-year relationship with. *Id.* ¶¶ 71, 73. WBL never asked for the name or contact information of this "friend." *Id.* ¶ 75. Agbodjogbe also told WBL that he intended to use a portion of the loan proceeds to "replenish his children's education savings account(s), from which he had borrowed funds to cover expenses in his restaurant business." *Id.* ¶ 74. In fact, however, his children had no such savings accounts. *Id.* WBL asked for documentation regarding the savings accounts, but "never received" it. *Id.*

Plaintiff alleges, upon information and belief, that WBL undertook no efforts to follow-up on Agbodjogbe's representations, "because they knew the results of any such follow-up efforts would have scuttled the loan, costing WBL the considerable profits they stood to gain from the fraudulent loan." *Id.* ¶ 78. Plaintiff alleges that WBL knew that Agbodjogbe's story

regarding the wire transfers being gifts "was unsupported by anything other than Mr. Agbodjogbe's say-so, which WBL knew could not be trusted." *Id.* ¶ 79. In support of this, Plaintiff recites an internal email from one WBL employee, in which she explains her concerns regarding Agbodjogbe:

> The bank accounts provided, do not support the loan amount, as it has wires again, that cannot be explained. The client also had an argument with valuation stated that the 2nd floor [of 306-10 N. Howard Street] was A PLUS, and of course from pics we saw yesterday, they are not A PLUS, its not even completed. Client also stated that he was getting gifts and that they were reflected on his tax returns. They don't. Client also now is just giving us items. Client has been not truthful this whole time, and still has not been able to clear our minds behind the fact that he is potentially money laundering. He has no proof on how he can afford our payments either.

*Id.* On January 22, 2016, Bobby Williams, on WBL's behalf, informed Agbodjogbe that WBL approved his loan, but would not allow the wires from Al-Sabah to support his financial ability to pay. *Id.* ¶ 80. Three days later, WBL contacted David Leichter, CPA, Agbodjogbe's accountant, to discuss Agbodjogbe's tax returns. *Id.* ¶ 81. Leichter told WBL that the transfers were "coming from a 'princess' in Kuwait, whom Agbodjogbe had met while she was visiting the U.S.," and that the increase in the amount of money Agbodjogbe received in wire transfers from 2014 to 2015 would "blow your mind." *Id.* Not long thereafter, Agbodjogbe withdrew his loan application. *Id.* ¶ 82.

### 2. Agbodjogbe Received Two Loans from WBL in 2016

In April, 2016, Agbodjogbe again applied for a loan with WBL, but this time he was looking to utilize the NY Condo as collateral. *Id.* ¶ 83. Plaintiff alleges that WBL "overlooked all indicia of fraud that it had learned about during its discussions with Agbodjogbe." *Id.* ¶ 84. They "ignored" Agbodjogbe's bank records, "ignored" their determination that he was "untrustworthy," "never followed-up" on his claim about borrowing from his children's savings

accounts, and "never sought to learn the identity of or contact Ms. Al-Sabah." *Id.* Agbodjogbe also "significantly overstated" on his loan application that his restaurant had a monthly revenue of $150,000. *Id.* ¶ 85. Moreover, during another call with a WBL underwriter, Agbodjogbe "misrepresented to WBL that he rented the [NY Condo] to a friend of his that he had known for over 5 years and that his friend had not signed a lease." *Id.* ¶ 89.

Notwithstanding this, Plaintiff alleges that, upon information and belief, "WBL knew that Ms. Al-Sabah's wire transfers were not gifts to Agbodjogbe," that she "had provided the purchase money for the [NY Condo]," and that her daughter lived in the NY Condo. *Id.* ¶ 91. Despite this knowledge, WBL made no effort to follow-up with Al-Sabah, "and merely accepted Agbodjogbe's explanation." *Id.* ¶ 92. And, even with this knowledge, on May 25, 2016, WBL executed a mortgage for $600,000.00 on the NY Condo ("the First WBL Mortgage"). *Id.* ¶ 93. The two-year loan carried an annual interest rate of thirty-four percent, resulting in projected interest payments of more than $414,000, exclusive of other fees and costs. *Id.*

Not long after Agbodjogbe obtained the First WBL Mortgage, he reached out to them to obtain another one. *Id.* ¶ 95. Recorded phone calls between WBL and Agbodjogbe in August, 2016 "confirm that WBL knew that Ms. Al-Sabah was the person responsible for sending the wire transfers." *Id.* ¶ 96. Moreover, during these calls, Agbodjogbe "once again changed his story," and told WBL that the money was coming from "a 'personal friend' in Kuwait that he had 'known for ten years.'" *Id.* ¶ 97. In fact, Agbodjogbe told WBL that this friend "gave him money whenever he needed it with 'no questions asked.'" *Id.* WBL, however, made no follow-up inquiries on any of these representations. *Id.* ¶¶ 97-99.

On August 25, 2016, WBL executed a second mortgage for $639,528.31 on the NY Condo, and consolidated it with the First WBL Mortgage into a single $1.2 million mortgage

("the Second WBL Mortgage").  *Id.* ¶ 100.  This consolidated loan required interest payments over one year totaling more than $675,000, resulting in an annual interest rate of over fifty-six percent, exclusive of other fees and costs.  *Id.* ¶ 101.  Agbodjogbe only saw $549,513.06 in proceeds from this second loan.  *Id.* ¶ 100.

### 3.    Agbodjogbe Received a Loan from Sharestates in December, 2016

Just two months after receiving the Second WBL Mortgage, on October 27, 2016, Kenneth Williams reached out to Sharestates to see if it would refinance the NY Condo.  *Id.* ¶ 106.  On November 1, 2016, Sharestates provided a loan term sheet that contemplated a $1.54 million at eleven percent interest and "4 points."  *Id.*  The loan also included a $61,600 origination fee for Sharestates.  *Id.*

Al-Sabah alleges that Sharestates, in their investigation of Agbodjogbe's ability to repay, "should and would have had serious doubts as to Agbodjogbe's ability to repay" the loan, considering "the modest income of Agbodjogbe's restaurant business generated, the two recent loans from WBL, and the willingness to pay $150,000 in prepayment penalties on the Second WBL Mortgage."  *Id.* ¶ 107.  Sharestates also knew that Al-Sabah provided the money used to purchase the NY Condo, *id.* ¶ 108, and had obtained a copy of the lease Al-Sabah's daughter signed with 9 Jewels to live in the NY Condo, *id.* ¶ 112.  Despite these facts, however, Sharestates "made no attempt to contact Ms. Al-Sabah . . . to confirm whether she was aware of the loan transactions and had, in fact, gifted to Agbodjogbe the purchase money for the apartment securing the mortgage."  *Id.*

A mortgage in the amount of $1.522 million was eventually executed on December 14, 2016 ("the Sharestates Mortgage").  *Id.* ¶ 114.  Despite an increase of $322,000 in principal as compared to the Second WBL Mortgage, Agbodjogbe saw no proceeds at all from the

Sharestates Mortgage. *Id.* ¶ 110. Moreover, the loan required monthly, interest-only payments at eleven percent interest on the full principal balance (equating to approximately $15,000.00 per month), and a balloon payment for the entire principal balance on January 1, 2018. *Id.*

### 4. Agbodjogbe Received a Loan from Woodbridge Mortgage Investment Fund IV, LLC in February, 2017

By "early 2017," Agbodjogbe defaulted on a separate mortgage he had already taken out on 306-10 North Howard and 5722 York Road. *Id.* ¶ 119. Allegedly motivated by this inability to pay, and by "the threat presented by Ms. Al-Sabah's inquiries," Agbodjogbe and Kenneth Williams sought to obtain a larger loan on those two properties. *Id.* Kenneth Williams approached Riverdale Funding, LLC about obtaining a loan for Agbodjogbe on January 5, 2017, seeking approximately $800,000 in funds. *Id.* ¶¶ 120-22. On that same day, Riverdale approved Agbodjogbe for a $960,000 loan, secured by 306-10 North Howard and 5722 York Road. *Id.* ¶ 122. Woodbridge Mortgage Investment Fund IV, LLC ("Woodbridge"), one of Riverdale's capital sources of funding for loans that Riverdale underwrote, memorialized the loan on February 21, 2017 ("the Woodbridge Mortgage"). *Id.* ¶ 123.

### C. Agbodjogbe Receives Additional Loans on the Subject Properties from the Lender Defendants, Despite the *Lis Pendens* Issued Against Each Property

Around the same time that Al-Sabah sued Agbodjogbe, in March, 2017, Agbodjogbe approached WBL a fourth time, this time to mortgage the Pikesville residence that he had purchased with Al-Sabah's money. *Id.* ¶ 125. Notwithstanding the *lis pendens* notice filed against the property, and the knowledge WBL had gained about Agbodjogbe in its prior transactions, WBL executed a $360,000 mortgage on the Pikesville residence ("the Pikesville Mortgage") on March 29, 2017. *Id.* ¶¶ 126-27. At no time during the due diligence period on this loan did WBL attempt to contact Al-Sabah. *Id.* ¶ 128.

13

Also around that same time, in March, 2017, Kenneth Williams also reached out to Sharestates to inquire about obtaining a loan secured by 327 North Eutaw.  *Id.* ¶ 131.  Sharestates likewise "knew that Ms. Al-Sabah had sued Agbodjogbe and his business entities for fraud," and that she "had filed a Notice of *Lis Pendens*."  *Id.* ¶ 132.  Nonetheless, Sharestates executed a mortgage on 327 North Eutaw in the amount of $210,000 ("the 327 North Eutaw Mortgage"). *Id.* ¶ 133.

Finally, after Woodbridge sold the Woodbridge Mortgage to IRM Plaza, Agbodjogbe reached out to IRM Plaza in August, 2017, about refinancing the Woodbridge Mortgage.  *Id.* ¶¶ 136-37.  "By that time, IRM knew or should have known" about the Notice of *Lis Pendens* filed against 5722 York Road and 306-10 North Howard, and that Al-Sabah had sued Agbodjogbe for fraud.  *Id.* ¶ 137.  Notwithstanding this knowledge, IRM Plaza executed a new mortgage on the two properties in the amount of $1.5 million on August 22, 2017 ("the IRM Plaza Mortgage"). *Id.* ¶ 138.  IRM Plaza structured the mortgage such that it had a "holdback" of all interest due under the note, "meaning that they were guaranteed to capture the total interest due," unless Agbodjogbe refinanced the mortgage early.  *Id.* ¶ 140.

D.     **Al-Sabah's Instant Claims for Relief**

As noted, Plaintiff filed the operative Complaint against the Lender Defendants, as well as Kenneth Williams, Bobby Williams, and Uptown, on September 25, 2018.  She asserts eleven different causes of action, each implicating the Lender Defendants.  In Count I, Al-Sabah alleges that each Lender Defendant engaged in a civil conspiracy with the "Core Conspirators," Agbodjogbe and Kenneth Williams, to defraud Al-Sabah by extracting equity from the properties that Agbodjogbe purchased with her money.  *Id.*  First, Al-Sabah alleges that WBL joined the conspiracy in 2016 after ignoring several alleged "red flags" raised by Agbodjogbe's application,

14

including his ever-changing explanations about the source of his wire transfers, his relatively modest cash flow, and his overall inability to substantiate many of the claims he made to WBL during the underwriting process. *Id.* ¶¶ 147-49. This knowledge, coupled with WBL's alleged failure to conduct "any reasonable due diligence or investigation," "is evidence that WBL agreed to join and actively participated in the Conspiracy." *Id.* ¶¶ 148-49. Al-Sabah also points to the fact that WBL executed the Pikesville Mortgage in March, 2017, despite knowledge of the *lis pendens* that had been filed. *Id.* ¶ 150.

Al-Sabah further alleges that Sharestates and IRM Plaza joined the conspiracy, in order to benefit from the lucrative terms ascribed to the loans, despite "knowing that Ms. Al-Sabah provided the funds used to purchase the Properties, that those funds were not gifts, and that Agbodjogbe was engaging in fraud." *Id.* ¶ 151. She alleges that Sharestates and IRM Plaza "were aware of many of the same red flags that WBL ignored," in addition to the fact that Agbodjogbe "had already squandered hundreds of thousands of dollars in fees and penalties to refinance the mortgages because he was unable to repay them." *Id.* ¶ 152. She claims that each conspirator's shared goal and motive was to "extract as much money" as possible from the properties before the fraud and conspiracy were discovered. *Id.* ¶ 153. Based upon the same facts, Al-Sabah asserts, in Count II, that each Lender Defendant aided & abetted Agbodjogbe's fraud. *Id.* ¶¶ 156-58.

Counts III and IV allege that the Lender Defendants committed Fraud by Omission, and Constructive Fraud, against Al-Sabah. *Id.* ¶¶ 159-62. She alleges that each Lender Defendant "knew, or willfully ignored the obvious indicia, that Ms. Al-Sabah was the equitable owner of the properties, [] that Agbodjogbe had purchased them with Ms. Al-Sabah's funds, and that Agbodjogbe's claimed ownership of the [p]roperties, as it existed on paper, was a fiction." *Id.* ¶

15

159.  She also claims that each Lender Defendant "kn[ew] with virtual certainty that Agbodjogbe could never repay the loans," but nonetheless charged "exorbitant terms to which no bona fide borrower would have agreed."  *Id.*  They charged these terms, however, because they knew that the market value of the properties would act as a "backstop" in the event of foreclosure.  *Id.* Thus, Al-Sabah alleges that the Lender Defendants "owed a duty to the actual/equitable owner," which she claims is herself, to both "alert her to Agbodjogbe's efforts to fraudulent[ly] extract from her properties all of the equity," and "not to proceed with the transactions that [they] knew were dissipating the equity" in each property.  *Id.*  Despite these duties, the Lender Defendants allegedly designed the transactions to transfer from her, to Agbodjogbe, "millions of dollars of ill-gotten equity," all while "enriching themselves through fraudulent commissions, fees, charges, penalties, interest, and other sums."  *Id.* ¶ 162.  In the alternative, Count V alleges that, based on these same facts, the Lender Defendants are liable in negligence to Al-Sabah, for they had a duty to "alert her, as the equitable owner of the properties, to the suspicious nature of the transactions," but failed to do so.  *Id.* ¶¶ 163-65.  These facts also form the basis for Count X, which asserts a claim of Mortgage Fraud and Conspiracy to Commit Mortgage Fraud, in violation of the Maryland Mortgage Fraud Protection Act, Md. Code Ann., Real Prop. § 7-406. *Id.* ¶¶ 180-85.

Count VI, entitled "Constructive Trust," seeks the imposition of a constructive trust over the properties that the Lender Defendants executed mortgages for with Agbodjogbe.  *Id.* ¶¶ 166-69.  Al-Sabah seeks to have the Lender Defendants "equitably estopped from asserting any right to foreclose on any of the [p]roperties," and stripped of the liens they have on those properties. *Id.* ¶¶ 168-69.

16

Count VII asserts that, based on their "actual or constructive knowledge" of Al-Sabah's equitable ownership of the subject properties, the Lender Defendants were unjustly enriched. *Id.* ¶¶ 170-72. Al-Sabah seeks to equitably estop the Lender Defendants "from retaining any of such gains," and to force them to remit those gains to her. *Id.* ¶ 172.

Counts VIII ("Quiet Title/Invalidate Liens on Maryland Properties"), IX ("Declaratory Judgment"), and XI ("Invalidate New York Mortgage Due to Fraud"), all seek to invalidate the Lender Defendants' liens against the relevant properties, and ask this Court to issue an Order declaring Al-Sabah the rightful owner of each property. *Id.* ¶¶ 173-79, 186-96.

## II.    LEGAL STANDARDS

The Lender Defendants have moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). When, in cases such as this, the pleadings have closed, Rule 12(c) permits a party to move for judgment on the pleadings, as long as such motion comes "early enough to not delay trial." The Federal Rules provide that in such a motion, a party may assert that the plaintiff has failed to state a claim, and/or that she has failed to join a required party under Rule 19(b). Fed. R. Civ. P. 12(h)(2). The Lender Defendants invoke both grounds in their Motion. ECF 47; ECF 47-1 at 5.

In deciding any Rule 12(c) motion, this Court must accept all well-pleaded factual allegations in the Complaint. *Pulte Home Corp. v. Montgomery County*, 909 F.3d 685, 691 (4th Cir. 2018) (quoting *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 705 (4th Cir. 2016)). The Court may also accept as true factual allegations in the Answer(s), but only where they do not contradict the allegations in the Complaint. *See Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011) (citation omitted); *see also Jadoff v. Gleason*, 140 F.R.D. 330, 331 (M.D.N.C. 1991) (explaining that, since a plaintiff need not reply to an Answer

under Rule 8(b)(6), any contradictory allegations contained in an Answer are deemed denied and therefore cannot be considered under Rule 12(c)). Those facts, and any "inferences to be drawn therefrom," must be viewed "in the light most favorable to the nonmoving party." *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019) (quoting *Hanover Ins. Co. v. Urban Outfitters, Inc.*, 806 F.3d 761, 768 (3d Cir. 2015)). Indeed, a Rule 12(c) motion grants this Court no license to "resolve the merits of the plaintiff's claims or any disputes of fact." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (citing *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012)); *see also* CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1367 (3d ed. 2010) ("The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."). This Court also need not accept legal conclusions drawn from the facts, or a legal conclusion "couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Nat'l Cas. Co. v. Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 600 (D. Md. 2006) (citation omitted).

A Rule 12(c) motion for failure to state a claim is "assessed under the same standard that applies to a Rule 12(b)(6) motion." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Whether a complaint states a claim for relief is typically determined by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). In other words, the plaintiff's complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the]

actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'").

Al-Sabah asserts several claims sounding in fraud. Federal Rule of Civil Procedure 9(b) provides that any claim "alleging fraud or mistake . . . must state with particularity the circumstances constituting the fraud or mistake." *See also Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (noting that Rule 9(b) applies not just to causes of action or elements of fraud, but to claims whose allegations "sound in fraud"). This means that any plaintiff alleging fraud must "identify with some precision the date, place, and time of active misrepresentations or the circumstances of active concealments, specifying which Defendant or Defendants is or are supposedly responsible for those statements or omissions." *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007); *see United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010). While more onerous a burden than that imposed by Rule 8, Rule 9(b) "does not require elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 453 (D. Md. 2019) (quoting *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991)). Moreover, elements such as "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Whether the Rule 8(a)(2) or 9(b) pleading standard applies, a motion for judgment on the pleadings should be granted only if "it appears certain that the plaintiff cannot prove any set of facts in support of [her] claim entitling [her] to relief." *Drager*, 741 F.3d at 474 (quoting *Edwards*, 178 F.3d at 244); *see also Pulte Home Corp*, 909 F.3d at 691. Granting a Rule 12(c)

motion, however, is not tantamount to a dismissal with prejudice. *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 501 & n.7 (E.D. Pa. 2014). "[D]ismissal of claims upon a motion for judgment on the pleadings *can* be with prejudice, if amendment would be futile, but there certainly is no categorical rule that judgment on the pleadings is per se with prejudice." *Id.* at 501; *see also 180S, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638-39 (D. Md. 2009) (explaining, in the Rule 12(b)(6) context, that claims should be dismissed with prejudice only if "there is no set of facts the plaintiff could present to support [her] claim").

## III.    ANALYSIS

The Lender Defendants have challenged the sufficiency of Al-Sabah's allegations as to all but one of the eleven claims for relief she asserts in her Complaint. ECF 47-1 at 12-36.[3] Additionally, the Lender Defendants have asserted various procedural grounds for dismissal of Al-Sabah's entire Complaint. *Id.* at 36-44; ECF 72; ECF 73. The Court will consider first the procedural grounds for dismissal, followed by the sufficiency of the allegations for each specific claim for relief.

### A.    The Procedural Claims for Dismissal

The Lender Defendants, collectively, assert three procedural reasons for dismissing the Complaint in its entirety:  (1) that Rule 19 bars the instant suit for failure to join a required party; (2) that the doctrines of res judicata and collateral estoppel preclude Al-Sabah's instant claims;

---

[3] Count XI of the Complaint also lodges a claim of statutory mortgage fraud under New York law against Sharestates. ECF 1, ¶¶ 186-96. The Lender Defendants' Motion, however, only offers argument as to the MMFPA claim in Count X. ECF 47-1 at 17-20. The only time Count XI is mentioned is once, in passing, in the Reply. ECF 56 at 6. This lone reference is insufficient to justify this Court's consideration of judgment on the pleadings as to Count XI. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734-35 (D. Md. 2006) (noting the "ordinary rule in federal courts . . . that an argument raised for the first time in a reply brief or memorandum will not be considered.").

and (3) that the equitable doctrine of laches bars the instant suit.  ECF 47-1 at 38-44; ECF 56 at 23-27; ECF 72; ECF 73.  As explained below, each contention lacks merit.

### 1.    Rule 19 Failure to Join a Required Party

First, the Lender Defendants argue that Rule 19 bars the instant suit, because Al-Sabah was required to join the Lender Defendants in her previous suit against Agbodjogbe.  ECF 47-1 at 38-42; ECF 56 at 23-25.  Since that lawsuit has now concluded, they cannot be joined, therefore precluding the instant suit.  *Id.* at 41-42.  This argument is misplaced.

Federal Rule of Civil Procedure 19 governs the required joinder of necessary, or "required," parties.  The Rule 19 analysis involves a two-step inquiry.  *See Owens-Ill., Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999).  First, the Court must determine if a party is "necessary" to the action.  *Id.*  Rule 19(a) provides that a party is necessary if (1) "in that person's absence, the court cannot accord complete relief among the existing parties," or, as relevant here, (2) "that person claims an interest relating to the action, and disposing of the action in the person's absence may[,] as a practical matter, impair or impede the person's ability to protect the interest."[4]  Fed. R. Civ. P. 19(a)(1)(A)-(B).  This inquiry is "a practical one, and is addressed to the sound discretion of the court."  *R-Delight Holding LLC v. Anders*, 246 F.R.D. 496, 499 (D. Md. 2007) (citation omitted).  Second, if joinder is required, but not feasible, the Court must consider whether the party is indispensable under Rule 19(b) such that dismissal is required.  *Owens-Ill.*, 186 F.3d at 440.  The burden falls on the Lender Defendants to show that Rule 19 requires dismissal.  *See R-Delight*, 246 F.R.D. at 499.

---

[4] The Rule also requires that the person to be joined must be "subject to service of process," and his joinder must not "deprive the court of subject-matter jurisdiction."  Fed. R. Civ. P. 19(a)(1).  The Lender Defendants do not argue that either prerequisite is at issue here.

The Lender Defendants' argument attempts to fit a square peg into the round Rule 19 hole. In essence, the Lender Defendants wish to dismiss *this* action, because they were a necessary party to *another* action. It is axiomatic, however, that Rule 19 does not require a plaintiff to sue all joint tortfeasors together in one action. *See, e.g.*, *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."). Moreover, Rule 19(a)(1) only contemplates dismissal where a party's absence prevents the Court from affording complete relief "among those already parties." Thus, based on Rule 19's plain language, the operative inquiry is whether Al-Sabah's failure to join some other party renders the Court unable to afford complete relief between her and the Lender Defendants *in this case*. The Lender Defendants have made no argument sufficient to satisfy this particular burden.

Even assuming that their argument were properly placed, the Lender Defendants' Rule 19 argument would still fail, because they were not required or indispensable parties in the Agbodjogbe Lawsuit. The jury, and this Court, were able to afford full relief between the parties named in the Agbodjogbe Lawsuit. The Lender Defendants originally argued (over a year ago) that Al-Sabah sought declaratory relief in the Agbodjogbe Lawsuit, namely, for the Court to award her title to all of the disputed properties, which would have impacted the mortgage liens the Lender Defendants have on each property. ECF 47-1 at 36-37. This Court, however, ultimately denied Al-Sabah's request for that relief, based in part on the fact that this case had been filed, and that those issues would be properly addressed in this context. *See Al-Sabah v. Agbodjogbe*, No. SAG-17-730, 2020 WL 1063003, at *4-5 (D. Md. Mar. 4, 2020) (denying Al-Sabah's request for the imposition of a constructive trust over the same properties at issue here, because doing so "may have unintended collateral consequences on the mortgage liens held by

other entities"; equity therefore "require[d] that the Court fully address" all issues regarding property ownership in the context of the instant lawsuit, not the Agbodjogbe Lawsuit). Thus, Rule 19 does not require dismissal of this action.

### 2. Res Judicata and Collateral Estoppel

Next, WBL and Sharestates argue that the judicial doctrines of res judicata and collateral estoppel bar Al-Sabah's instant claims. ECF 72; ECF 73. They base this argument on a decision by New York State Supreme Court Justice Arlene P. Bluth, denying Al-Sabah's motion to intervene in a foreclosure action by Chondrite Asset Trust ("Chondrite") against the NY Condo ("the Foreclosure Action"). *See* Decision and Order, *Chondrite Asset Trust v. 9 Jewels, LLC*, No. 850005/2018 (N.Y. Sup. Ct., N.Y. Cty. Apr. 30, 2019), NYSECF No. 76 [a true copy filed in this case, and hereinafter cited to, as ECF 56-1]. In that proceeding, Chondrite – the assignee of the mortgage and note on the NY Condo from Sharestates – sought to foreclose on the property, but Al-Sabah moved to intervene, claiming that she was the equitable owner of the property. *Id.* at 1-3. Justice Bluth, however, denied Al-Sabah's motion to intervene. *Id.* at 11. Her decision, WBL and Sharestates argue, has preclusive effect in this litigation. ECF 72, 73.

Before addressing the substance of the parties' arguments, the Court must first address the threshold issue of which state's res judicata and collateral estoppel law should apply. Both parties assume that Maryland law governs this Court's analysis. *See* ECF 72 at 2; ECF 73 at 2-3; ECF 77 at 1-2. This Court disagrees.

A federal court sitting in diversity generally must apply the choice of law rules of its forum state. *See, e.g.*, *Padco Advisors, Inc. Omdahl*, 179 F. Supp. 2d 600, 605 (D. Md. 2002). In conjunction with this principle, then, this Court must utilize Maryland's choice of law rules to determine the preclusive effect of the alleged New York state court judgment. *See St. Paul Fire*

*& Marine Ins. Co. v. Lack*, 476 F.2d 583, 585 (4th Cir. 1973) ("Since jurisdiction here is based on diversity, the law of the state where the District Court sits . . . controls questions of res judicata and collateral estoppel."); *cf. Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 218 (4th Cir. 2006) (holding that a federal court sitting in diversity must determine the preclusive effect of a prior judgment rendered by another federal court previously sitting in diversity by referring to the claim preclusion rules of the forum of the court in the first action). Maryland law, in turn, requires courts to determine the preclusive effect of a prior judgment of a foreign state according to the law of the foreign state in which the judgment was rendered. *Jessica G. v. Hector M.*, 337 Md. 388, 404 (1995) (citing cases). Thus, this Court must determine the preclusive effect of the New York state court decision according to principles of New York law.

Under New York law, res judicata, also known as claim preclusion, bars a subsequent lawsuit if a prior lawsuit "between the same parties on the same cause of action" reaches a "valid final judgment." *Parker v. Blauvelt Volunteer Fire Co.*, 712 N.E.2d 647, 649 (N.Y. 1999); *see also O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981). This doctrine applies not only to those who were actually a party to the prior litigation, but also those in privity with them. *E.g.*, *Syncora Guar. Inc. v. J.P. Morgan Sec. LLC*, 970 N.Y.S.2d 526, 530 (App. Div. 2013).

Sharestates argues that it was a party to the Foreclosure Action, because Al-Sabah attempted to file a counterclaim in that case that would have named Sharestates as a "Third-Party Defendant." ECF 72 at 4. This argument lacks merit. Sharestates was never actually a party to the Foreclosure Action. Justice Bluth concluded that Al-Sabah lacked an interest to intervene in Chondrite's foreclosure action precisely because there were no allegations connecting Chondrite to the alleged fraud. ECF 56-1 at 6; *see also id.* at 7 ("[Al-Sabah] cannot combine the roles of Sharestates and [Chondrite] without more detailed allegations about the positions of each

entity."). Justice Bluth's opinion focused not on the allegations made against Sharestates, but on the fact that Al-Sabah's proposed counterclaim against Chondrite lacked any factual allegations connecting Chondrite to the alleged fraud scheme with Agbodjogbe. *Id.* at 6. Accordingly, Justice Bluth concluded that Chondrite was a bona fide purchaser for value, whose interest in the NY Condo could not be disturbed by Al-Sabah's claims. *Id.* 8-9. Al-Sabah was never granted leave to actually file her *proposed* counterclaim in that action. Sharestates therefore cannot establish that it was ever a party to the Foreclosure Action, a necessary element for the application of res judicata.

Sharestates and WBL next argue that Al-Sabah is collaterally estopped from litigating the issue of their intentional and/or negligent conduct in issuing loans to Agbodjogbe. ECF 72 at 6-7; ECF 73 at 3-5. Collateral estoppel is a corollary of res judicata. *Gramatan Home Inv'rs Corp. v. Lopez*, 386 N.E.2d 1328, 1331 (N.Y. 1979). This doctrine "permits in certain situations the determination of an issue of fact or law raised in a subsequent action by reference to a previous judgment on a different cause of action in which the same issue was necessarily raised and decided." *Id.* In essence, then, there are two essential elements: "(1) the identical issue was necessarily decided in the prior proceeding and is decisive of the present action; and (2) there was a full and fair opportunity to contest that issue in the prior proceeding." *Zimmerman v. Tower Ins. Co. of N.Y.*, 788 N.Y.S.2d 309, 311 (N.Y. App. Div. 2004). Whether the party had a "full and fair opportunity" to contest the prior determination "involves a practical inquiry into 'the realities of the litigation,'" and "cannot be reduced to a formula." *Gilberg v. Barbieri*, 423 N.E.2d 807, 809 (N.Y. 1981) (quoting *Schwartz v. Pub. Adm'r of Cty. of Bronx*, 246 N.E.2d 725, 729 (N.Y. 1969)); *see also Moore v. Aegon Reinsurance Co. of Am.*, 608 N.Y.S.2d 166, 170 (App. Div. 1994). "[T]he burden rests upon the proponent of collateral estoppel to demonstrate

25

the identicality and decisiveness of the issue, while the burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in [the] prior action or proceeding." *Parker*, 712 N.E.2d at 651 (quoting *Ryan v. N.Y. Tel. Co.*, 467 N.E.2d 487, 491 (N.Y. 1984)).

Sharestates's and WBL's invocation of collateral estoppel fails, for the issue decided in the Foreclosure Action is not identical to the issues to be decided here vis-à-vis Sharestates and WBL. In support of their argument, Sharestates and WBL largely point to conclusory language from Justice Bluth's summary paragraphs at the end of her opinion. *See* ECF 72 at 5-6 & n.6; ECF 73 at 3. An analysis of the substance of Justice Bluth's opinion, however, demonstrates that her ruling was only predicated on the finding that there were no allegations to refute the notion that Chondrite was a bona fide purchaser of the NY Condo note. *See* ECF 56-1 at 6 ("But completely absent from her allegations is any mention of [Chondrite's] role in the fraud."); *id.* at 7 ("[W]hile not dispositive, [Chondrite] was surely entitled to consider the fact that other entities previously loaned money to [9] Jewels for this property when conducting its own due diligence. And [Al-Sabah] does not allege what due diligence [Chondrite] should have conducted or failed to do. Instead, she provides specific complaints about WBL and Sharestates."). Though Justice Bluth held that that there was no duty on Chondrite to "investigate and confirm the sources of all funds available" to Agbodjogbe prior to purchasing the loan, this finding was made solely in reference to Chondrite's due diligence upon acquiring the NY Condo note from Sharestates. *Id.* at 8-9. Indeed, Justice Bluth found that "[t]here was nothing to put [Chondrite] on notice that [Al-Sabah's] purported interest in the property was fraudulently extinguished." *Id.* at 8; *see also id.* at 10 ("This inquiry is whether the facts *at the time [Chondrite] took over the loan* raised red flags that a reasonable lender would not have ignored" (emphasis added)). Thus, while there will

be some overlapping facts in this case, the inquiry into whether Sharestates and WBL executed their respective mortgages with Agbodjogbe under fraudulent or negligent circumstances is not identical to that which governed an analysis of Chondrite's purchase of the note from Sharestates.

Sharestates and WBL latch onto language from the final paragraph of the Opinion in an attempt to bolster their collateral estoppel argument:

> Of course, in hindsight, it is easy to argue that Sharestates or WBL did shoddy due diligence and that if they had properly questioned the source of [9] Jewels'[s] funding to purchase the property, it would have immediately revealed a massive fraud.  But that revisionist history misses a key point—the property upon which the mortgage was secured was purchased for over $2 million by an entity in which Agbodjogbe was the sole member.  And the mortgage was worth less than the value of the property.

ECF 56-1 at 11-12.  Assuming *arguendo* that these remarks speak to the reasonableness of Sharestates and/or WBL's conduct in dealing with Agbodjogbe directly, the remarks are dicta, for they do not bear on the ultimate issue of Chondrite's reasonableness in investigating its purchase of the NY Condo note.  As such, they cannot be given preclusive effect, under New York law.  *See Pollicino v. Roemer & Featherstonhaugh P.C.*, 716 N.Y.S.2d 416, 417 (App. Div. 2000) ("Language that is not necessary to resolve an issue, however, constitutes dicta and should not be accorded preclusive effect." (citing *Stokes v. Stokes*, 65 N.E. 176, 181 (N.Y. 1902))).  Accordingly, the Motion for Judgment on the Pleadings on res judicata and collateral estoppel grounds will be denied, without prejudice to the Lender Defendants' raising other collateral estoppel issues at a later stage.[5]

---

[5] At this point, Chondrite (who is not a party to these proceedings) has successfully foreclosed on the NY Condo.  *See* Judgment, *Chondrite Asset Trust*, No. 850005/2018 (N.Y. Sup. Ct., N.Y. Cty. Dec. 2, 2019), NYSECF No. 141.  It may be that, as a result, Al-Sabah cannot invalidate the mortgage associated with that property under res judicata and/or collateral estoppel principles.

### 3.        Doctrine of Laches

Finally, the Lender Defendants seek judgment on the pleadings based on the doctrine of laches. ECF 47-1 at 42-44. Federal Rule of Civil Procedure 8(c) provides that a defendant may plead laches as an affirmative defense. *See also Jones v. State*, 445 Md. 324, 339 (2015) (noting that laches serves as an affirmative defense under Maryland state law). Laches only applies to claims for equitable relief, and not to legal claims. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (noting that laches is "properly relevant only where the claims presented may be characterized as equitable, rather than legal"); *Ross v. State Bd. of Elections*, 387 Md. 649, 668 (2005) (noting that laches is "a defense in equity against stale claims" (quoting *Parker v. Bd. of Election Supervisors*, 230 Md. 126, (1962))).

Because this is a diversity action, Maryland law controls the substantive analysis of the Lender Defendants' laches defense. *See, e.g.*, *Cornell v. Council of Unit Owners Hawaiian Vill. Condos., Inc.*, 983 F. Supp. 640, 642 (D. Md. 1997) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The doctrine of laches may bar a plaintiff's equitable claims for relief under Maryland law where (1) the plaintiff unreasonably delays in asserting a ripe claim, and (2) that delay prejudices the defendant. *See Ademiluyi v. Md. State Bd. of Elections*, 458 Md. 1, 9 (2018) (quoting *Jones*, 445 Md. at 339); *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 590 (2014). The passage of time, alone, does not *ipso facto* give rise to a successful laches defense. *Buxton v. Buxton*, 363 Md. 634, 645 (2001). Instead, courts must consider time as just "one of the many circumstances" informing the ultimate, case-specific determination of whether a plaintiff's delay is unreasonable or unjustifiable. *Id.* (quoting *Parker*, 230 Md. at 130). In fact, Maryland courts hold that laches may even bar a claim brought within the relevant statute of

---

The Court expresses no view on this issue at this time, however, as neither WBL or Sharestates raised it in their supplemental briefing. *See* ECF 72, 73.

limitations. *Id.* at 646.  However, for laches to apply in any situation, a party must have known, or reasonably should have known, of the facts giving rise to her claim, "since laches implies negligence in not asserting a right within a reasonable time after its discovery." *Id.* (quoting *Parker*, 230 Md. at 131).  The prejudice necessary to establish a successful laches defense is "generally held to be anything that places [the party asserting laches] in a less favorable position." *Parker*, 230 Md. at 130-31; *see also Liddy v. Lamone*, 398 Md. 233, 244 (2007) (citation omitted).  The type of conduct that justifies applying the doctrine of laches "must be determined by the facts and circumstances of each case." *Ross*, 387 Md. at 669 (quoting *Parker*, 230 Md. at 130).

As a procedural matter, in certain cases, the doctrine of laches may be decided in a pre-discovery motion to dismiss or motion for judgment on the pleadings.  *See Knickman v. Prince George's County*, 187 F. Supp. 2d 559, 565 n.4 (D. Md. 2002) (citing *Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996)).  This will occur, however, only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *see Alexander*, 801 F. Supp. 2d at 445 (applying this principle to a laches defense asserted in a motion for judgment on the pleadings); *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, No. DKC-09-2357, 2010 WL 3781660, at *9 (D. Md. Sept. 23, 2010) (applying this principle to a laches defense at the Rule 12(b)(6) stage).  At all times, the burden remains with the party asserting laches to prove that it applies.  *See White*, 909 F.2d at 102.

The Lender Defendants' laches arguments are unavailing on the current record.  First, the Lender Defendants argue that Al-Sabah's delay in bringing her instant claims was unreasonable, because "if Plaintiff wanted the Court to determine her ownership in property in which the

Lenders had an interest, Plaintiff was required to join the Lenders in the [Agbodjogbe Lawsuit]." ECF 47-1 at 43. This, they argue, prejudiced their ability to participate in discovery in the Agbodjogbe Lawsuit, and to adequately protect their interests in that proceeding. *Id.* at 43-45. As described above, however, this Court took no action in the Agbodjogbe Lawsuit that impacted the Lender Defendants' rights in the subject properties. Even assuming there was some unreasonable delay, there simply is no prejudice. The Lender Defendants will be free to depose the same individuals that Al-Sabah deposed in discovery in the Agbodjogbe Lawsuit, including Agbodjogbe himself. They are in no less favorable position now than they would have been as co-defendants in the Agbodjogbe Lawsuit.

The Lender Defendants' second argument, explicated for the first time in their Reply, focuses on the alleged lack of due diligence on Al-Sabah's part to discover Agbodjogbe's fraud. ECF 56 at 25-27. Had she acted on her suspicions in the spring of 2016, the argument goes, Al-Sabah could have prevented any mortgage from being taken out on the properties, thereby mitigating her damages. *Id.* at 26.

Viewing the facts in a light most favorable to Al-Sabah, as this Court must at this stage, it cannot be said that, as a matter of law, Al-Sabah unreasonably delayed in filing this suit against the Lender Defendants. It is true that Al-Sabah began to grow suspicious of Agbodjogbe sometime in the spring of 2016. ECF 1, ¶ 116. However, upon her suspicions, she demanded Agbodjogbe to provide her with documentation regarding who owned the properties, and he made continued (and failed) promises to do so throughout 2016. *Id.* ¶¶ 116-17. Eventually, Agbodjogbe "cut[] off all communication" with Al-Sabah, prompting her to investigate him and his businesses in November, 2016. *Id.* ¶ 118. She then confronted him in December, 2016, through counsel. *Id.* Further, when she sued Agbodjogbe in March, 2017, she filed a Notice of

*Lis Pendens* on each of the subject properties, but even that did not prevent each Lender Defendant from executing mortgages on the Pikesville Home (WBL), on 327 North Eutaw (Sharestates), and on 5722 York Road and 306-10 North Howard, collectively (IRM Plaza). *Id.* ¶¶ 126-38. Even a publicly filed *lis pendens*, then, did not deter the Lender Defendants from negotiating with Agbodjogbe. Moreover, once Al-Sabah learned of the terms of the mortgages during discovery in the Agbodjogbe Lawsuit, she promptly filed the instant lawsuit. *Id.* ¶ 5. To conclude that Al-Sabah did not act reasonably during this time period would require the Court to make factual inferences and conclusions against her, which it may not do at the current stage of the proceedings. Further discovery on this issue is necessary, and dismissal is not appropriate.

## B.      The Negligence Claim

Turning to the merits of each count, the Court beings by analyzing the sufficiency of Al-Sabah's negligence claim. *See* ECF 1, ¶¶ 163-65 (Count V). Before proceeding, however, the Court must preliminarily address a choice of law issue presented by Al-Sabah's negligence claim.

In the over 100 pages of collective briefing before the Court, neither party addresses the conflicts of law issue. Instead, throughout, the parties presume that Maryland law governs the outcome of each legal issue. *See generally* ECF 47-1, 52, 56, 72, 73, 77. As noted, when this Court sits in diversity, it must apply the choice of law rules of its forum state, Maryland. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). It is equally well-settled that for causes of action sounding in tort, Maryland courts apply the *lex loci delicti* rule, which demands that courts apply "the law of the State where the injury—the last event required to constitute the tort—occurred." *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 605, 606 (D. Md. 2008) (citations omitted).

It appears that Al-Sabah could, arguably, have suffered injuries in multiple states (i.e., New York and Maryland).  "Maryland courts have not, however, squarely addressed the proper application of *lex loci delicti* in cases where the wrongful conduct in one jurisdiction causes pecuniary loss . . . to the plaintiff in another jurisdiction," let alone in multiple jurisdictions.  *Dell v. DeTar*, No. JFM-16-00887, 2017 WL 3835679, at *4 (D. Md. Aug. 31, 2017) (collecting cases).  The Maryland Court of Appeals has noted, however, that where a party fails to give "notice of an intent to rely on foreign law," and it is clear that another State's law may control, courts have the discretion to "presume that the law of the other jurisdiction is the same as Maryland law."  *Chambco, Div. of Chamberlin Waterproofing & Roofing, Inc. v. Urban Masonry Co.*, 338 Md. 417, 421 (1995).  Given that the parties here "have relied upon Maryland law and have not identified any relevant legal principles that might differ in other jurisdictions," this Court will presume that Maryland law controls.  *Ademiluyi*, 929 F. Supp. 2d at 514; *see also Bank of La. v. Marriott Int'l, Inc.*, MDL No. PWG-19-2879, Case No. PWG-18-3833, 2020 WL 607006, at *7 (D. Md. Feb. 7, 2020) ("Courts applying Maryland's choice of law rules only use Maryland law to evaluate substantive law claims as a default when both parties only cite Maryland law in their briefing.); *Fidelity & Guar. Life Ins. Co. v. United Advisory Grp., Inc.*, No. WDQ-13-0040, 2014 WL 346630, at *4 (D. Md. Jan. 29, 2014) (applying Maryland law, and deferring ruling on the complex choice of law issue, because the state of the injury was not alleged and both parties cited exclusively to Maryland law).[6]

---

[6] This Court's deferral on the choice of law issue does not conflict with its determination that New York law applies to the Lender Defendants' res judicata and collateral estoppel claims.  The choice of law issue vis-à-vis the tort claims is "fact-intensive, context specific, and complex[]," and therefore may properly be deferred until after discovery.  *Malinowski v. Lichter Grp., LLC*, No. WDQ-14-917, 2015 WL 1129522, at *4 (D. Md. Mar. 11, 2015) (cleaned up).

It is hornbook law that, to prevail on a negligence claim in Maryland, Al-Sabah must demonstrate that (1) the Lender Defendants owed her a duty of care, (2) the Lender Defendants breached that duty, (3) said breach was the proximate cause of her injury, and (4) she sustained damages. *See Valentine v. On Target*, 353 Md. 544, 549 (1999). Al-Sabah alleges that, based on what the Lender Defendants learned during their due diligence, they owed her "a duty to alert her, as the equitable owner of the properties, to the suspicious nature of the transactions then underway." *Id.* ¶ 164. She alleges that the Lender Defendants breached that duty by failing to so alert her. *Id.* ¶ 165. The Lender Defendants seek judgment on the pleadings as to this count for two reasons: (1) they lacked a legally cognizable duty of care; and (2) Al-Sabah was contributorily negligent and/or assumed the risk of her conduct in dealing with Agbodjogbe. ECF 47-1 at 27-31. As explained below, both contentions lack merit, at this stage.

### 1. Under the Unique Facts Alleged, Taken as True, the Lender Defendants Owed Al-Sabah a Duty of Care.

The atypical, well-pleaded facts alleged in the Complaint give rise to a plausible inference that the Lender Defendants owed Al-Sabah a legally cognizable duty in tort. A "duty" is "an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 532 (1986) (citation omitted). Whether a duty exists is a question of law for the Court. *Doe v. Pharmacia & Upjohn Co., Inc.*, 388 Md. 407, 414 (2005); *Bobo v. State*, 346 Md. 706, 716 (1997).

Determining whether a duty exists is, at its core, "a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Gourdine v. Crews*, 405 Md. 722, 745 (2008) (quoting *Patton v. USA Rugby*, 381 Md. 627, 636-37 (2004)); *see also Rosenblatt v. Exxon*, 335 Md. 58, 77 (1994). There is no "precise formula" for determining

whether a defendant owes a duty of care, *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 12 (2000), though the existence of a duty is generally influenced by "(1) the nature of the harm likely to result from a failure to exercise due care, and (2) the relationship that exists between the parties," *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 213-14 (2013) (quoting *Jacques*, 307 Md. at 534).   In the ordinary tort case alleging a physical injury, the principal consideration is foreseeability.  *See, e.g.*, *Patton*, 381 Md. at 637.

Where, as here, a plaintiff only alleges an economic injury, courts require a closer relationship between the parties before imposing a tort duty upon a defendant.  *Id.* at 534-35.  This is referred to as the "economic loss doctrine."  *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 612 (2017).  Under the economic loss doctrine, if "the failure to exercise due care creates a risk of economic loss only," the plaintiff must demonstrate that "an intimate nexus" exists between herself and the defendant for tort liability to exist for those economic harms.  *Jacques*, 307 Md. at 534.  "This intimate nexus is satisfied by contractual privity or its equivalent."  *Id.* at 534-35.

Here, despite Al-Sabah's claim that she is the equitable owner of the subject properties, she cannot establish direct contractual privity with any Lender Defendant.  *See Iglesias v. Pentagon Title & Escrow, LLC*, 206 Md. App. 624, 648 (2012) (finding a lack of direct contractual privity between an individual, Iglesias, and a lender, despite the fact that the loans were in Iglesias's name, because a second individual, Ramirez, used a fraudulent Power of Attorney to take out the loans in Iglesias's name without Iglesias's knowledge), *cert. denied*, 430 Md. 346 (2013).  Thus, Al-Sabah must show that she was in the equivalent of privity with the Lender Defendants, in order to establish a duty.

Maryland courts have employed different inquiries to determine whether the equivalence of privity exists between a plaintiff and defendant. *See Balfour*, 451 Md. at 615-20 (collecting cases). At minimum, the privity-equivalent analysis requires a level of conduct linking the plaintiff to the defendant demonstrating that "the defendant knew or should have known of the plaintiff's reliance." *Id.* at 620; *see also Chi. Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 297 (2006) ("[A] defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care." (quoting *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 684 (2000))). "This means, of course, that context is critical." *Balfour*, 451 Md. at 620-21 (citing *Blondell v. Littlepage*, 413 Md. 96, 119 (2010)).

Maryland courts, as well as courts in this District, have had occasion to consider whether an "intimate nexus" exists between a bank and a non-customer. The general rule that has developed is that "a bank, with certain narrow exceptions, does not owe a duty to a non-customer with whom it has no direct relationship." *Nat'l Grange Mut. Ins. Co. v. Verizon's Benefits Ctr.*, 541 F. Supp. 2d 745, 749 (D. Md. 2008); *accord Schuster v. SLM Corp.*, Civil No. CCB-17-2108, 2017 WL 4777708, at *2-3 (D. Md. Oct. 23, 2017); *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 345 (D. Md. 2003); *see also Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (in analyzing a question of first impression under North Carolina law, collecting cases from across the country for the proposition that "a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship"). In each of these cases, courts rejected the notion that the defendant banks had any "intimate nexus" with the plaintiffs, who were the victims of fraud or identity theft, simply because the bank maintained the fraudulent account. *Schuster*, 2017 WL 4777708, at *2-4 (bank owed no duty of care to

35

plaintiff, who was previously a borrower with said bank, regarding economic harm caused by a third-party's opening a fraudulent account in plaintiff's name; neither the previous lending relationship, nor Maryland law generally, imposed an ever-present duty on the bank to monitor for, and protect noncustomers from, fraud); *Nat'l Grange*, 541 F. Supp. 2d at 747-48, 751-52 (no equivalence of privity between minor and bank; the minor's previously-appointed guardian deposited misappropriated funds entrusted to her that were maintained in an account with the defendant bank, but the bank had no knowledge that the funds were guardianship funds); *Nat'l Union Fire*, 282 F. Supp. 2d at 342-43, 345 (no duty owed by banks to plaintiff, where a fraudster opened up an account in the plaintiff's name at the bank, and the bank allowed the fraudster to deposit checks into that account). Considering the unique facts that Al-Sabah alleges here, however, the decisions of the Maryland Court of Appeals in *Chicago Title*, and the Court of Special Appeals in *Iglesias*, provide helpful guidance.

*Chicago Title* represents the only decision in which the Court of Appeals has recognized an intimate nexus between a bank and a non-customer. In that case, an individual, Shannahan, refinanced his home, and received settlement services from First Equity. 394 Md. at 277. First Equity learned that two deeds of trust existed against Shannahan's property in favor of Farmers Bank, securing a loan and a line of credit Shannahan had with Farmers Bank. *Id.* at 277-78. First Equity directly sent Farmers Bank a check to close the loan. *Id.* Later, following settlement, First Equity forwarded Shannahan a check, drawn on First Equity's account held by Allfirst Bank, payable to Farmers Bank. *Id.* at 278. First Equity concurrently provided Shannahan with a letter instructing Farmers Bank to use that check to close the line of credit. *Id.* Shannahan took the check to Farmers Bank to deposit, but he did not present the letter from First Equity. *Id.* A Farmers Bank manager assisted Shannahan, and after consulting with a Farmers

Bank loan officer, the manager allowed Shannahan to deposit the check made payable to Farmers Bank into Shannahan's personal account. *Id.* Because the line of credit was never closed, and because Shannahan stopped making payments on it, Farmers Bank sought to foreclose on his property. *Id.* at 279. First Equity countered with a negligence claim against Farmers Bank, alleging that Farmers Bank had negligently handled the check that First Equity intended to close the line of credit account. *Id.* at 279, 290.

The Court of Appeals held that the equivalent of privity existed between Farmers Bank and First Equity. *Id.* at 297-98. The court noted that Farmers Bank was aware that First Equity was a title company, and had already received one check from First Equity to close a different loan that Shannahan had with Farmers Bank. *Id.* at 298. In fact, Farmers Bank had provided First Equity with the two "payoff amounts" needed to close the two secured loans Farmers Bank had with Shannahan. *Id.* The court also cited testimony from Farmers Bank's president, who stated that when presented with a check payable to the institution without any other instructions, a branch manager "should make inquiries to the presenter on 'how they wanted to use the funds.'" *Id.* at 297. Considering all of these facts, and that all of Shannahan's debts to Farmers Bank were secured by the same real property, the Court of Appeals determined that Farmers Bank should have been on notice that the check made payable to it by First Equity was in furtherance of a refinance, and should have known that First Equity was relying on Farmers Bank to properly apply the funds to Shannahan's line of credit and close the account. *Id.* at 297-98. Under those circumstances, an "intimate nexus" existed. *Id.* at 300. The court emphasized that its holding "[did] not impose liability on Farmers Bank to an indeterminate class of people for an indeterminate time, but rather, addresses a specific entity, First Equity, for this specific transaction." *Id.* at 299-300.

In *Iglesias*, the Court of Special Appeals considered the principles of *Chicago Title*, and other intimate nexus cases from Maryland and other jurisdictions, and held that a lender-bank was not intimately connected to a noncustomer. *Iglesias*, 206 Md. App. at 647-56. The plaintiff, Maria Iglesias, discovered that another individual, Ramirez, executed a fraudulent Special Power of Attorney ("the Ramirez POA") that purported to grant Ramirez the authority to purchase particular real property ("the English Turn Property") in Prince George's County, Maryland. *Id.* at 632. The POA was signed "Maria Iglesias," and was duly notarized. *Id.* at 632-33. Chase Bank executed two loans, both secured by the English Turn Property, with Ramirez, purportedly acting on Iglesias's behalf through the fraudulent POA. *Id.* The Chase loans named Iglesias as the sole obligor, but noted that Iglesias and Ramirez would be joint tenants. *Id.* at 633 & n.7. Iglesias maintained, however, that she never signed a POA, or any of the documents allegedly signed by her during settlement on the property. *Id.* at 633. A second individual, Canales, also executed a fraudulent, yet duly notarized, Special Power of Attorney ("the Canales POA"), and used that to purchase separate real estate in Germantown, Maryland ("the Sawyer Terrace Property"). *Id.* at 634-35. For both transactions, the fraudsters utilized Pentagon Title and Escrow for settlement. *Id.* at 632-34.

As relevant here, Iglesias sued Chase Bank in negligence, arguing that Chase owed her a duty "to 'take reasonable steps' to ensure that the applicant in the loan transaction in this case was who she represented herself to be." *Id.* at 647. On appeal at the motion to dismiss stage, the Court of Special Appeals rejected this argument, finding that she and Chase were not in the equivalent of contractual privity. *Id.* at 653-56. The court explained that Iglesias alleged no facts "that would have put Chase on notice that the English Turn Property loan transaction was suspect." *Id.* at 653. Iglesias did not allege the breach of a contractual duty, or that Chase

carelessly processed the fraudulent loan application. *Id.* at 653-54. Rather, the court noted, Iglesias's negligence claim rested solely on the notion that Chase issued a loan "on the strength of a notarized POA without verifying that Iglesias had in fact signed the POA." *Id.* at 654. The court refused to find an intimate nexus based "upon Chase's mistaken belief that it was in contractual privity with Iglesias," because there were simply no facts "that would have put Chase on notice that the Ramirez POA, despite bearing a notarial seal, was a forgery." *Id.* at 654-55.

Iglesias also claimed that Pentagon was negligent, because the "'red flags' in each transaction put Pentagon on notice that the POAs were suspect, thus making it foreseeable that Iglesias was likely a victim of identity fraud." *Id.* at 660. Iglesias argued that Pentagon was therefore in the equivalent of contractual privity with her, and that Pentagon had a duty "to investigate whether a fraud was being perpetrated before allowing the sales to proceed." *Id.* at 661. The trial court granted summary judgment in Pentagon's favor. *Id.* at 657-58. The Court of Special Appeals affirmed. The court first noted the legal principle that entities generally have no duty to inquire behind the power of a facially valid POA. *Id.* at 661-63. It reasoned further that the "red flags" that Iglesias alleged "would only be material if they served to put Pentagon on notice that Iglesias likely was the victim of identity fraud, thus enlightening Pentagon to the fact that she would be relying upon it to protect her interests." *Id.* at 663. The court found that none of the "red flags" that Iglesias alleged were "sufficiently unusual to put Pentagon on notice that a fraud was being committed and that Iglesias was relying upon it to protect her from fraud." *Id.* at 663-64. Accordingly, Pentagon owed her no duty of care. *Id.*

Applying these principles, and assuming the truth of Al-Sabah's allegations, she has sufficiently alleged that she was in the equivalent of contractual privity with the Lender Defendants. Beginning with the three loans issued by WBL and Sharestates in 2016 and

January, 2017, Al-Sabah alleges that WBL and Sharestates knew that she provided the funds that Agbodjogbe, and the relevant corporate entities, used to purchase the subject properties outright, without encumbrance.  ECF 1, ¶¶ 79, 81, 91-92, 96 (WBL); *id.* ¶ 108 (Sharestates).  In fact, WBL and Sharestates saw Agbodjogbe's accounts, which indicated the large wire transfers coming into Agbodjogbe's account.  *Id.* ¶¶ 61-63, 107.  Al-Sabah alleges that, in the lending industry, "when a lender observes that a prospective borrower has received large cash transfers into his or her bank accounts, the lender must ensure that those funds belong to the prospective borrower and not someone else, and that they are neither loans nor from illegitimate or unlawful sources." *Id.* ¶ 51.   Neither WBL nor Sharestates ever made any efforts to contact Al-Sabah, despite their knowledge that she was the one who had provided those funds.  *Id.* ¶¶ 92, 109. Unlike in *Iglesias,* the Lender Defendants had no validly notarized POA or other documentation suggesting Al-Sabah's approval of Agbodjogbe's actions. Under these unique circumstances, and drawing all reasonable inferences in Al-Sabah's favor, it is plausible that the Lender Defendants knew, or should have known, "that a fraud was being committed and that [Al-Sabah] was relying upon [them] to protect her from fraud." *Iglesias*, 202 Md. App. at 663-64; *see Chi. Title*, 394 Md. at 297-98.  Al-Sabah has bolstered her Complaint with sufficient "red flags" that WBL and Sharestates became aware of during due diligence that, taken as true, plausibly place them on notice that Agbodjogbe was engaged in fraudulent activity against Al-Sabah.

As to the remaining loans, WBL, Sharestates, and IRM Plaza each executed one *after* Al-Sabah filed a *lis pendens* on each property in March, 2017, and yet still failed to contact Al-Sabah. *Id.* ¶¶ 125-28 (WBL); *id.* ¶¶ 131-33 (Sharestates); *id.* ¶¶ 136-38 (IRM Plaza).  Under the doctrine of *lis pendens*, "an interest in property acquired while litigation affecting title to that property is pending is taken subject to the results of that pending litigation."  *DeShields v.*

*Broadwater*, 338 Md. 422, 433 (1995).  It places "a general notice of an equity to all the world" as to the plaintiff's superior right to the property, assuming she prevails on the merits of her underlying claim.  *Id.* at 435 (citation omitted).  Thus, at minimum, the *lis pendens* notice would have alerted each Lender Defendant to Al-Sabah's fraud claims against Agbodjogbe.  The existence of the *lis pendens* strengthens Al-Sabah's contention that the Lender Defendants were in the equivalent of contractual privity with her, and that she was relying upon them to protect her from further fraudulent activity by the very person she was suing in this Court.

Thus, because each Lender Defendant plausibly was in the equivalence of privity with Al-Sabah, Al-Sabah has sufficiently pled that each Lender Defendant owed her a duty of care to alert her of Agbodjogbe's efforts to execute cash-out mortgages on each property.  Like the Court of Appeals in *Chicago Title*, this Court's determination "[would] not impose liability on [the Lender Defendants] to an indeterminate class of people for an indeterminate time," but rather, would address only the specific, highly unusual pattern of loan activity that impacted Al-Sabah.  394 Md. at 299-300.

>    **2.     The Lender Defendants' Contributory Negligence and Assumption of the Risk Defenses Do Not Compel Dismissal.**

The Lender Defendants also argue that Al-Sabah was contributorily negligent, and/or assumed the risk of her actions.  ECF 47-1 at 29-31.  Al-Sabah counters, however, that there are sufficient allegations in her Complaint to allow for "room for difference of opinion . . . by reasonable minds" as to whether she was contributorily negligent or assumed the risk of investing money with Agbodjogbe.  ECF 52 at 34-35 (quoting *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 717 (2017)).  At the current stage of the litigation, the Court agrees with Al-Sabah.

"Contributory negligence is the neglect of the duty imposed upon all [individuals] to observe ordinary care for their own safety.  It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." *Balt. Gas & Elec. Co. v. Flippo*, 348 Md. 680, 703 (1998) (citation omitted).  Maryland continues to adhere to the rule that a plaintiff's contributory negligence acts as a complete bar to her recovery, "regardless of the quantum of a defendant's primary negligence." *Harrison v. Montgomery Cty. Bd. of Educ.*, 295 Md. 442, 451 (1983); *see Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690-95 (2013) (refusing to abrogate this contributory negligence principle).  Ordinarily, whether a plaintiff was contributorily negligent is a jury question.  *See Reiser v. Abramson*, 264 Md. 372, 377-78 (1972); *Campbell v. Balt. Gas & Elec. Co.*, 95 Md. App. 86, 93 (1993).  However, the Court may take the issue from the jury, and decide it as a matter of law, where the evidence "show[s] some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Flippo*, 348 Md. at 703 (quoting *Reiser*, 264 Md. at 378); *see also May v. Giant Food, Inc.*, 122 Md. App. 364, 383-84 (1998) ("The issue of contributory negligence cannot be taken from the jury unless no reasonable person could reach a contrary conclusion.").

Relatedly, the doctrine of assumption of the risk also acts as a complete bar to a plaintiff's recovery for damages in a negligence action. *ADM P'ship v. Martin*, 348 Md. 84, 91 (1997).  For the doctrine to apply, the defendant must show that the plaintiff "(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Id.* at 90-91 (citing *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 630 (1985)).  "Maryland's courts apply a hybrid objective-subjective standard to determine whether an injured

plaintiff had the requisite knowledge and appreciation of the risk." *Meyers v. Lamer*, 743 F.3d

908, 912 (4th Cir. 2014).   The Maryland Court of Appeals has explained what this hybrid

approach entails:

> The test of whether the plaintiff knows of, and appreciates, the risk involved in a
> particular situation is an objective one, and ordinarily is a question to be resolved
> by the jury.  Thus, the doctrine of assumption of risk will not be applied unless the
> undisputed evidence and all permissible inferences therefrom *clearly* establish
> that the risk of danger was *fully* known to and *understood* by the plaintiff.  On the
> other hand, when it is clear that a person of normal intelligence in the position of
> the plaintiff must have understood the danger, the issue is for the court.

*Schroyer v. McNeal*, 323 Md. 275, 283-84 (1991) (internal citations and quotations omitted)

(emphasis in original).

Here, the Lender Defendants argue that Al-Sabah's actions in sending "millions of

dollars overseas without any legal protections to someone she barely knew" were both negligent

and objectively risky.  ECF 47-1 at 30-31.  They assert that any reasonable person would have

performed some level of due diligence "regarding a large real estate investment," and would

have had some supervision over the funds.  *Id.* at 31.  "By choosing not to initially investigate or

retain legal assistance when making overseas financial transactions worth millions of dollars,

Plaintiff was contributorily negligent and assumed the investment risk as a matter of law."  *Id.*

While this argument may ultimately convince a jury, this Court cannot say that, as a matter of

law, Al-Sabah was contributorily negligent, or voluntarily assumed an obvious risk.  Taking as

true Al-Sabah's allegations that Agbodjogbe successfully cultivated a relationship of deep trust

with her, and utilized that relationship to convince her that he would be able to competently

manage her real estate investment ventures, it is plausible that a jury could find that Al-Sabah

was not negligent, and that the risk she faced was not obvious.  *See* ECF 1, ¶¶ 21-34.  Indeed, it

is not lost on the Court that the same facts that the Lender Defendants cite in their instant

argument were also at issue in the Agbodjogbe trial. The jury, in awarding Al-Sabah damages for fraud, necessarily found that Al-Sabah's reliance on Agbodjogbe's continued misrepresentations was justified and reasonable. This does not bar the Lender Defendants from litigating this issue, but underscores the notion that reasonable minds can differ as to the appropriate conclusion. Accordingly, the Motion to Dismiss Count V will be denied.

    **C.**    **The Common Law Fraud Claims**

    Next, Al-Sabah brings two common law fraud claims – "Fraud by Omission" and "Constructive Fraud" – and a statutory fraud claim under the Maryland Mortgage Fraud Protection Act ("MMFPA"). ECF 1, ¶¶ 159-62 (Counts III-IV). Like with Al-Sabah's negligence claim, this Court will presume that Maryland law governs her fraud claims. *See* Section III.B, *supra*.[7] Fraud by omission, also referred to as fraudulent concealment, "is any statement or other conduct which prevents another from acquiring knowledge of a fact." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 138 (2007). To plausibly allege a claim of fraud by omission, Al-Sabah must allege five elements, with particularity:

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell*, 413 Md. at 119 (quoting *Lloyd*, 397 Md. at 138).

    Constructive fraud occurs where a defendant "breaches a legal or equitable duty to the plaintiff in a way that tends to deceive others, to violate public or private confidence, or to injure

---

[7] At least two courts in this District have held that, under *lex loci delicti*, Maryland courts would apply the law of the forum in which the wrong occurred if faced with a fraud claim involving misrepresentations made in multiple states. *See Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 735 (D. Md. 2005); *Cremi v. Brown*, 955 F. Supp. 499, 522-25 (D. Md. 1997). Even application of this principle to the facts of this case would not produce a clear outcome as to which jurisdiction's law would control Al-Sabah's claims, on the current record.

public interests." *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 69 (2015) (internal quotations and alterations omitted) (quoting *Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374, 421-22 (2006)); *see also, e.g.*, *Md. Envtl. Tr. v. Gaynor*, 370 Md. 89, 97 (2002).   Thus, constructive fraud claims are substantively different than other fraud claims, because the defendant's intent to defraud the plaintiff is irrelevant – the breach of the legal or equitable duty itself is fraudulent, because of its tendency to deceive.   *Chassels v. Krepps*, 235 Md. App. 1, 16 (2017).

The Lender Defendants challenge the sufficiency of Al-Sabah's allegations regarding (1) a duty of disclosure that the Lender Defendants owed to Al-Sabah, (2) Al-Sabah's justifiable reliance on the Lender Defendants' continued silence, and (3) for the purposes of her fraudulent concealment claim only, the Lender Defendants' intent to defraud her.   ECF 47-1 at 13-17; ECF 56 at 7-10.   Each argument is unpersuasive, on the current record.

### 1. Under the Factual Scenario Alleged in the Complaint, the Lender Defendants Had a Duty to Disclose Material Facts to Al-Sabah.

Taking all of Al-Sabah's well-pleaded facts as true, the Lender Defendants plausibly had a duty to disclose material facts to Al-Sabah.   First, a plaintiff can establish a constructive fraud claim by showing that the defendant owed her a legal or equitable duty.   *Thompson*, 443 Md. at 69.   A legal duty includes one imposed by statute, as well as a tort duty.[8]   *See id.*; *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 656 (D. Md. 2012) (citing *Jones v. State*, 425 Md. 1, 19 (2012); *see also Panoqicz v. Hancock*, No. DKC-11-2417, 2015 WL 4231712, at *9 (D. Md. July 9, 2015).   Because, as set forth above, each Lender Defendant plausibly owed Al-Sabah a tort duty, she has alleged a duty sufficient to maintain a constructive fraud claim.

---

[8] The Maryland Mortgage Fraud Protection Act imposes on mortgage lenders a duty to disclose material facts to borrowers in the lending process.   *Ademiluyi*, 929 F. Supp. 2d at 531-32.   As explained in Section III.D, *infra*, Al-Sabah does not plausibly state a claim for relief under that Act.   Accordingly, this statutory duty cannot serve as the basis for the Lender Defendants' duty to disclose, for the purpose of her common law fraud claims.

Generally, Maryland courts refuse to hold a defendant liable for fraud, based on a failure to disclose a fact, "unless there exists a duty of disclosure." *Ademiluyi*, 929 F. Supp. 2d at 531 (quoting *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 100 n.14 (2000)). The duty to disclose, in turn, "is typically predicated on a confidential or fiduciary relationship between two parties." *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 271-72 (2011) (citing *Hogan v. Md. State Dental Ass'n*, 155 Md. App. 556, 566 (2004)). Under Maryland law, "the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor and is not fiduciary in nature." *Yousef v. Trustbank Sav., F.S.B.*, 81 Md. App. 572, 536 (1990). Absent "special circumstances," courts are "exceedingly reluctant" to transform that relationship "into a fiduciary relationship[,] or to impose any duties on the bank not found in the loan agreement." *Parker v. Columbia Bank*, 91 Md. App. 346, 369, *cert. denied*, 327 Md. 524 (1992). Again, the question of whether a duty is owed is a legal one. *Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407, 414 (2005).

Al-Sabah, without citation to case law, argues that the "intimate nexus" that existed between her and the Lender Defendants also gives rise to a duty to disclose material facts, for the purposes of a fraudulent concealment claim. ECF 52 at 19-20, 35. The Lender Defendants counter, however, that Al-Sabah cannot allege a confidential or fiduciary relationship necessary to trigger a duty of disclosure to her. ECF 47-1 at 13-15.

There appears to be some merit to the Lender Defendants' argument that the scope of the duty to disclose, for the purposes of a fraudulent concealment claim, is more narrow than the general duty of care that governs a negligence claim. In *Lubore v. RPM Associates, Inc.*, the appellant argued that the court "may find that the duty to disclose arose of the alleged existence of a 'special relationship' and 'intimate nexus' between the parties." 109 Md. App. 312, 330 n.3

(1996).  The Court of Special Appeals, however, declined to address whether such a special relationship "c[ould] also legally trigger a duty to disclose for the intentional tort of fraud or deceit."  *Id.*  Had the Court of Special Appeals addressed the issue, its determination would control the outcome of Al-Sabah's instant fraud allegation.

However, Maryland's appellate courts have demonstrated a tendency, since *Lubore*, to consider the duty owed in negligence, and that for the tort of fraud, together.  *See, e.g.*, *Blondell*, 413 Md. at 119-24 (considering the duty owed for fraudulent concealment and negligence together); *Parker*, 91 Md. App. at 367-74 (considering the duty owed for fraudulent concealment, negligent misrepresentation, negligence, and breach of fiduciary duty together).  Considering this trend, coupled with the Court's conclusion above that the facts alleged, if proven, would give rise to an "intimate nexus" between Al-Sabah and the Lender Defendants, there is a plausible basis in Maryland law for the existence of a duty to disclose for the purposes of fraud.  The Court does not deem it appropriate to conclusively determine, at this juncture, the novel issue of whether Maryland courts would recognize a duty to disclose, for the purposes of fraud, under the facts that Al-Sabah has alleged.  Setting aside the fact that the parties' briefing lends no insight into this novel legal question, the Court finds that the more prudent course is to reexamine the issue at the summary judgment stage, assuming that the facts developed through discovery support such an inquiry.  Given this conclusion, the Court also need not explore Al-Sabah's allegation that the Lender Defendants owed her a duty "not to proceed" with the transactions that they "knew were dissipating the equity" in each property.  ECF 1, ¶ 159.

### 2.    Intent to Defraud or Deceive

The Lender Defendants next assert that Al-Sabah's fraudulent concealment claim insufficiently alleges that they intended to defraud her.  ECF 47-1 at 15.  They argue that their

"engage[ment] in their usual business practices," i.e., making loans, "is not sufficient to show participation in Agbodjogbe's alleged fraud."  *Id.* (citing *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)).  This argument is unpersuasive.

While Federal Rule of Civil Procedure 9(b) generally imposes a heightened pleading standard upon fraud claims, it specifically provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Al-Sabah has met that burden.  First, as described at length in this Court's negligence analysis in Part III.B.1, *supra*, Al-Sabah has alleged, even with particularity, facts and circumstances giving rise to a plausible inference that the Lender Defendants knew, or should have known, of Agbodjogbe's fraud.  In fact, she has directly alleged that the Lender Defendants did know of his fraud, and intended to further it.  *E.g.*, ECF 1, ¶¶ 5, 157, 159.  These allegations are bolstered by her allegations describing how (1) the due diligence WBL and Sharestates employed in underwriting the pre-*lis pendens* loans failed to satisfy industry standards, *id.* ¶¶ 60-86 (WBL); *id.* ¶¶ 106-13 (Sharestates); (2) WBL and Sharestates ignored "red flags" in those loan applications, *id.* ¶ 147 (WBL); *id.* ¶¶ 106-09, 131-33 (Sharestates); and (3) the loans issued all contained commercially unreasonable terms, *id.* ¶¶ 93, 100, 110, 133, 140.

The Lender Defendants' reliance on *United Food* does little to further their position.  In that case, the Seventh Circuit held that a Walgreens's and a pharmaceutical company's commercial relationship, without more, could not give rise to the plausible existence of a RICO enterprise between the two.  719 F.3d at 853-55.  Even assuming that this case is apposite, Al-Sabah's Complaint sufficiently alleges conduct beyond a "normal" loan operation.  This challenge to Count III therefore fails.

### 3.    Justifiable Reliance

Finally, the Lender Defendants argue that Al-Sabah "does not allege a single fact" showing that she ever relied on the Lender Defendants, given that "she has no relationship with them."  ECF 47-1 at 16; ECF 56 at 8.  This argument, too, lacks merit, on the current record.

Even assuming that justifiable reliance is required for both Al-Sabah's fraudulent concealment and constructive fraud[9] claims, she has plausibly alleged that element.  Liability for a failure to disclose a fact flows if the defendant knows that the failure to disclose "may justifiably induce the other to act *or refrain from acting*."  RESTATEMENT (SECOND) OF TORTS § 551(1) (AM. LAW. INST. 1979) (emphasis added); *see also, e.g.*, *Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 528 (2008) (explaining that a fraudulent misrepresentation claim lies where the defendant knows, or has reason to expect, that the "class of persons" to receive the misrepresentation will cause them to "act or to refrain from action in reliance upon the misrepresentation" (quoting RESTATEMENT (SECOND) OF TORTS § 531)).  Generally, reliance is unreasonable only where "the [true] facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance or he has discovered something which should serve as a warning that he is being deceived."  *Md. Nat'l Bank v. Resolution Tr. Corp.*, 895 F. Supp. 762, 772 (D. Md. 1995) (quoting *Gross v. Sussex*, 332 Md. 247, 269 (1993)).

---

[9] In Maryland, a constructive fraud claim lies where "a party is justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare," and the defendant violates that belief.  *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 198 n.6 (1995) (quoting *Crawford v. Mindel*, 57 Md. App. 111, 120-21 (1984)).  Thus, it appears that the only reliance necessary, for the purposes of a constructive fraud claim, is reliance upon the general notion that the duty owed to the plaintiff will not be breached.  *See In re Reecher*, 514 B.R. 136, 157-58 (Bankr. D. Md. 2014).  Even if actual reliance on the non-disclosed fact is necessary, however, Al-Sabah has plausibly alleged it here.

Here, even granting the Lender Defendants the assumption that Al-Sabah should have begun investigating Agbodjogbe when she grew suspicious of him in March, 2016, it is not clear, at this stage, that her reliance on the Lender Defendants was unjustified.  The specific fact that is alleged to have not been disclosed – that Agbodjogbe was seeking to mortgage each property – would not have been discovered even with due diligence, unless Agbodjogbe opted to tell Al-Sabah himself.  Otherwise, Al-Sabah could only have learned about the mortgages *after* the Lender Defendants publicly filed their deeds of trust.

Perhaps Al-Sabah could have filed suit against Agbodjogbe quicker had she done an earlier investigation.  Yet even in the hypothetical world in which Al-Sabah sues Agbodjogbe in March, 2016, and files notices of *lis pendens* on each property, it is *still* not clear, taking all facts in a light most favorable to Al-Sabah, that this would have prevented the Lender Defendants from executing mortgages on the subject properties.  Indeed, each Lender Defendant is alleged to have issued a new, or refinanced an outstanding, loan after Al-Sabah filed her notices of *lis pendens* in March, 2017.  ECF 1, ¶¶ 126-40.

"There is nothing in the law or in reason which requires one to deal as though dealing with a liar or scoundrel, or that denies the protection of the law to the trustful who have been victimized by fraud."  *Gross*, 332 Md. at 267 (quoting *Schmidt v. Milhauser*, 212 Md. 585, 593 (1957)); *see also Field v. Mans*, 516 U.S. 59, 71-75 (1995) (observing that justifiable reliance is a less stringent standard that reasonable reliance, and noting, "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases" (citations omitted)).  Here, like the issues of contributory negligence and laches, the soundness of Al-Sabah's actions after she became suspicious of Agbodjogbe will likely be heavily contested

throughout this litigation.  At the motion for judgment on the pleadings stage – where all facts and inferences must be taken in Al-Sabah's favor – the Court cannot find, as a matter of law, that her reliance on the nondisclosed fact of Agbodjogbe's efforts to mortgage the properties was unjustifiable.  *See, e.g.*, *Schmidt*, 212 Md. at 593-95 (finding that purchasers of stock in a corporation, whose main asset was an apartment building, justifiably relied on the false representation that a roof was recently replaced, even after being given an opportunity to inspect the roof and the defendant's balance sheets, which would have demonstrated falsity, because the defect was observable only to a trained eye, and the plaintiffs only directed the accountant to examine the balance sheets for a limited purpose).  Accordingly, judgment on the pleadings as to Counts III and IV is inappropriate.

### D.    The Statutory Fraud Claim

Count X of the Complaint collectively alleges a violation of, and a conspiracy to violate, the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. §§ 7-401 to 409.  ECF 1, ¶¶ 180-85.  As explained below, the Court agrees with the Lender Defendants that both allegations fail to state a claim.

The MMFPA generally prohibits "mortgage fraud," Md. Code Ann., Real Prop. § 7-402, which is statutorily defined as encompassing misrepresentations or omissions of fact "during the mortgage lending process" that the violator intends for "a mortgage lender, borrower, or any other party to the mortgage lending process" to rely upon, *id.* § 7-401(d)(1)-(6).  The "mortgage lending process" includes, as relevant here, "[t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan."  *Id.* § 7-401(e)(2)(i).  A "mortgage loan," in turn, is "any loan *primarily for personal, family, or household use* that is secured by a mortgage, deed of trust, or other equivalent consensual

security interest on a dwelling or residential real estate on which a dwelling is constructed or intended to be constructed." Md. Code Ann., Fin. Inst. § 11-501(*l*) (emphasis added); Real Prop. § 7-401(f) (adopting the definition of "mortgage loan" set forth in § 11-501 of the Financial Institutions Article). Section 11-501 of the Financial Institutions Article defines "residential real estate" as "any owner-occupied real property located in Maryland on which a dwelling is constructed or intended to be constructed," § 11-501(q). A "dwelling" is "a residential structure or mobile home which contains one to four family housing units, or individual units of condominiums or cooperatives," 15 U.S.C. § 1602 (2018); Md. Code Ann., Fin. Inst. § 11-501(c)(1). Residential structures and mobile homes only qualify as "dwellings," however, if they are owner-occupied. *Id.* § 11-501(c)(2).

The Lender Defendants first argue that none of the loans here were for "personal, family, or household use." ECF 47-1 at 18 (quoting Md. Code Ann., Fin. Inst. § 11-501(*l*)). Al-Sabah, apparently conceding this point as to most of the properties, argues that she properly states a claim as to the Pikesville Home, and as to the NY Condo, both of which she argues were plausibly for residential use. ECF 52 at 31-32. It is not clear that the NY Condo falls under the MMFPA's purview, given that a "mortgage loan" only applies to "dwellings" and the "residential real estate" that said dwelling occupies. Md. Code Ann., Real Prop. § 7-401(f); Fin. Inst. § 11-501(c), (*l*). "Residential real estate," however, is only statutorily defined to encompass land in Maryland. Md. Code Ann., Fin. Inst. § 11-501(*l*). It would seem contrary to the Maryland State Legislature's intent, then, to allow recovery for mortgage fraud concerning a mortgage loan on a property located outside the State of Maryland.

In any event, Al-Sabah fails to state a plausible claim under the MMFPA because, under the facts alleged, she was not a "mortgage lender, borrower, or any other party to the mortgage

lending process."  Md. Code Ann., Real Prop. § 7-401(d)(1)-(6).  As her allegations recognize, she was not the borrower in any of these transactions.  Otherwise, the MMFPA only allows recovery for fraudulent statements made to some "*party* to the mortgage lending process."  *Id.* (emphasis added).  As that term is used in the law, Al-Sabah does not plausibly establish her entitlement to relief under that statute.  *See Party*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. Someone who takes part in a transaction <a party to the contract>."); *see also Iglesias*, 206 Md. App. at 648 (holding that a victim of fraud was not in contractual privity with a lender, even though the lender believed that it was contracting with the victim).   While Maryland common law allows for those in the *equivalent* of contractual privity to recover in negligence (and potentially fraud), *see Chi. Title*, 394 Md. at 297-300, there is nothing in the text of the MMFPA, or in the technical meaning of the term "party," that indicates that the Legislature intended to allow those in the equivalence of privity with a lender to recover under the MMFPA. Accordingly, Count X will be dismissed without prejudice.

> ### E.    The Inchoate Fraud Claims

Separate and apart from the fraud claims asserted directly against the Lender Defendants, Counts I and II seek to hold the Lender Defendants liable as associates to Agbodjogbe's fraud scheme.  Count I alleges that the Lender Defendants conspired with Agbodjogbe to defraud Al-Sabah, ECF 1, ¶¶ 143-55, and Count II alleges that they aided & abetted Agbodjogbe's fraud, *id.* ¶¶ 156-58.  Presuming, once again, that Maryland law governs, both claims plausibly allege Al-Sabah's entitlement to relief.

> #### 1.    Civil Conspiracy to Commit Fraud

To establish a claim for civil conspiracy under Maryland law, Al-Sabah must allege "(1) [a] confederation of two or more persons by agreement or understanding; (2) some unlawful or

tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) [a]ctual legal damage resulting to the plaintiff." *Lloyd*, 397 Md. at 154 (quoting *Van Royen v. Lacey*, 262 Md. 94, 97-98 (1971)).   It is well-established that Maryland law does not recognize civil conspiracy as its own independent tort. *E.g.*, *Alleco*, 340 Md. at 189.   Here, since Al-Sabah has obtained a jury verdict against Agbodjogbe for fraud, there is a sufficient underlying tort to support a civil conspiracy claim, assuming that there is an agreement and an overt act.

As an initial matter, the Lender Defendants argue that they could not have had the "legal capacity" to engage in the conspiracy, because Al-Sabah has not plausibly alleged a conspiracy to commit mortgage fraud under the MMFPA.   ECF 47-1 at 22 (citing *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014)).   In *Marshall*, the Fourth Circuit upheld a trial court's grant of summary judgment in favor of a defendant, alleged to have conspired to violate the Maryland Finder's Fee Act.   785 F.3d at 538-39, 541.   The Finder's Fee Act only prohibits mortgage brokers from charging finder's fees in transactions in which they serve as the lender. *Id.* at 539 (discussing Md. Code Ann., Com. Law § 12-804(e)).   The court held that since the defendant was not a mortgage broker, but instead acted only as a "funding lender," he had no "legal capacity" to conspire to violate the Finder's Fee Act.   *Id.* at 541-42.   Unlike *Marshall*, here, as discussed above, Al-Sabah has plausibly alleged a duty of disclosure running from the Lender Defendants to her for the purposes of common law fraud.   Thus, while the Lender Defendants have no legal capacity to conspire to commit mortgage fraud, they have the legal capacity to conspire to commit common law fraud by virtue of the plausible allegation of common law fraud against them.   *See id.*; *see also Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 352-53 (2009) (holding that a defendant needed to owe a plaintiff a fiduciary duty before he

could have the capacity to engage in a civil conspiracy based on the underlying tort of breach of fiduciary duty). Of course, if the facts adduced in discovery do not confirm the existence of a duty of disclosure to support Al-Sabah's common law fraud claim, the Lender Defendants will be entitled to raise this issue again at the summary judgment stage.

The Lender Defendants next argue that their agreement to join the conspiracy is not plausibly alleged. This argument is unpersuasive, on the current record. It is true that a defendant must have "knowledge of an illegal enterprise" to be liable for civil conspiracy. *E.g.*, *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 193 (1975). Yet the plaintiff need not provide direct evidence of an agreement between two co-conspirators. *Daugherty v. Kessler*, 264 Md. 281, 292 (1972). Rather, the conspiracy can be established through "inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design." *Id.*

Citing *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 718 (8th Cir. 2019), the Lender Defendants argue that the "red flags" that Al-Sabah alleges they learned during the underwriting process cannot amount to "actual knowledge" of wrongdoing, "much less agreement to participate in a conspiracy." ECF 47-1 at 22-23. *Zayed* is unpersuasive, for two reasons. First, the case was before the Eighth Circuit after a ruling on a summary judgment motion, and after the conclusion of discovery. *See* 913 F.3d at 715-19. Second, and more substantively, the plaintiffs' arguments of actual knowledge in *Zayed* – for the purposes of an aiding and abetting claim under Minnesota law – were premised solely on the presence of "red flags" in scammers' banking activity with the bank. *See id.* Here, however, the "red flags" that are alleged to have

been present in Agbodjogbe's applications are not the only evidence Al-Sabah cites to support

her allegation of knowledge.   Each Lender Defendant allegedly provided Agbodjogbe with

commercially unreasonable loan terms, and issued Agbodjogbe a loan even *after* Al-Sabah filed

a notice of *lis pendens* on each property.   Taken together with the "red flags," the evidence Al-

Sabah alleges is sufficient, at this stage, to give rise to an inference that the Lender Defendants

knew that Agbodjogbe was engaged in fraud, even under the heightened Rule 9 pleading

standard.   *See Hoffman v. Stamper*, 385 Md. 1, 25-28 (2005) (finding the evidence adduced at

trial sufficient to show that a housing appraiser engaged in a conspiracy with a seller to defraud

home purchasers; the evidence showed that the appraiser knew that the seller purchased the

properties only a few months prior, but the appraiser nonetheless inflated the appraisal values of

those homes based on (1) major improvements to those homes that the appraiser knew, or in

some cases "would have known, or had reasonable grounds to suspect," were not made, and (2)

comparison homes that "were not at all comparable").

The allegations are is also sufficient to plead that the Lender Defendants agreed to further

Agbodjogbe's fraudulent actions.   The Lender Defendants' principal argument, that their conduct

in making loans in the ordinary course of business cannot be the basis for implying an agreement

to join the conspiracy, is of no moment.   *See* ECF 47-1 at 23.   The Lender Defendants rely

heavily on *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 253-54 (D. Md. 2000) but that reliance is

misplaced.   In that case, there were no facts, other than the existence of transactions between

multiple defendants, supporting the alleged conspiracy.   Here, reading the allegations in a light

most favorable to Al-Sabah, the Lender Defendants appear to have acted as a "fence" for

Agbodjogbe, in that they provided him the means to "cash out" value inherent in the real estate

that the Lender Defendants knew he fraudulently procured.   The Lender Defendants did this

through mortgage loans with commercially unreasonable interest rates and fees, without conducting a commercially reasonable underwriting process and without contacting the person that they knew fronted the purchase money for the properties.  This scenario, if true, would support the existence of an agreed-to conspiracy, despite the fact that the Lender Defendants were engaged in the business of executing loans.  *See Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 643-44 (D. Md. 2014) (finding a civil conspiracy between the defendant and a third-party fraudster plausibly alleged, where the defendant-company acted as a "fence" for the fraudster by purchasing a large volume of information technology equipment from the fraudster at a price four times lower than fair market value "from an individual seller with no ostensible background in the procurement or sale of that type of equipment"); *Hoffman*, 385 Md. at 25-28.  Accordingly, at this stage, the Motion as to Count I will be denied.

### 2. Aiding & Abetting Fraud

The tort of aiding and abetting is similar to, yet different than, a civil conspiracy. Whereas a civil conspiracy requires an agreement to participate in the underlying tort, liability for aiding and abetting flows if a person "by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Duke v. Feldman*, 245 Md. 454, 457 (1967).[10]  Thus, like civil conspiracy, there must be an underlying tort committed before one can be liable for aiding and abetting. *Alleco*, 340 Md. at 200-01.  Since a jury found Agbodjogbe liable for fraud, that prerequisite is satisfied.

---

[10] It should be noted that "aider and abettor liability is relevant only if the defendant is not already accused of principal liability for the tort." *Gorby v. Weiner*, Civ. No. TDC-13-3276, 2014 WL 4825962, at *17 (D. Md. Sept. 23, 2014).  At this stage, however, Al-Sabah is permitted to plead alternative, yet competing, theories of liability. *See, e.g.*, *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002) ("Parties may plead alternative theories of liability, indeed as many theories as the facts will fit." (citation omitted)).

Maryland law recognizes civil liability for aiding and abetting common law fraud.  *See George Wasserman & Janice Wasserman Goldstein Family LLC v. Kay*, 197 Md. App. 586, 628-29 (2011) (finding that the plaintiff sufficiently alleged a claim for aiding and abetting fraud against a corporation).   "Traditionally, 'aiding or abetting' consists of knowingly giving 'substantial assistance' to someone committing a tort."  *Gorby*, 2014 WL 4825962, at *16 (quoting RESTATEMENT (SECOND) OF TORTS § 876).   To that end, Lender Defendants again challenge the sufficiency of the Complaint's allegations to establish their actual knowledge of Agbodjogbe's fraud.  ECF 47-1 at 24-25.  For the same reasons that this challenge fails as to the Civil Conspiracy claim, it similarly fails as to the Aiding & Abetting claim.

The Lender Defendants also assert that their provision of "routine professional services" offered "in the usual course of business" is not sufficient "substantial assistance," as a matter of law, to make them an aider and abettor of Agbodjogbe's fraud.  ECF 47-1 at 26-27.  Again, for similar reasons elucidated above, this argument lacks merit, on the current record.  While some courts have held that a defendant who owes a plaintiff no duty cannot be an aider and abettor based on a failure to disclose a third party's fraudulent activity against a plaintiff, *see id.* (citing *Schatz v. Rosenburg*, 943 F.2d 495, 496-97 (4th Cir. 1991), and *Stratton v. Miller*, 113 B.R. 205, 211 (D. Md. 1989)), that law is inapplicable here, at this stage.  The Lender Defendants plausibly owed Al-Sabah a duty of care, and a duty of disclosure.  Moreover, the Lender Defendants are not merely alleged to be passive observers of Agbodjogbe's fraud, but instead are alleged to have been active participants, providing him with commercially unreasonable loans secured by properties that they knew were rightfully owned by Al-Sabah, and knowing that Agbodjogbe would not be able pay the loans back.  Such assistance, if proven, would plausibly qualify as "substantial."

Recognizing a plausible aider and abettor claim in this unique situation would not, as the Lender Defendants suggest, subject them to liability in every case where they happen to issue a loan to a fraudster.  Unlike the cases the Lender Defendants reference, the Lender Defendants are not plausibly subject to aider and abettor liability here merely because they offered Agbodjogbe a professional service.  *See Schatz*, 943 F.2d at 496-97 (attorneys who "did no more than 'paper the deal'"); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188-89 (Minn. 1999) (accountants who prepared financial statements, set up draw accounts, recorded conveyances, and provided tax advice); *Spinner v. Nutt*, 631 N.E.2d 542, 546 (1994) (attorneys, representing trustees of a trust, who became aware of the trustees' breach of fiduciary duty, but failed to advise the client how to best protect the trust's assets).  Rather, they are plausibly subject to aider and abettor liability because the specific facts alleged give rise to the inference that they knew that executing these loans with Agbodjogbe would be profitable to them, and would give Agbodjogbe a means of liquidating the properties he had fraudulently obtained.  *See Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 550-52, 559 (D. Md. 1998) (denying a motion to dismiss an aiding and abetting securities fraud claim against a law firm, because the facts alleged showed that two attorneys employed by the firm knew of their client's fraudulent activities, and utilized their positions to help their client further his fraud); *see also Great Am. Ins. Co.*, 73 F. Supp. 3d at 642-43 (holding that a plaintiff plausibly alleged aiding and abetting conversion because the facts showed that the defendant-company "provid[ed] an outlet through which [the thief] could dispose of the stolen goods").  Accordingly, the Motion as to Count II will be denied.

### F.   Constructive Trust

Count VI of the Complaint asserts an independent cause of action entitled "Constructive Trust."  ECF 1, ¶¶ 166-69.  However, under Maryland law, "[a] constructive trust is an equitable

*remedy*, not a cause of action in itself." *Chassels*, 235 Md. App. at 15 (emphasis added); *see also Lyon v. Campbell*, 33 F. App'x 659, 663 (4th Cir. 2002).  Accordingly, Count VI will be dismissed with prejudice.  Al-Sabah will still be entitled to seek the imposition of a constructive trust as a remedy, however, assuming both that she succeeds on one of her remaining claims for relief, and that a constructive trust is a proper remedy for that claim.

### G.    Unjust Enrichment

Count VII of the Complaint asserts that the Lender Defendants have been unjustly enriched, requiring them to disgorge the ill-gotten profits obtained from the loans they executed with Agbodjogbe and his corporate entities.  ECF 1, ¶¶ 170-72.  Presuming that Maryland law controls, this count, too, plausibly states a claim for relief.

A claim for unjust enrichment is one "that may not be reduced neatly to a golden rule." *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007).  Generally, a claim for unjust enrichment entails three elements:  "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of or appreciated the benefit; and (3) the defendant accepted or retained the benefit under such circumstances that it would be inequitable to allow the defendant to retain the benefit without paying value in return."  *Hobbs v. St. Martin*, 320 F. Supp. 3d 748, 752 (D. Md. 2018) (citing *Hill*, 402 Md.at 295).  Such a claim is designed to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses."  *Dep't of Hous. & Cmty. Dev. v. Mullen*, 165 Md. App. 624, 659 (2005) (citation omitted).

The Lender Defendants, for the first time in their Reply, argue that there is no evidence that Al-Sabah *herself* conferred a benefit upon them.  ECF 56 at 21-22.  Assuming that this

argument is properly before the Court, it nonetheless fails.  Maryland courts "have not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff's own resources."  *Hill*, 402 Md. at 298; *see also Plitt v. Greenberg*, 242 Md. 359, 364 (1966) ("It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." (citation omitted)).  An unjust enrichment claim will not lie, however, if the benefit is conferred "by a volunteer or intermeddler."  *Hill*, 402 Md. at 296.  Agbodjogbe was not a mere volunteer or intermeddler, given that a federal jury found him liable for defrauding Al-Sabah.  Nor can Al-Sabah be considered to have voluntarily conferred a benefit on the Lender Defendants, assuming that her alleged facts are true, given that she was the victim of Agbodjogbe's fraud.  *See Hobbs*, 320 F. Supp. 3d at 753-54.  If Al-Sabah succeeds in demonstrating that the Lender Defendants knew, or had to reason to know, of this fraud scheme, it is plausible that the profits they saw from the subject loans are improper "benefits" for the purposes of an unjust enrichment claim.

The Lender Defendants' second argument – that they are entitled to protection as *bona fide* mortgagees for value without notice – fares no better, on the current record.  ECF 47-1 at 32-33.  Where a mortgagee has notice of fraudulent conduct, it may be subject to an unjust enrichment claim, and cannot obtain *bona fide* status.  *See Wash. Mut. Bank v. Homan*, 186 Md. App. 372, 394–98 (2009) ("[L]enders who secure their interests with a mortgage or deed of trust [are] entitled to the protections available to bona fide purchasers for value, where such lenders were without notice of the mortgagor's fraudulent conduct.").  As described at length above, taking the facts alleged in the Complaint as true, the Lender Defendants knew, or should have known, that Agbodjogbe, and the relevant corporate entities, were engaged in fraud.  This would

eliminate any protection afforded to them under Maryland law. *See also Hobbs*, 320 F. Supp. 3d at 755-56 (explaining that a defendant with constructive notice that the plaintiff was being defrauded would not be entitled to keep the benefits of the transaction). As such, the Lender Defendants' final argument, insisting that it is equitable for them to retain the "commercial" benefits obtained from the relevant loans – commissions, fees, charges, penalties, interest, and repayment of principal – is without merit. *See* ECF 47-1 at 34. Accordingly, judgment on the pleadings as to Count VII is inappropriate.

### H.     "Quiet Title/Invalidate Liens" Count

Count VIII of the Complaint is entitled "Quiet Title/Invalidate Liens on *Maryland Properties*." ECF 1, ¶¶ 173-75. Al-Sabah requests that the Lender Defendants be "equitably estopped from asserting any interest in or l[ien] on *the Maryland Properties*, and any such interest(s) or lien(s) should be declared invalid pursuant to Md. Real Prop. Code Ann., § 14-108, and/or at common law." *Id.* ¶ 175 (emphasis added).

The Lender Defendants, citing § 14-108 and *Homan*, 186 Md. App. at 403, argue that Al-Sabah fails to allege facts showing that she was in actual or constructive possession of the Maryland properties, a necessary prerequisite for relief under § 14-408. ECF 47-1 at 35-36. In opposition, Al-Sabah focuses only on her alleged constructive possession of the *NY Condo*. ECF 52 at 35. The NY Condo has no relevance, however, to a cause of action seeking to quiet title to properties in Maryland.[11] In essence, then, the Motion as to Count VIII is unopposed. Nonetheless, the Court remains mindful of its "obligation to review the motion[] to ensure that

---

[11] Even if the NY Condo were relevant here, none of the Lender Defendants seem to claim title to that property. The Court takes judicial notice, by way of the Foreclosure Proceeding Opinion discussed above, that Sharestates assigned its interest in that property to Chondrite, who is not a party to this litigation.

dismissal is proper," even though unopposed.  *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014).

The Court need not linger long on the point, however, for it is clear that Al-Sabah's claims are legally insufficient.  To qualify for the remedy afforded in § 14-408 of the Real Property Article, Al-Sabah must demonstrate that she has actual or constructive possession of the commercial properties, and the Pikesville Home, located in Maryland.   At most, the Complaint's allegations only plausibly establish that she has equitable title to those properties.  Equitable title alone, however, is insufficient for Al-Sabah to invoke § 14-408.  *See Homan*, 186 Md. App. at 405-06 (reversing a trial court's entry of summary judgment in favor of the land claimant on its claim under § 14-408 to quiet title, because the claimant only showed, at most, that it "possessed equitable, and not legal, title to the Property," and explaining that constructive possession over vacant properties would have only existed if the claimant had *legal* title to the property). Accordingly, the Motion as to Count VIII will be granted, and it will be dismissed without prejudice.

**I.      Declaratory Judgment**

Finally, the Lender Defendants seek to dismiss Count IX of the Complaint, which seeks declaratory relief regarding "the true and equitable ownership of the [p]roperties and as to the validity of the various interests asserted in the [p]roperties."  ECF 1, ¶¶ 176-79.  The Lender Defendants argue that without Agbodjogbe or the corporate entities – the parties who "legally own[] title to the properties – in this lawsuit, Al-Sabah cannot obtain her requested declaratory relief.  ECF 47-1 at 36.  At least with regards to her requested declaratory relief regarding the validity of the mortgage liens each Lender Defendant has in the property, the Court cannot see how such relief cannot be afforded without Agbodjogbe and the other corporate entities.  The

Lender Defendants' concerns regarding Agbodjogbe's presence were raised long before the Agbodjogbe Lawsuit went to trial.  As noted at the outset, this Court provided the parties with the opportunity to provide supplemental briefing in this case *after* the Agbodjogbe Lawsuit, but neither party discussed the impact of the jury's verdict on these proceedings.  *See* ECF 72, 73, 77.  The Court notes, however, that Al-Sabah may not be entitled to her requested declaratory relief vis-à-vis the NY Condo, given that Sharestates assigned the note to Chondrite.  Again, however, neither party addresses this issue.  Suffice it to say that, at this point, because Al-Sabah can plausibly obtain some form of declaratory relief from the Lender Defendants without the joinder of additional parties, the Motion will be denied as to Count IX.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Judgment on the Pleadings, ECF 47, is GRANTED IN PART and DENIED IN PART.  A separate Order follows.

Dated:  July 9, 2020                                        _____/s/_____
                                                            Stephanie A. Gallagher
                                                            United States District Judge