## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ALIA SALEM AL-SABAH,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-18-2958** |
| | * | |
| **WORLD BUSINESS LENDERS, LLC,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM OPINION

Plaintiff Alia Salem Al-Sabah ("Al-Sabah") filed this lawsuit against various defendants involved in lending monies to Jean Agbodjogbe ("Agbodjogbe") and his associated corporate entities.  Two such defendants, World Business Lenders, LLC ("WBL") and Sharestates Investments, LLC ("Sharestates") (collectively "the Lender Defendants")[1], have filed motions for summary judgment.  ECF 135, 136.  This Court has reviewed the motions, the related briefing, and the exhibits attached thereto.  ECF 137, 138, 139, 142, 143, 145, 149, 150.  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, WBL's motion will be granted in part and denied in part, and Sharestates's motion will be granted in its entirety.

### I.      FACTUAL BACKGROUND

#### A.  General Circumstances

In June, 2014, while visiting Baltimore, Al-Sabah, a member of the Kuwaiti royal family, purchased a large order of Halal food from Nailah's Kitchen, a restaurant owned and operated by

---

[1] Technically, there is one additional lender defendant remaining in this case, IRM Plaza, LLC. That entity is currently not represented by counsel and is not included in the defined term "Lender Defendants" in this Memorandum Opinion.

Agbodjogbe.  ECF 142-1 at 7.  Al-Sabah donated the food to a Baltimore mosque.  *Id.*  After that successful charitable transaction and some subsequent discussions with Agbodjogbe, Al-Sabah agreed to acquire a 50% ownership interest in Nailah's Kitchen in exchange for her investment of $150,000.  *Id.*  The agreement provided that Al-Sabah's share of the restaurant profits would be used to fund ASA Foundation, Inc., a non-profit Al-Sabah wished to establish to help inner city youth in Baltimore.  *Id.*

Agbodjogbe and Al-Sabah retained an attorney, Jeffrey P. Rogyom, to form a new operating entity for Nailah's Kitchen and to document the partnership.  *Id.*  Rogyom prepared draft paperwork for the formation of N&A Kitchen, LLC ("N&A Kitchen"), which he sent to Al-Sabah for her signature.  ECF 142-2, 142-7.  Believing that she was a 50/50 owner of N&A Kitchen, on September 9, 2014, Al-Sabah wire transferred her agreed capital contribution of $150,000 to N&A Kitchen.  ECF 142-1 at 9.  After additional discussions, Al-Sabah also wire transferred $50,000 to N&A on September 30, 2014, to fund a restaurant expansion or purchase of a food truck and $500,000 to N&A Kitchen on February 24, 2015 for the purpose of acquiring 306-10 N. Howard Street in Baltimore City, where Nailah's Kitchen was operating.  *Id.*

After Al-Sabah made her initial investment in N&A Kitchen, Agbodjogbe suggested to her that she invest in other real estate in the Howard Street Corridor of Baltimore City.  *Id.*  He represented that the area was "booming" and that she could purchase inexpensive properties to renovate and sell or lease at a profit.  *Id.*  To facilitate one such proposed transaction, Al-Sabah wire-transferred $825,000 to N&A Kitchen on October 16, 2014.  ECF 142-1 at 10.  Al-Sabah intended those funds to be used for her personal investment in a Howard Street building, despite sending them to N&A Kitchen's account.  *Id.*  Agbodjogbe represented that the building Al-Sabah had hoped to purchase had fallen through, but he suggested that she buy 400 N. Howard Street.

2

*Id.*  He disclosed that the building was in poor shape but was cheaper and could be renovated.  *Id.*  Al-Sabah agreed to buy the property in the name of a holding company, 9 Jewels, LLC ("9 Jewels"), named for Al-Sabah's nine daughters.  ECF 142-1 at 10.  Al-Sabah believed she was the sole owner of 9 Jewels.  *Id.*

Over the ensuing months, Al-Sabah transferred millions of dollars to 9 Jewels and to N&A Kitchen for renovating 400 Howard Street, for purchasing and renovating other investment properties, and for purchasing a condominium in New York City ("the NY Condo") for Al-Sabah's daughter to live in while she attended school.  ECF 142-1 at 10-11.  Agbodjogbe also told Al-Sabah that he had purchased a separate property, 5722 York Road, at an auction sale for $40,000.  *Id.*  Based on her understanding that 9 Jewels owned the York Road property, Al-Sabah sent additional funds to 9 Jewels and N&A Kitchen for its renovation.  *Id.*

During a tour of the properties on a visit to Baltimore in May 2015, Al-Sabah learned for the first time that 400 N. Howard Street had been titled in the name of N&A Kitchen, not 9 Jewels.  *Id.* at 11.  Al-Sabah directed Rogyom, the attorney, to prepare paperwork effecting the transfer of the property to 9 Jewels.  *Id.*  Though Rogyom prepared drafts of the paperwork, Agbodjogbe terminated his representation before the transfer could be effected.  *Id.* at 11-12.

Al-Sabah again visited Baltimore in April, 2016 to see the renovations.  During that visit, Al-Sabah first asked Agbodjogbe for documentation showing how her investments had been spent.  *Id.* at 13.  She did not receive any.  *Id.*  After returning to Kuwait, she continued to message Agbodjogbe with requests for documentation.  *Id.*  Agbodjogbe continually represented that he would provide documentation, but never sent it.  *Id.*  Finally, in October, 2016, Agbodjogbe sent a voice mail to Al-Sabah's daughter, saying he needed "space" to deal with "personal issues" and would contact Al-Sabah or her family when he was ready to talk.  *Id.*

After receiving that message, in light of the lack of documentation to prove her interest in the properties, Al-Sabah arranged to run a background check on Agbodjogbe. *Id.* The background check revealed a prior bankruptcy, along with Agbodjogbe's purchase of a house in Pikesville, Maryland, without a mortgage, on January 28, 2015. *Id.* at 14. Al-Sabah sued Agbodjogbe for fraud in March, 2017. Between September 9, 2014 and July 18, 2016, Al-Sabah wire transferred more than $7.8 million to N&A Kitchen, 9 Jewels, and Agbodjogbe in eighteen separate transactions. ECF 142-1 at 3-6. Eventually, she discovered that both N&A Kitchen and 9 Jewels were registered with Agbodjogbe as sole owner.

### B. The WBL Transactions

In October, 2015, independent loan broker Kenneth Williams[2] told WBL that his client, Agbodjogbe, sought to borrow against various properties he owned. ECF 145-1. Kenneth Williams provided a Uniform Commercial Loan Application, signed by Agbodjogbe, attesting that he owned millions of dollars of property unencumbered by mortgages or liens. ECF 145-2. In December, 2015, WBL issued Agbodjogbe a conditional approval for a $500,000 loan to N&A Kitchen, subject to assurance that the value of the proposed securing property, 306-10 N. Howard, exceeded $700,000. ECF 145-10. When the appraisal took longer than anticipated, Agbodjogbe emailed WBL to cancel his loan application. ECF 145-15.

However, WBL continued its underwriting efforts. An "Underwriting Review Form" prepared by a WBL employee in January, 2016 indicated that Agbodjogbe's application evidenced "numerous character concerns," and had "high fraud risk." ECF 145-16. A WBL employee interviewed Agbodjogbe telephonically on January 18, 2016, and during the interview Agbodjogbe

---

[2] Kenneth Williams was a named defendant in this litigation, although default judgment has been entered against him. ECF 39.

said that the money used to purchase the properties was gifted to him by "some investor that I work with from overseas," specifically "people that I deal with from the Royal Family that are very good to me and these are donations they give to me every year" because "I have a long relationship with them for over 12 years." ECF 145-17 at 20-22.

Following the continued underwriting efforts, the WBL Investment Committee considered a proposed $350,000 loan to Agbodjogbe on January 21, 2016. ECF 145-16. The proposed loan was approved, subject to a series of six pre-closing conditions. *Id.* Some of those conditions were never met. *Id.* In fact, a WBL Vice President raised concerns about the proposed loan, stating that Agbodjogbe "has been not truthful this whole time, and still has not been able to clear our minds behind the fact that he is potentially money laundering." ECF 145-21. In continuing to investigate Agbodjogbe's file, on January 26, 2016, a WBL employee spoke with David Leichter, Agbodjogbe's accountant. ECF 145-23. The WBL employee asked who had supplied the funds used to purchase the NY Condo. *Id.* Leichter, who did not know Al-Sabah's name, stated that it was "one of the princesses of Kuwait" and that the condo was purchased "for the sole purpose of housing the princess's daughter." *Id.* Even after this discussion, WBL did not ask Agbodjogbe to identify Al-Sabah by name.

In May, 2016, Agbodjogbe again applied for business loans from WBL. ECF 145- 27, 145-28. In his applications, he misrepresented the monthly revenues of N&A Kitchen and 9 Jewels. *Id.* WBL did not follow its underwriting guidelines when considering the loan applications, did not take basic steps to verify the information provided by Agbodjogbe about the operational status of his various restaurant locations, and did not investigate conflicting information Agbodjogbe had provided about the occupant of the NY Condo. Nevertheless, on

May 27, 2016, WBL lent N&A Kitchen $600,000, secured by the NY Condo, with Agbodjogbe and 9 Jewels as guarantors (the "First WBL Loan"). ECF 145-35.

Just weeks later, on July 12, 2016, Agbodjogbe approached WBL about obtaining additional funding. ECF 145-44. Specifically, he requested that an additional $600,000 be added to the principal of the First WBL Loan. ECF 145-43. In underwriting the request, WBL representatives asked Agbodjogbe about the discrepancy between the business revenues he had projected and the actual deposits into N&A Kitchen's bank accounts. ECF 145-42. During the underwriting process, someone at WBL ran a Google search for "Alia Salem N&A Kitchens LLC," on August 9, 2016, which returned no results. ECF 145-49. Nevertheless, WBL closed on the refinance on August 26, 2016, making the principal of the First WBL Loan $1.2 million, with N&A Kitchen paying a prepayment penalty of $65,000. ECF 145-52. On December 14, 2016, Agbodjogbe refinanced the First WBL Loan by obtaining a larger loan from Sharestates and paying off WBL in full.

On March 17, 2017, Al-Sabah sued Agbodjogbe for fraud, in a complaint alleging in part that he had "used Al Sabah's money to purchase a personal residence in his own name." *Al-Sabah v. Agbodjogbe*, 17-CV-730-SAG, ECF 1. On that same date, Agbodjogbe reached out to WBL to borrow against his personal residence, 103 Mt. Wilson Lane in Pikesville, Maryland. ECF 145-55. According to Agbodjogbe, a WBL employee, Yasmin Fakioglu, told him to state that he would use the funds for "rehab." ECF 145-56 at 228. Al-Sabah docketed a *lis pendens* on Agbodjogbe's Pikesville residence on March 20, 2017. ECF 145-57. WBL learned of the *lis pendens* by March 23, 2017, and also knew of the suit Al-Sabah had filed. ECF 145-59. In fact, on March 24, 2017, someone at WBL Googled "N&A Kitchen LLC scam" and accessed the PACER docket for the lawsuit. ECF 145-60, 145-61. Despite being aware of the allegations, WBL loaned Agbodjogbe

and N&A Kitchen another $360,000 on March 30, 2017, secured by Agbodjogbe's Pikesville residence ("Second WBL Loan").  ECF 139-27.

### C.  The Sharestates Transactions

The same independent loan broker, Kenneth Williams, who initially contacted WBL on Agbodjogbe's behalf, contacted Sharestates in October, 2016 to ask whether Sharestates would make a cash-out loan to Agbodjogbe secured by two properties:  5722 York Road and 306 N. Howard Street.  ECF 143-1.  Kenneth Williams claimed that Agbodjogbe's credit score was "about 680."  *Id.*  A few days later, Kenneth Williams submitted a separate Agbodjogbe application to Sharestates for a loan of $1,563,750 to refinance the existing WBL mortgage on the New York Condo.  *Id.*  In the application, Agbodjogbe represented that the NY Condo had been purchased in cash on September 3, 2015 and was rented to a friend, without a formal lease, for $3,500 per month.  *Id.*  He further represented that he hoped eventually to obtain a conventional loan to pay off the Sharestates loan.  *Id.*

Sharestates's file reflects that, during underwriting, it only received and reviewed bank statements for N&A Kitchen, not for Agbodjogbe or for 9 Jewels, the owner of the NY Condo.  ECF 143-2.  Sharestates did receive a written lease between 9 Jewels and the tenant of the NY Condo, AlJawhara Al-Sabah.  ECF 142-8.  The lease reflected monthly rent of just $2,600, not $3,500.  *Id.*

Although Sharestates procured an appraiser to render a purportedly independent valuation of the NY Condo, the appraiser and Sharestates engaged in an email exchange during the appraisal process.  At best, Sharestates signaled to the appraiser what valuation it would need to make the loan.  Specifically, the appraiser asked, "Does 2.15 M even 2.175 M work here?" and Sharestates responded "2.175 will do thanks."  ECF 142-11.

During the underwriting process, Sharestates learned that Agbodjogbe's credit report scores were only 641 or 637 – not 680 as had been represented by Kenneth Williams.  ECF 142-15.  And Agbodjogbe submitted a "sponsor track record" showing that he had acquired $4 million in real estate in cash, but Sharestates did not attempt to look into how he had obtained the funds for those purchases.  ECF 142-14.  Sharestates's underwriting of its loan fell short of its underwriting guidelines in many respects.  ECF 142-3; 142-27.  Nevertheless, on December 14, 2016, Sharestates loaned N&A Kitchen $1.522 million, secured by the NY Condo ("the Sharestates NY Loan").  ECF 135-6, 135-7.  The Sharestates NY Loan was used in part to pay the First WBL Loan.

Just weeks later, Agbodjogbe applied for a second Sharestates loan, to be secured by 327 N. Eutaw Street.  ECF 143-5.  He asked for either a cash-out mortgage or a construction loan, representing that if it was a cash-out mortgage, the proceeds would be "used for the real estate development at 306 N. Howard Street" but that if it was a construction loan, the proceeds would be used to renovate 327 N. Eutaw Street.  *Id.*  Sharestates made no inquiry into the seemingly inconsistent proposals.  The appraisal in connection with the loan indicated that the 327 N. Eutaw Street property was "in pretty decent condition" and "had been renovated."  ECF 142-19.  Al-Sabah filed a notice of *lis pendens* on 327 N. Eutaw Street on March 23, 2017, which was indexed and recorded (albeit improperly) on March 27, 2017.  ECF 142-23.  Nevertheless, on that same date, Sharestates and N&A closed on a $210,000 loan secured by the property (the "Sharestates Eutaw Loan").  ECF 142-24.

## II.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material fact.  *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party

opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS OF THE CLAIMS

With the exception of a claim for declaratory judgment pertaining only to Sharestates and common law claims of fraud by omission and constructive fraud pertaining only to WBL, the remaining claims against the two Lender Defendants are largely the same: civil conspiracy, aiding and abetting, negligence, and unjust enrichment.[3] However, differences in the two factual scenarios lead to different results for the two defendants as to several of the claims.

### A.  Civil Conspiracy

The elements of civil conspiracy are an agreement or understanding between the Lender Defendant and Agbodjogbe, an unlawful or tortious act in furtherance of that agreement, and actual damages to Al-Sabah.  *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154 (2007).  Al-Sabah has offered no direct evidence of an express agreement or understanding between Agbodjogbe and either Lender Defendant to defraud her.  Instead, she argues that "a conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them and all the surrounding circumstances preceding and attending the culmination of the common design."  *Western Maryland Dairy v. Chenowith*, 180 Md. 236, 243 (1942).

---

[3] Both parties applied Maryland law to the claims asserted, despite the fact that both Lender Defendants maintained offices in New York.  This Court agrees with Al-Sabah that, applying *lex loci delicti* to this case suggests that the harm accrued with Ms. Al-Sabah when Agbodjogbe received the proceeds in his bank in Maryland, and that Maryland law should be applicable despite Al-Sabah's losses in more than one jurisdiction.

### 1. Sharestates

Although the existence of an agreement may be proved by logical inference and circumstantial evidence, the circumstances evidenced by Al-Sabah fail to muster a genuine issue of material fact as to the existence of an agreement between Agbodjogbe and Sharestates to defraud Al-Sabah.  Al-Sabah amply adduced evidence suggesting that Sharestates engaged in paltry underwriting – including but not limited to its failure to comply with its own underwriting guidelines; its looking only at N&A Kitchen's bank statements (which reflected limited income) and not the bank statements of the owner of the NY Condo or the personal guarantor; and its failure to recognize the negative cash flow of the NY Condo.  But a shoddy underwriting process does not equate to a recognition that Agbodjogbe was engaged in fraud, particularly where, as here, the lender's financial exposure was minimal due to the value of the collateral.  Because Sharestates did such little investigation, there is no indicia that it even became suspicious of Agbodjogbe's activities, and certainly no evidence that it recognized and agreed to participate in fraud, tacitly or otherwise.

Clearly, both Sharestates and Agbodjogbe wanted to close the two loans that Sharestates extended to him.  But Sharestates's motive for loaning the money was to further its lawful business objective of extending business loans to distressed borrowers at a hefty profit.  In the absence of any direct or circumstantial evidence that Sharestates agreed, expressly or tacitly, to commit fraud, Al-Sabah's civil conspiracy claim against Sharestates does not survive summary judgment.

### 2. WBL

The civil conspiracy claim against WBL, while a closer question, fails for similar reasons. The record establishes that WBL harbored unspecified suspicions about Agbodjogbe's activities: describing him at various times as "high fraud risk," having "character concerns," and "possibly

engaged in money laundering." ECF 145-16, 145-21.  WBL also knew about Al-Sabah's lawsuit against Agbodjogbe before it issued one of its loans to him.  Although WBL's underwriting investigation unearthed more information than Sharestates's, WBL still failed to comply with its own underwriting standards and to take certain steps like contacting Al-Sabah to confirm the veracity of Agbodjogbe's representations.  Still, though, in totality, these circumstances do not amount to evidence of an agreement to commit fraud.  At best, they amount to suspicions of unspecified wrongful conduct that WBL failed to confirm.

Put another way, under Al-Sabah's "conspiracy" theory, because WBL generally suspected that Agbodjogbe could be up to no good but failed to investigate further, WBL should be liable for civil conspiracy to engage in whatever wrongful activity Agbodjogbe committed.  Had it turned out, for example, that Agbodjogbe had been money laundering, WBL would be liable for civil conspiracy to commit money laundering for engaging in the same conduct it engaged in here. Uninvestigated suspicions are insufficient to "convince the Court that the parties were acting together understandingly to accomplish the fraudulent scheme." *Western Md. Dairy*, 180 Md. at 243.  Conspiracy requires more specific intent, or a "meeting of the minds," that never came to fruition in this case.  Accordingly, summary judgment will also be granted for WBL on Al-Sabah's civil conspiracy claim.[4]

### B.  Aiding and Abetting

The elements of a claim for aiding and abetting are "(1) a tortious act committed by the primary actor, (2) the defendant's knowledge of that tortious act, and (3) the defendant's substantial assistance in the commission of that tortious act." *Lathan v. Sternberg*, No. 0988, 2015

---

[4] Because Al-Sabah has not established the first element, an agreement between Agbodjogbe and the Lender Defendants, this Court need not analyze whether she has adduced evidence of an overt act in furtherance of the conspiracy or actual damages she sustained.

WL 6125427, at *7 (Md. Ct. Spec. App. Sept. 30, 2015) (citing *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360 (2000); *Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 199 (1995)).  Importantly, "willful blindness to fraudulent activity . . . suffices as actual knowledge." *Hoffman v. Stamper*, 385 Md. 1, 44 (2005).  "Willful blindness occurs when a person 'has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance.'"  *Id.* (quoting *State v. McCallum*, 321 Md. 451, 459-60 (1991) (Chasanow, J., concurring)).  "The subtle gradient that makes [a willfully blind person] more culpable is that the person actually suspects that the representation is false and chooses not to investigate, whereas [a recklessly indifferent person] simply does not know and does not care."  *Id.*

Sharestates and WBL fare differently under this inquiry.  Sharestates, at best, is in the recklessly indifferent category, as there is no evidence that Sharestates ever had its suspicion aroused.  The question is not whether a reasonable lender should have cared enough to be suspicious of Agbodjogbe's financial circumstances, but whether the lender actually became suspicious.  Sharestates's willingness to make the loan with very little relevant investigation may have been a risky business proposition, but there is no evidence that Sharestates became suspicious of fraud and chose to ignore it.[5]

The opposite is true as to WBL.  Al-Sabah has adduced specific evidence that WBL's suspicion was aroused.  A January 2016 "Underwriting Review Form" stated that Agbodjogbe's

---

[5] This Court acknowledges that this ruling could be viewed to create a perverse incentive for lenders not to investigate fully the sources of funding of their potential borrowers, past fulfilling any applicable legal and regulatory requirements. Such action, while potentially shielding the lenders from the exposure WBL now faces, poses significant risk to the lenders who extend loans without ascertaining the borrowers' ability to repay them.  This case presented something of an anomaly, where the prospective borrower offered a property of significant value to post as collateral, making it less risky for Sharestates to extend credit with a less-than-customary level of scrutiny of Agbodjogbe's or 9 Jewels's finances.

file suggested "numerous character concerns" and noted "File having high fraud risk."  ECF 145-16.  On January 22, 2016, a WBL Vice President emailed her colleagues to say that Agbodjogbe, "has not been truthful this whole time, and still has not been able to clear our minds behind the fact that he is potentially money laundering."  ECF 145-21.  Finally, prior to the Pikesville loan, WBL became aware that Al-Sabah had filed a *lis pendens* on the Pikesville property and someone at WBL Googled the term "N&A Kitchen LLC scam" on March 24, 2017.  ECF 145-60, 145-61.  Nonetheless, WBL closed on another loan to Agbodjogbe and N&A Kitchen.  Those facts suffice to create a genuine issue of material fact as to whether WBL, after having its suspicions aroused, chose to remain willfully blind to Agbodjogbe's fraudulent activity.  Given that WBL's loans assisted Agbodjogbe in withdrawing cash equity from the properties, a reasonable factfinder could conclude that WBL aided and abetted Agbodjogbe's fraudulent activities.  Summary judgment will therefore be denied as to the aiding and abetting count against WBL, but granted as to Sharestates.

### C.  Negligence, Constructive Fraud, and Fraud by Omission

Al-Sabah's claims against WBL for negligence, constructive fraud, and fraud by omission all require her to establish that the Lender Defendants owed her a duty of care.  *See, e.g.*, *Valentine v. On Target*, 353 Md. 544, 549 (1999) (noting that the first element of a negligence claim is "that the defendant was under a duty to protect the plaintiff from injury."); *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 69 (2015) (requiring "a legal or equitable duty to the plaintiff" for constructive fraud claims) (quotation omitted); *Blondell v. Little*, 413 Md. 96, 119 (2010) ("[O]ne of the essential elements of . . . fraudulent concealment is the existence of a duty between the parties.").  "Inherent also in the concept of duty is the concept of a relationship between the parties out of which the duty arises."  *Rosenblatt v. Exxon*, 335 Md. 58, 77 (1994).  The precise description of

the relationship required to establish a duty varies by context. *See, e.g.*, *Thompson*, 443 Md. at 69 ("For constructive fraud's purposes, a defendant owes an equitable duty to the plaintiff where the parties are in a confidential relationship."); *100 Investment Ltd. Partnership v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 214 (2013) (describing the inquiry into "when an 'intimate nexus' is present between parties such that a duty in tort exists in a case of economic injury") (quoting *Blondell*, 413 Md. at 122); *Iglesias v. Pentagon Title and Escrow, LLC*, 206 Md. App. 624, 663-64 (Md. Ct. Spec. App. 2012).[6] "[T]he existence of a legal duty is a question of law to be decided by the court." *Remsburg v. Montgomery*, 376 Md. 568, 581 (2003).

For purposes of a negligence claim related to "economic loss," Maryland law requires "an intimate nexus between the parties as a condition to the imposition of tort liability." *100 Investment*, 430 Md. at 214 (quoting *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534-35 (1986)). An "intimate nexus is satisfied by contractual privity or its equivalent." *Id.* (quoting *Jacques*, 307 Md. at 534-35).

In the context of constructive fraud, a duty may exist if the parties are in a "confidential relationship." *Thompson*, 443 Md. at 69. A confidential relationship exists "where the defendant 'has gained the [plaintiff's] confidence . . . and purports to act or advise with the [plaintiff]'s interest in mind.'" *Id.* (quoting *Buxton v. Buxton*, 363 Md. 634, 654 (2001)) (alterations in original).

---

[6] Contractual privity would of course also establish a duty, but Al-Sabah had no contract with either Lender Defendant.

Finally, with respect to fraudulent concealment or fraudulent omission, the Maryland Court of Appeals has analyzed whether a duty exists under the same framework it uses to analyze whether a duty exists for purposes of a negligence claim.[7]  *See Blondell*, 413 Md. at 119-24.

Under any phrasing, Al-Sabah has not proffered evidence that would satisfy her burden to establish a duty owed to her by either Lender Defendant.  Maryland law is clear that, in most circumstances, a bank owes no duty to a non-customer.  *See Nat'l Grange Mut. Ins. Co. v. Verizon's Benefits Ctr.*, 541 F. Supp. 2d 745, 749 (D. Md. 2008) (citing the "well-established rule . . . that a bank, with certain narrow exceptions, does not owe a duty to a non-customer with whom it has no direct relationship.").  The sole case in which Maryland courts have recognized a duty owed to a non-customer is readily distinguishable from this case.  In *Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270 (2006), a title company contacted a bank to request payoff quotes on two secured loans, in anticipation of releasing the liens.  The bank's customer subsequently appeared at the bank with two checks from the title company, in the amount of the payoff quotes, with the checks made payable to the bank.  *Id.*  The bank deposited one of the two checks into the customer's account and did not pay off or release the second lien.  *Id.*  On those facts, the court found the equivalence of privity between the title company and the bank, as a result of those parties' direct interactions about the payoff plans and the bank's subsequent receipt of the title company's checks.  *Id.*  The court determined that those acts represent "conduct on the part of [the

---

[7] Notably, fraudulent concealment or omission differs from both negligence and constructive fraud insofar as it requires intent to defraud or deceive and justifiable reliance on the defendant's omission or concealment.  *Blondell*, 413 Md. at 119 (quoting *Lloyd*, 397 Md. at 138).  While Al-Sabah's fraud by omission claim must fail because WBL did not owe her any duty, for the same reasons explained above, there is also no evidence that WBL intended to defraud or deceive her.  Moreover, this Court agrees with WBL insofar as it argues that Al-Sabah did not take any action that could be construed as justifiable reliance on any omission or concealment by WBL.  ECF 150 at 30-31.

bank] that links it to [the title company] and evinces [the bank's] understanding of [the title company's] reliance." *Id.* at 299.

Here, there is no such conduct on the part of either Lender Defendant, nor is there any conceivable "link" between either Lender Defendant and Al-Sabah. Neither had any interaction or direct dealing with Al-Sabah whatsoever, and there is no evidence that Sharestates even knew of Al-Sabah's identity. The record reflects that, over the course of time, WBL learned Al-Sabah's name as Agbodjogbe's benefactor, but discovered no documentary or other evidence reflecting her ownership of the properties in question. Even WBL's knowledge of the *lis pendens* on the Pikesville property did not create a duty to Al-Sabah, because awareness of litigation against a borrower does not create a duty to investigate the veracity of the claims made in that litigation or to assume the truth of those assertions. While WBL's awareness of the *lis pendens* may have provided it a reason to scrutinize Agbodjogbe's reliability as a borrower, it did not create an "intimate nexus" or a "confidential relationship" between WBL and Al-Sabah such that WBL owed any duty to her.

This Court agrees with the Lender Defendants, then, that ruling in Al-Sabah's favor as to a duty owed would start the law down a slippery slope with no clear line to be drawn. The record reflects that inquiries by the Lender Defendants to Agbodjogbe often resulted in misrepresentations that the monies received from Al-Sabah were gifts. Al-Sabah avers that the lenders' investigations were insufficient, but admits no principle governing the degree of investigation she would deem sufficient to fulfill the duty she believes should be owed. Further, it is unclear whether she believes the Lender Defendants' alleged duty of care in this case arises from the large sums of money at issue or whether, in her view, in any case a lender would have a duty to investigate a smaller deposit from an unknown third-party that may have resulted in some

equity interest in a proposed securing property.  In the absence of any precedence under Maryland law, this Court declines to create a generalized duty of care owed from lenders to all persons who may claim ownership interests in loan collateral, to engage in some unspecified degree of investigation to ferret out those potential interests before extending a loan.

Al-Sabah's repeated reliance on this Court's ruling on her motion to dismiss is unpersuasive in the current posture, as the facts alleged in her complaint have not all been borne out by the evidence in discovery.  Applying the governing legal standards to the present record, it is clear that summary judgment is appropriate for both Lender Defendants on Al-Sabah's negligence claims, and for WBL as to her constructive fraud and fraud by omission claims, because no duty is owed by a bank to a non-customer with whom it has had no contact.[8]

### D.  Unjust Enrichment

The elements of a claim for unjust enrichment are that Al-Sabah conferred a benefit on the defendant, that the defendant knew of or appreciated the benefit conferred, and that the defendant accepted or retained the benefit under such circumstances that it would be inequitable to allow the defendant to retain the benefit without paying its value in return. *See Clark Office Bldg., LLC v. MCM Capital Partners, LLLP*, 249 Md. App. 307, 315 (Md. Ct. Spec. App. 2021) (quoting *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007)).  While it is indisputable that Al-Sabah personally conferred no benefit on either Lender Defendant, her theory is that benefits (namely the loans against properties she rightfully owned) were conferred from her resources.  She has adduced

---

[8] Absent finding a duty of care on which to rest a negligence claim, this Court declines to reach the issue of whether Al-Sabah was contributorily negligent by providing millions of dollars to Agbodjogbe without receiving paperwork to document her ownership interests or the uses of her investments.

evidence that the Lender Defendants derived interest, fees, and revenues from her properties, resulting in her own equitable interests being compromised.

The crux of Plaintiff's unjust enrichment claims is whether the Lender Defendants "knew of or appreciated the benefit" conferred from Al-Sabah's resources, or whether they were simply engaged in arms-length business transactions. A bona fide lender who is enriched is not enriched unjustly. *See Plitt v. Greenberg*, 242 Md. 359, 364 (1966) ("[I]f a transferee came into possession of a plaintiff's money in good faith after paying a good and valuable consideration for it, then the plaintiff could not prevail and recover back the funds in that transferee's possession."). Accordingly, absent notice of a mortgagor's fraudulent conduct, mortgage lenders are afforded the same protections and benefits as a bona fide purchaser for value. *See Wash. Mut. Bank v. Homan*, 186 Md. App. 372, 394-98 (Md. Ct. Spec. App. 2009).

Under that calculus, once again there is a genuine issue of material fact as to WBL's liability, but not Sharestates's. For the reasons described above, Sharestates lacked notice of Agbodjogbe's fraudulent conduct, but there is sufficient evidence of WBL's potential notice to permit Al-Sabah's claim to be presented to a jury. Certainly, both Lender Defendants made commercial loans to a distressed borrower using terms highly favorable to the lenders. While such loans are often widely viewed with disfavor and are sometimes described as "usurious," they are not illegal absent knowledge that unlawful activity is being furthered, as addressed in the civil conspiracy count above. It is uncontroverted that Al-Sabah took steps to conceal her publicly traceable connection to the properties at issue, meaning that lenders would have to undertake proactive investigation to discover her connection. WBL did investigate sufficiently to develop suspicions about Agbodjogbe's conduct and to learn Al-Sabah's identity. A jury should therefore decide whether WBL remains entitled to the same protections as a bona fide purchaser or whether

19

its suspicion or knowledge constituted "notice of fraud" such that it should be liable for unjust enrichment.

### E.  Declaratory Judgment Claim

Al-Sabah seeks a declaration regarding "whether Sharestates' purported lien on 327 N. Eutaw Street is valid, and . . . if the lien is valid, the relative seniority of Sharestates' lien and Al-Sabah's judgment lien."  ECF 143 at 38.  However, courts have long recognized that two courts cannot exercise jurisdiction over the same property at the same time.  Accordingly, the doctrine of prior exclusive jurisdiction establishes that where an *in rem* proceeding is already pending in another court regarding a property, "the jurisdiction of the one court must yield to that of the other." *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 466 (1939).  In other words, "when a party seeks equitable relief concerning property that is already in the *res* (the subject) of an ongoing *in rem* action in another court, it is well-settled that the court controlling the property for purposes of the earlier-filed suit has jurisdiction over the property, and the court in which the later equity action was filed lacks jurisdiction." *Tucker v. Specialized Loan Serv.*, 83 F. Supp. 3d 635, 641-42 (D. Md. 2015).

This case presents that exact scenario.  A state court foreclosure case for the Eutaw Street property has been reopened as of the court order of February 22, 2022.  ECF 149-1.  The instant case was filed roughly one month after that foreclosure action.  This Court is therefore barred from exercising jurisdiction to make Al-Sabah's requested declaratory rulings in light of the pending *in rem* proceeding already underway as to the property.

### IV.  CONCLUSION

For the reasons set forth above, Sharestates's Motion for Summary Judgment, ECF 135, is GRANTED in its entirety and WBL's Motion for Summary Judgment, ECF 136, is GRANTED

as to the claims for civil conspiracy, fraud by omission, constructive fraud, and negligence but

DENIED as to the claims for aiding and abetting (Count II) and unjust enrichment (Count VII).  A

separate implementing Order is filed herewith.


Dated:  April 1, 2022                                               _____/s/_____
                                                                             Stephanie A. Gallagher
                                                                             United States District Judge