# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **ALIA SALEM AL-SABAH,** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Case No. 18-cv-02958-SAG** |
| | * | |
| **WORLD BUSINESS LENDERS, LLC,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OF DECISION

Plaintiff Alia Salem Al-Sabah ("Al-Sabah") brought this action against Defendant World Business Lenders, LLC ("WBL"), alleging in Count II of her Complaint, ECF 1, that WBL aided and abetted a fraud committed by Jean Agbodjogbe ("Agbodjogbe"). Al-Sabah has also alleged in Count VII that even if WBL did not aid and abet Agbodjogbe's fraud, it was nonetheless unjustly enriched by its lending activities. This Court held a four-day bench trial from October 23 to October 27, 2023, and received post-trial briefing from both parties. ECF 212, 213.

This Court has heard and considered all the evidence, both testimonial and documentary. For the following reasons, that evidence partially supports Al-Sabah's claims of aiding and abetting. Accordingly, this Court partially finds in favor of Al-Sabah as to Count II and finds for WBL as to Count VII.

## I.    Findings of Fact

This Court finds the facts stated herein based on its evaluation of the evidence, including the credibility of the witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

### A. Al-Sabah's First Meeting with Agbodjogbe

1. On or about June 30, 2014, Al-Sabah first met Agbodjogbe at a restaurant located at 306 N. Howard Street in Baltimore called "Nailah's Kitchen." Al-Sabah Trial Testimony (Oct. 25, 2023).[1]

2. Al-Sabah is a member of the Kuwaiti royal family and traveled to Baltimore at the time to visit her daughter at Johns Hopkins University. *Id.*

3. Prior to returning to Kuwait, Al-Sabah wanted to donate money to a local mosque during the holy month of Ramadan. *Id.*

4. Al-Sabah found a local mosque in downtown Baltimore. Upon her arrival, the mosque directed her to Nailah's Kitchen across the street, where she could purchase food for donation to the mosque during Ramadan. *Id.*

5. Al-Sabah met Agbodjogbe, the owner of Nailah's Kitchen, and inquired about his ability to provide food from the restaurant to the mosque. After speaking with Agbodjogbe and observing his busy restaurant, Al-Sabah purchased $10,000 worth of food as a continuous donation during Ramadan and the Eid al-Fitr holiday. *Id.*

6. Al-Sabah returned to Kuwait that evening. *Id.*

7. To verify her continuous donation, Al-Sabah requested and received from Agbodjogbe daily photographs and/or videos of food that Nailah's Kitchen prepared and delivered to the mosque. *Id.*

8. Al-Sabah and Agbodjogbe continued remote communications via WhatsApp and FaceTime during Ramadan. *Id.*

---

[1] The full transcript of Al-Sabah's trial testimony is available at ECF 216.

**B.  Funds Al-Sabah Transferred to Agbodjogbe for N&A Kitchen**

9.  During their communications, Agbodjogbe expressed to Al-Sabah a desire to expand his restaurant. They agreed that he would convert his existing business into a new business called N&A Kitchen, LLC ("N&A Kitchen"). *Id.*

10. Al-Sabah understood N&A Kitchen to stand for "Nailah's and Alia's Kitchen." *Id.*

11. Al-Sabah accepted the opportunity to invest in N&A Kitchen in exchange for 50% ownership. *Id.*

12. Al-Sabah had never previously invested in a prospective business opportunity like this one. *Id.*

13. On July 17, 2014, Al-Sabah received an email from Agbodjogbe providing her with background information about him and his family. In this email, Agbodjogbe provided Al-Sabah with his driver's license, copies of his business licenses and credit cards, and a 2013 U.S. federal income tax return for Nailah's Kitchen. Agbodjogbe also expressed willingness to "go through a background check if necessary." Pl's Trial Ex. 604.

14. Upon receiving this email, Al-Sabah believed Agbodjogbe was honest, genuine, and transparent about himself and his intentions to expand his restaurants with her as a business partner. Al-Sabah Trial Testimony (Oct. 25, 2023).

15. Accordingly, Al-Sabah did not perform a background check on Agbodjogbe. *See id.*

16. On August 8, 2014, Al-Sabah received an email from Agbodjogbe attaching draft articles of organization and an operating agreement for N&A Kitchen prepared by a lawyer, Jeffrey P. Rogyom. Pl's Trial Ex. 60.

17. Al-Sabah reviewed the draft articles of organization and operating agreement, which identified her as a member of N&A Kitchen and represented that she would have a 50% membership interest in the company. *Id.*; Al-Sabah Trial Testimony (Oct. 25, 2023).

18. The draft agreement defined "Membership Interest" to include "(a) a right of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under" the operating agreement and "(b) any management rights, voting rights, rights to consent, and the right to information concerning the business and affairs of the Company." Pl's Trial Ex. 60.

19. With the draft articles of organization and operating agreement, Al-Sabah believed Agbodjogbe was setting up N&A Kitchen according to her expectations. Al-Sabah Trial Testimony (Oct. 25, 2023).

20. On August 26, 2014, Agbodjogbe emailed Al-Sabah with a copy of a notice from the Internal Revenue Service ("IRS") assigning N&A Kitchen an employer identification number. Pl's Trial Ex. 108.

21. On August 28, 2014, Agbodjogbe shared with Al-Sabah bank account information for N&A Kitchen. Pl's Trial Ex. 109.

22. On September 2, 2014, Agbodjogbe forwarded to Al-Sabah an unexecuted contribution agreement for N&A Kitchen. Pl's Trial Ex. 110. This contribution agreement, drafted by Rogyom, confirmed Al-Sabah's intent to contribute $150,000 to N&A Kitchen and to retain a 50% interest in the business. *Id.*

23. On September 3, 2014, Al-Sabah received an email from Agbodjogbe with (1) a partially executed contribution agreement signed by Agbodjogbe and (2) instructions for her to sign the agreement, obtain a witness signature, and retain a copy for her files. Pl's Trial Ex. 16.

24. On September 9, 2014, Al-Sabah wired $150,000 to N&A Kitchen as her initial investment in the business. *See* Al-Sabah Trial Testimony (Oct. 25, 2023).

25. On September 16, 2014, Agbodjogbe sent Al-Sabah a physical copy of the draft operating agreement for N&A Kitchen via FedEx. After receiving this package, Al-Sabah signed the document and sent a photograph of her signature page back to Agbodjogbe. *See* Pl's Trial Exs 1, 15; Al-Sabah Trial Testimony (Oct. 25, 2023).

26. On September 30, 2014, Al-Sabah wired N&A Kitchen an additional $50,000 for purchase of a food truck. Al-Sabah Trial Testimony (Oct. 25, 2023).

### C. Funds Al-Sabah Transferred to Agbodjogbe for the Purchase of, and Investment in, Various Properties in the Name of 9 Jewels

27. On October 16, 2014, Al-Sabah wired another $825,000 to N&A Kitchen, which she intended to be used to purchase, renovate, and rent an old apartment building in Baltimore. *Id.*

28. Al-Sabah later understood that her $825,000 would be used to purchase, renovate, and rent a property located at 400 N. Howard Street in Baltimore, with any leftover proceeds to be used for restaurant operations at N&A Kitchen. *Id.*

29. Al-Sabah desired that the property located at 400 N. Howard Street be titled in the name of a separate company, wholly owned by Al-Sabah, named 9 Jewels, LLC ("9 Jewels") after her nine daughters. *Id.*

30. Al-Sabah did not intend for Agbodjogbe to use any portion of the $825,000 for his personal benefit. *Id.*

31. Agbodjogbe sent Al-Sabah pictures of 400 N. Howard Street, which she recalled appeared to be in a "very bad" condition. *Id.*

32. In November, 2014, Agbodjogbe transmitted to Al-Sabah a booklet depicting how the property at 400 N. Howard Street would look after renovations. *Id.*

33. On December 4, 2014, Agbodjogbe forwarded an email to Al-Sabah from a developer requesting that Agbodjogbe provide proof of funding available to complete the 400 N. Howard Street project. Pl's Trial Ex. 17.

34. On January 16, 2015, Agbodjogbe emailed Al-Sabah informing her that the 400 N. Howard Street project "will be tough," given its location near downtown Baltimore and noting that the property could double in price if investors found out about her involvement in buying the property, given her wealth. Pl's Trial Ex. 18; Al-Sabah Trial Testimony (Oct. 25, 2023).[2]

35. In the same email, Agbodjogbe identified two additional properties at 5722 York Road and 327 N. Eutaw Street in Baltimore for purchase. Pl's Trial Ex. 18.

36. Al-Sabah understood from this email that Nailah's Kitchen would move to 327 N. Eutaw Street because it did not have necessary gas service at its existing location at 306 N. Howard Street. Al-Sabah Trial Testimony (Oct. 25, 2023).

37. Al-Sabah also understood from this email that the property at 5722 York Road would be purchased to house an upscale restaurant as an expansion of Nailah's Kitchen. *Id.*

38. Al-Sabah intended and understood that these two additional properties would be wholly owned by her company, 9 Jewels. *Id.*

39. A short time after receiving Agbodjogbe's email, Al-Sabah wired N&A Kitchen $305,966 for the purchase of 327 N. Eutaw Street. *Id.*

40. On or about January 28, 2015, and unbeknownst to Al-Sabah, Agbodjogbe purchased a residential home located at 103 Mt. Wilson Lane in Pikesville, Maryland for

---

[2] Although WBL objected to these communications based on hearsay, the Court has admitted them not as evidence for their truth, but rather for the effect on Al-Sabah.

$469,990.00 in cash. ECF 178 at 34 (Joint Stipulations of Fact);[3] *see* Al-Sabah Trial Testimony (Oct. 25, 2023).

41. On or about February 9, 2015, "N&A Kitchen" (not 9 Jewels) purchased the real property located at 327 N. Eutaw Street in Baltimore, Maryland for $180,000.000 in cash. ECF 178 at 34 (Joint Stipulations of Fact).

42. On February 10, 2015, Al-Sabah wired N&A Kitchen an additional $1,000,000 to support construction at 400 N. Howard Street. Al-Sabah Trial Testimony (Oct. 25, 2023).

43. A few weeks later, Al-Sabah wired N&A Kitchen an additional half million dollars for the purchase of an additional property located at 306-310 N. Howard Street, where a nonprofit called "ASA Foundation" would provide aftercare for Muslim youth in Baltimore. *Id.*

44. On March 17, 2015, N&A Kitchen purchased the real property located at 400 N. Howard Street in Baltimore, Maryland for $139,000.000 in cash. ECF 178 at 35 (Joint Stipulations of Fact).

45. On March 19, 2015, "9 Jewels, LLC" purchased the real property located at 306-310 N. Howard Street in Baltimore, Maryland for $545,000.000 in cash. *Id.*

46. On April 2, 2015, Agbodjogbe informed Al-Sabah that he was "working very hard to make ASA foundation the best," and forwarded her an email from Curry Architects. Pl's Trial Ex. 119.

---

[3] This Court uses the ECF page numbers in the header at the top of the page.

47. On April 24, 2015, Agbodjogbe forwarded Al-Sabah an interior design of the ASA Foundation headquarters at 310 N. Howard Street prepared by Curry Architects. Pl's Trial Ex. 120.

48. On May 11, 2015, Al-Sabah returned to Baltimore to attend a meeting with Agbodjogbe, the Baltimore mayor's office, representatives from Curry Architects, Rogyom, and others to discuss the projects at 400 N. Howard Street and 310 N. Howard Street. Al-Sabah Trial Testimony (Oct. 25, 2023).

49. After this meeting, Al-Sabah visited the offices of Curry Architects to view a presentation about the 400 N. Howard Street and 310 N. Howard Street projects. *Id.*

50. During this presentation, Al-Sabah discovered that Curry Architects had put 400 N. Howard Street under the name N&A Kitchen, not 9 Jewels. *Id.*

51. Al-Sabah discussed her concerns over the ownership of 400 N. Howard Street with Rogyom and Agbodjogbe at Rogyom's offices. During their conversation, Al-Sabah directed Rogyom to place 400 N. Howard Street, as well as the properties at 327 Eutaw Street, 310 N. Howard Street, and 5722 York Road, in the name of 9 Jewels. *Id.*

52. Rogyom represented to Al-Sabah that these changes would be made, but that they would require additional time and money. *Id.*

53. Al-Sabah agreed to pay additional money to Rogyom to effectuate the changes. *Id.*

54. Al-Sabah left the meeting satisfied that Rogyom would honor her requests to transfer the ownership of the four properties from N&A Kitchen to 9 Jewels. *Id.*

55. Throughout this time, Al-Sabah believed Rogyom was her lawyer as well as Agbodjogbe's lawyer. *Id.*

8

56. After departing Rogyom's offices, Al-Sabah visited Agbodjogbe's accountant, David Leichter, at his Baltimore offices to determine where her money had gone. However, Leichter was unavailable. *Id.*

57. Al-Sabah returned to Rogyom's office to inform him that she was unable to meet with Leichter. *Id.*

58. On June 2, 2015, Al-Sabah wired $500,000 to N&A Kitchen for renovations at 5722 York Road. *Id.*

59. On or about June 29, 2015, Agbodjogbe informed Al-Sabah that he was terminating Rogyom as their lawyer because he became "greedy" over legal fees. *Id.*

60. Agbodjogbe informed Al-Sabah that he would replace Rogyom with another lawyer he personally knew. *Id.*

61. On August 6, 2015, at Agbodjogbe's request, Al-Sabah wired an additional $450,000 to N&A Kitchen for further renovations of 5722 York Road. *Id.*

62. On August 6, 2015, also at Agbodjogbe's request, Al-Sabah wired $200,000 to 9 Jewels to fund further renovations at one of the Howard Street properties. *Id.*; Def's Trial Ex. 2.

63. On August 7, 2015, Agbodjogbe informed Al-Sabah about a delay in the ASA Foundation project due to asbestos found in the existing building. Pl's Trial Ex. 146.

64. On August 20, 2015, "York Road, LLC" purchased the real property located at 5722 York Road in Baltimore, Maryland for $525,000 in cash. ECF 178 at 35 (Joint Stipulations of Fact).

65. Based on her understanding that the ASA Foundation project would require more money, Al-Sabah wired an additional $330,743 to N&A Kitchen on September 22, 2015. Al-Sabah Trial Testimony (Oct. 25, 2023).

66. On November 3, 2015, Al-Sabah wired $280,621 to 9 Jewels to complete further renovations at 400 N. Howard Street after learning from Agbodjogbe that prices for renovations had increased. *Id.*

67. On December 6, 2015, Al-Sabah wired $560,000 to N&A Kitchen to fund the acquisition of land in Maryland on which to build a cemetery for local Muslims who could not afford burial costs. *Id.*; Def's Trial Ex. 2.

68. On December 7, 2015, Al-Sabah wired an additional $104,000 to 9 Jewels to fund the acquisition of land for the cemetery after learning from Agbodjogbe that prices for permitting to level the property had increased. Al-Sabah Trial Testimony (Oct. 25, 2023); Def's Trial Ex. 2.

69. Al-Sabah received no documentation that Agbodjogbe used her money to buy any land for a cemetery. Al-Sabah Trial Testimony (Oct. 25, 2023).

### D. Funds Al-Sabah Transferred to Agbodjogbe to Purchase an Apartment in New York City

70. In July, 2015, Al-Sabah decided to buy an apartment in New York City for her daughter to live in while her daughter attended the City University of New York ("CUNY"). *Id.*

71. Agbodjogbe offered to help Al-Sabah find an apartment, representing to Al-Sabah that he had personal familiarity with, and was periodically traveling to, New York City. *Id.*

72. Al-Sabah accepted Agbodjogbe's offer to find an apartment for her daughter. *Id.*

73. Agbodjogbe sent Al-Sabah a video of an apartment located at 325 5th Avenue ("NYC Condo") and recommended it for her daughter based on its proximity to CUNY. *Id.*

74. Al-Sabah accepted Agbodjogbe's apartment recommendation and wired $200,000 to N&A Kitchen in mid-July, 2015, for the down payment on the NYC Condo. *Id.*

75. Al-Sabah wired the $200,000 down payment to N&A Kitchen with the understanding that Agbodjogbe would transfer the money to 9 Jewels, the entity Al-Sabah wanted to use to purchase the apartment located at 325 5th Avenue. *Id.*

76. On August 3, 2015, Al-Sabah received a signed contract of sale for the NYC Condo from Agbodjogbe via email. The contract of sale identified 9 Jewels as the buyer of the NYC Condo but contained Agbodjogbe's signature as the managing member of 9 Jewels. Pl's Trial Ex. 142.

77. Al-Sabah did not understand "managing member" to be synonymous with the owner of 9 Jewels.  Al-Sabah Trial Testimony (Oct. 25, 2023).

78. On August 4, 2015, Al-Sabah received an email from Agbodjogbe instructing her to wire a total of $1,910,000 to 9 Jewels to cover the rest of the purchase price of the NYC Condo, as well as closing costs, lawyer fees, and other miscellaneous fees associated with the purchase of the NYC Condo. Pl's Trial Ex. 143.

79. On August 6, 2015, Al-Sabah wired $1,900,000 to 9 Jewels. Al-Sabah Trial Testimony (Oct. 25, 2023).

80. Al-Sabah visited Baltimore and New York City that month to tour the apartment with her mother and two of her daughters. *Id.*

81. While in New York City and Baltimore, Al-Sabah met Agbodjogbe again in person. *Id.*

82. By the end of September, 2015, Al-Sabah's daughter moved in and occupied the NYC Condo. *Id.*

### E.   Funds Al-Sabah Transferred to Agbodjogbe in April and July, 2016

83. In early 2016, Agbodjogbe sought more money from Al-Sabah for commercial investment purposes in Baltimore. *Id.*

84. Al-Sabah informed Agbodjogbe that she was "not interested anymore" in commercial investments and requested paperwork regarding her existing investments. *Id.*

85. On April 14, 2016, Al-Sabah left a voice message for Agbodjogbe requesting him to send her paperwork for each property that documented which business entities owned the properties before she would send more money. Def's Trial. Ex. 82.

86. Al-Sabah feared that if something happened to Agbodjogbe, she would not have proof of her ownership in the businesses. Al-Sabah Trial Testimony (Oct. 25, 2023).

87. On or about April 18, 2016, Al-Sabah wired $325,000 to N&A Kitchen after Agbodjogbe informed her that he needed to make a final payment to contractors working on the building for the ASA Foundation or else he would be physically harmed. *Id.*

88. Later that month, Al-Sabah traveled to Baltimore to visit the site of the proposed ASA Foundation at 306-310 N. Howard Street and the locations of Nailah's Kitchen at 327 N. Eutaw Street and 5722 York Road. *Id.*

89. During that trip, Al-Sabah observed that the proposed ASA Foundation site and 5722 York Road property were nearly complete and ready for opening. However, Al-Sabah still had not received any paperwork confirming her ownership in 9 Jewels. *Id.*

90. On May 19, 2016, Al-Sabah left a voicemail for Agbodjogbe requesting that he open an account in her personal name because she needed U.S. credit cards and profits from

N&A Kitchen to repay her brother for monies she had provided to Agbodjogbe.[4] *Id.*; Def's Trial Ex. 90.

91. On May 20, 2016, Al-Sabah left another voicemail for Agbodjogbe, again seeking records of her ownership in the various properties she believed he purchased on her behalf. Al-Sabah Trial Testimony (Oct. 25, 2023).

92. On July 13, 2016, Al-Sabah received an email claiming that Agbodjogbe and his family were at risk of imminent eviction for defaulting on a mortgage on his personal residence. The email, which Al-Sabah believed to have been written by Agbodjogbe's wife, requested additional money from her to avoid the foreclosure. *Id.*; Pl's Trial Ex. 23.

93. On July 17, 2016, Al-Sabah messaged Agbodjogbe to again request records of her ownership in the various properties she believed he purchased on her behalf. Pl's Trial Ex. 400.

94. On July 18, 2016, Al-Sabah wired Agbodjogbe $150,000, which she intended to be a loan to avoid foreclosure on his home. Al-Sabah Trial Testimony (Oct. 25, 2023).

95. On November 9, 2016, Al-Sabah pressed Agbodjogbe why he had not been answering her calls and expressed concern that he might be "in trouble." Pl's Trial Ex. 164.

---

[4] During trial and in its post-trial brief, WBL argued that Al-Sabah lacked standing to recover damages related to the NYC Condo and the $150,000 loan she provided Agbodjogbe in July, 2016, because she admitted during trial that the money used for those wires came from various family members. *See* ECF 213 at 28–29. The Court need not address these arguments because, as detailed below, it does not find that Al-Sabah is entitled to damages related to the NYC Condo or the $150,000.

96.   When Agbodjogbe failed to respond to this email, Al-Sabah made additional efforts to contact Agbodjogbe through other channels, including by sending a family friend to find Agbodjogbe in person. Al-Sabah Trial Testimony (Oct. 25, 2023).

97.   On November 30, 2016, Al-Sabah received an email from Agbodjogbe instructing her to "stop sending people" to find him. Pl's Trial Ex. 166.

98.   Upon receipt of this email, Al-Sabah believed she was "in trouble," because she had been "defrauded." Al-Sabah Trial Testimony (Oct. 25, 2023).

99.   From 2014 to 2016, Al-Sabah wired $7.8 million to entities she believed she controlled but instead were solely controlled by Agbodjogbe. *Id*.

### F.  WBL's First Involvement with Agbodjogbe

100.   Doug Naidus founded WBL in 2011 as an alternative business lender that provides small businesses with short-term, high-cost loans secured by real estate. Naidus Trial Testimony (Oct. 24, 2023).[5]

101.   WBL serves businesses that cannot or do not qualify for loans from banks and other traditional lending sources. *Id.*; Pardes Dep. Testimony 56:11–19 (July 7, 2021); Oztreves Trial Testimony (Oct. 23, 2023).[6]

102.   WBL has an internal set of guidelines that it uses to assess its own credit risk during the underwriting of each loan. Pl's Trial Ex. 745; Oztreves Trial Testimony (Oct. 23, 2023).

---

[5] The full transcript of Naidus's trial testimony is available at ECF 215.

[6] The full transcripts of Oztreves's trial testimony are available at ECF 214 (Oct. 23, 2023) and ECF 215 (Oct. 24, 2023).

103.    WBL takes a discretionary approach to underwriting each prospective loan using, but occasionally deviating from, its internal underwriting guidelines as it sees fit. Naidus Trial Testimony (Oct. 24, 2023); Pardes Trial Testimony (Oct. 24, 2023).[7]

104.    The process of issuing and funding a loan at WBL involves (1) review and evaluation of the business applying for the loan; (2) valuation of the real estate pledged as collateral supporting the loan; (3) acquisition of title insurance for the collateral; (4) presentation to, and approval by, at least one person of a three-person investment committee; (5) credit approval issued by the credit department; (6) generation and signature of a funding package handled by the closing department; and (6) funding of the loan. Oztreves Trial Testimony (Oct. 23, 2023).

105.    In December, 2015, Agbodjogbe submitted a business loan application on behalf of N&A Kitchen requesting $350,000 from WBL to purchase restaurant equipment at 306 N. Howard Street ("Loan Zero"). Pardes Dep. Testimony 104:7–10 (July 7, 2021); Pl's Trial Ex. 660.

106.    Jon Pezzino, a WBL junior credit analyst at the time, reviewed the business loan application, including N&A Kitchen's projected business revenues, use of proceeds, monthly bank statements, and the proposed collateral at 306-310 N. Howard Street. *See* Pezzino Dep. Testimony 57:3–21 (Aug. 13, 2021); Pl's Trial Ex. 660.

107.    Upon review of N&A Kitchen's monthly bank statements, Pezzino noticed several large sums of money wired into the account. Pezzino Dep. Ex. 22;[8] Pl's Trial Ex. 660.

---

[7] The full transcript of Pardes's trial testimony is available at ECF 215.

[8] The Court overrules Al-Sabah's objections to the extent she objects to the admission of this deposition exhibit because she does not identify an evidentiary issue with the exhibit itself.

108.    On December 28, 2015, Pezzino requested more information about the source of these wires from Agbodjogbe's loan broker, Kenneth Williams. Pezzino Dep. Ex. 22.

109.    Williams subsequently informed Pezzino that the wires came from Agbodjogbe's business partner. *Id.*

110.    On January 18, 2016, Pezzino held a telephonic merchant interview with Agbodjogbe to discuss his loan application. Pezzino Dep. Ex. 4.

111.    WBL keeps records of its merchant interviews and uses them in conjunction with its underwriting activities. Oztreves Trial Testimony (Oct. 23, 2023).

112.    During the January 18 merchant interview, Pezzino learned that the wire transfers were gifts to Agbodjogbe from a business partner belonging to a wealthy family in Kuwait. Pezzino also learned that Agbodjogbe reported these gifts to the IRS on his personal tax returns and requested Agbodjogbe provide WBL with copies of those tax returns to confirm the gifts he received. Pezzino Dep. Ex. 4.

113.    On January 19, 2016, Pezzino received a 2014 IRS Form 3520 (Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts), revealing that Agbodjogbe had reported $1,024,975 in gifts to the IRS. Leichter Dep. Ex. 4.

114.    A Maryland-licensed certified public accountant, Leichter, prepared and signed Agbodjogbe's 2014 IRS Form 3520. *Id.*; Leichter Dep. Testimony 23:1–14 (July 20, 2021).

115.    Leichter provided bookkeeping, tax planning, and tax preparation services to Agbodjogbe beginning in early 2015. Leichter Dep. Testimony 34:12–18, 47:19–48:1 (July 20, 2021).

116.    On a loan underwriting review form dated January 20, 2016, WBL identified "numerous character concerns" associated with the loan, including that Agbodjogbe had not complied with "numerous requests for missing documents" and the file had "high fraud risk." Pl's Trial Ex. 660.

117.    On January 22, 2016, Yasemin Fakioglu, a WBL vice president at the time, informed WBL's Managing Director and Chief Operating Officer, Robert Pardes, that Agbodjogbe's file contained "multiple large deposits, which he claims are gifts from relatives" and a "[p]ossibility of money laundering." Pl's Trial Ex. 679; *see* Pardes Trial Testimony (Oct. 24, 2023).

118.    Fakioglu considered the possibility that Agbodjogbe engaged in money laundering because the large wires did not match Agbodjogbe's regular monthly business revenue of $40,000 and because restaurants are among "industries that cash flow a lot for money laundering." Fakioglu Dep. Testimony 99:12–100:8 (July 15, 2021).[9]

119.    Naidus also became aware of money laundering concerns and required Pardes separately "to take a look at it." Naidus Trial Testimony (Oct. 24, 2023).

120.    On January 22, 2016, shortly after he received Fakioglu's email noting her concerns, Pardes informed Fakioglu that U.S. financial regulations require Agbodjogbe's depository bank to investigate and clear the large deposits and that WBL "can only assume that the depository bank has exercised the requisite due diligence." Pl's Trial Ex. 679; Pardes Trial Testimony (Oct. 24, 2023).

---

[9] For reasons stated on the record during the September 29, 2023, pretrial conference, the Court overrules WBL's objections to these lines of deposition testimony. *See* ECF 196.

121.   According to Pardes, the 2014 IRS Form 3520 satisfied WBL's concerns about money laundering "because money laundering is a discrete activity, and here the deposits are being reported to the IRS and the federal government directly." Pardes Trial Testimony (Oct. 24, 2023).

122.   This response satisfied Fakioglu's money laundering concerns. Fakioglu Dep. Testimony 122:13–19 (July 15, 2021).

123.   Fakioglu then informed Pezzino that the possibility of money laundering "shouldn't be a concern for us." *Id.* at 124:4–21; Pl's Trial Ex. 679.

124.   Pardes nonetheless recommended that Fakioglu and Pezzino speak with Agbodjogbe's accountant, Leichter, to get more information about Agbodjogbe's characterization of the wires as gifts. Pardes Trial Testimony (Oct. 24, 2023).

125.   On January 26, 2016, Pezzino called Leichter to further discuss Agbodjogbe's 2014 IRS Form 3520, noting during the call "some concern about some very large wires." Def's Trial Ex. 72.

126.   Pezzino believed that his call with Leichter corroborated Agbodjogbe's representations that the wires were gifts. Pezzino Dep. Testimony 92:13–14 (Aug. 13, 2021).[10]

127.   For example, Leichter informed Pezzino that the wires came from Kuwait and were "legitimate" and "legal" based on an agreement between Agbodjogbe and "one of the princesses from Kuwait" to transfer money to Agbodjogbe for projects and business ventures. Leichter represented to Pezzino that his accounting firm could not verify

---

[10] The Court overrules WBL's foundation objections to this line of deposition testimony because Pezzino has sufficient personal knowledge of how his call with Leichter corroborated the information elicited in his earlier merchant interview with Agbodjogbe.

Agbodjogbe was not money laundering but noted that "the princess who had wired the money did come to [his] office" and "she is a legitimate princess of Kuwait[,] [a]s ridiculous as it sounds." Def's Trial Ex. 72.

128.    Leichter represented to Pezzino that Agbodjogbe was "an upstanding guy" and his "entire story" with respect to the wires "all checks out." *Id.*

129.    Leichter further informed Pezzino that Agbodjogbe purchased a property in New York for the daughter of the Kuwaiti princess while the daughter attended graduate school. *Id.*

130.    Pezzino discussed this call with Cem Oztreves, WBL's senior investment officer and assigned underwriter for the loan. Oztreves Trial Testimony (Oct. 23, 2023).

131.    On January 28, 2016, Oztreves approved and signed off on Loan Zero on behalf of WBL's investment committee. In so doing, Oztreves found that the character concerns identified in the January 20, 2016, underwriting review form were "all mitigated" because WBL "confirmed that the funds are gift funds through a professional . . . who filed the tax returns" and reported the wires to the IRS. *Id.*

132.    The terms of Loan Zero included a $250,000[11] principal secured with a lien on the property at 306-310 N. Howard Street and guaranteed by Agbodjogbe and 9 Jewels. Pl's Trial Ex. 660.

133.    WBL ultimately did not fund Loan Zero because Agbodjogbe withdrew his loan application before it funded. Fakioglu Dep. Testimony 182:17–183:4 (July 15, 2021); Oztreves Trial Testimony (Oct. 23, 2023).

---

[11] WBL approved Loan Zero for $250,000 after Agbodjogbe requested the loan amount be reduced. Oztreves Trial Testimony (Oct. 23, 2023).

### G. WBL's First Loan to Agbodjogbe

134.    Four months later, in May, 2016, Agbodjogbe submitted a new business loan application to WBL, now seeking a $600,000 loan for N&A Kitchen ("Loan One"). Fakioglu Dep. Ex. 17; Stafford Dep. Ex. 18; Stafford Dep. Testimony 151:8 (Aug. 9, 2021).

135.    As collateral for Loan One, Agbodjogbe pledged the NYC Condo that he bought in August, 2015 in the name of 9 Jewels. Pl's Trial Ex. 957.

136.    On May 24, 2016, Pezzino held another telephonic merchant interview with Agbodjogbe to discuss his Loan One application. Def's Trial Ex. 74.

137.    During that interview, Pezzino inquired about the NYC Condo and requested that Agbodjogbe provide proof of purchase of the NYC Condo. *Id.*

138.    Pezzino also re-inquired about the large international wires coming into Agbodjogbe's bank accounts and received an explanation similar to the one in the January, 2016 interview—that Agbodjogbe receives the money as gifts from a longtime friend and that he has reported the money to the IRS as gifts. *Id.*

139.    Pezzino also learned that Agbodjogbe used some of the gift money to purchase the NYC Condo and used the rest of the money to purchase other properties for redevelopment. Def's Trial Ex. 74.

140.    Agbodjogbe's representations satisfied Pezzino that the large wire transfers were personal gifts Agbodjogbe received and reported to the IRS. Pezzino Dep. Testimony 116:23–117:15 (Aug. 13, 2021).

141.    At least one large wire deposit ($324,968) on Agbodjogbe's April, 2016 Capital One bank account came from "ALSHAIKHA ALIA SALEM AL-S." Pl's Trial Ex. 736.

142.     WBL reviewed this April, 2016 bank statement in connection with the underwriting of Loan One. *See* Oztreves Trial Testimony (Oct. 24, 2023).

143.     On May 24, 2016, the same day as Pezzino's merchant interview, WBL's investment committee approved Loan One for $600,000 over a 24-month term, based on Agbodjogbe's projected revenues at three locations of N&A Kitchen. Pl's Trial Ex. 738; Oztreves Trial Testimony (Oct. 23, 2023).

144.     WBL approved Agbodjogbe's loan application with a payment-to-deposit ratio ("PDR") of 154%, which exceeded WBL's internal guidelines of 30%. Pl's Trial Ex. 738; Pl's Trial Ex. 631; Oztreves Trial Testimony (Oct. 24, 2023).[12]

145.     A borrower's PDR represents the borrower's capacity to repay the loan by dividing the borrower's daily loan payments per month by the business's average monthly deposits. According to WBL's guidelines, exceptions to WBL's 30% maximum PDR "should be supported by compensating factors" such as the guarantor's credit and other income. Pl's Trial Ex. 631; *see also* Pl's Trial Ex. 745.

146.     Agbodjogbe, as the guarantor of the loan, had a low credit score of 575. Oztreves Trial Testimony (Oct. 23, 2023).

147.     WBL made an exception to the 30% maximum PDR solely based on Agbodjogbe's projected revenues at the three restaurant locations. *Id.*[13]

148.     During his underwriting of Loan One, Oztreves did not have any concerns over the source of the large wires entering Agbodjogbe's accounts based on WBL's previous

---

[12] The Court overrules WBL's Rule 403 objections to these lines of testimony.

[13] While the use of actual business revenues resulted in a PDR of 154%, the use of projected business revenues resulted in a much lower projected PDR of 13%. Pl's Trial Ex. 738.

review of the 2014 IRS Form 3520, Pezzino's discussion with Leichter back in January, 2016, and Oztreves's belief that the wires were personal gifts to Agbodjogbe. *Id*.; Oztreves Trial Testimony (Oct. 24, 2023).

149.   WBL subjected Loan One to certain closing conditions, including (1) proof of purchase for the NYC Condo to the satisfaction of Oztreves; (2) a first position lien on the NYC Condo with title insurance; and (3) a long form attorney opinion letter to the satisfaction of Pardes. Pl's Trial Ex. 738.

150.   Oztreves reviewed Agbodjogbe's bank statements confirming a purchase price of $1.8 million for the NYC Condo in the name of 9 Jewels. Oztreves Trial Testimony (Oct. 23, 2023).

151.   Pardes signed off on a short form accountant letter from Leichter in lieu of a long form attorney opinion letter for Loan One. As Pardes testified, Leichter's letter was a convenient way for WBL to obtain a professional opinion that Agbodjogbe wholly owned both 9 Jewels (the owner of the NYC Condo), and N&A Kitchen, the loan applicant. Although WBL's policy states that loans above $200,000 must obtain attorney opinion letters, Pardes accepted an accountant representation for this loan. Pardes Trial Testimony (Oct. 24, 2023); *see* Pl's Trial Ex. 736.

152.   On May 27, 2016, WBL funded the $600,000 loan amount to N&A Kitchen, secured by a first position lien on the NYC Condo and guaranteed by Agbodjogbe and 9 Jewels. Oztreves Trial Testimony (Oct. 24, 2023); Pl's Trial Ex. 736.

### H.  WBL's Second Loan to Agbodjogbe

153.   In July, 2016, Agbodjogbe sought to refinance Loan One with a new loan from WBL in the amount of $1.2 million to N&A Kitchen ("Loan Two"). Stafford Dep. Ex. 22.

154.    On July 29, 2016, Oztreves advised Naidus that WBL should not approve the loan because Agbodjogbe's application had several missing items, including (1) month-to-date bank statements; (2) a completed merchant interview; (3) validation of projected increases in business revenue; (4) updated use of funds for the new loan; and (5) a prepayment structure. Pl's Trial Ex. 750.

155.    On August 9, 2016, Pezzino held a merchant interview with Agbodjogbe to discuss the operating status and projected revenues of Agbodjogbe's restaurants, intended use of funds for Loan Two, past use of funds, and sources of additional large wires transferred to Agbodjogbe's bank statements. Pezzino Dep. Ex. 12.

156.    Pezzino identified the source of the wires as Alia Al-Sabah from Agbodjogbe's recent bank statements. *Id.*

157.    Pezzino recorded this information on the underwriting review form and credit analysis sheet for Loan Two, noting on the underwriting review form that the large wires are observed to be coming from "ALIAH SALEM ALALI ALSABAH." Pezzino Dep. Testimony 172:21–174:13 (Aug. 13, 2021);[14] Def's Trial Ex. 30.

158.    On August 9, 2016, WBL's investment committee approved Loan Two for $1.2 million based on Agbodjogbe's updated revenue projections at his three restaurant locations. Def's Trial Ex. 30.

159.    WBL calculated Loan Two's PDR at 94%, which again far exceeded the 30% maximum set forth in WBL's internal guidelines. *Id.*; *see* Pl's Trial Ex. 745.

---

[14] The Court overrules WBL's objections as to foundation because Pezzino has sufficient personal knowledge of Loan Two's underwriting review form and the information from the merchant interview that factored into that form. Similarly, the Court does not perceive the questions as withdrawn.

160.    WBL's investment committee approved Loan Two despite inconsistencies in Agbodjogbe's representations between Loans One and Two regarding his businesses. For example, although Agbodjogbe represented to WBL that all three of his restaurant locations were open during the underwriting of Loan One, he informed WBL during the underwriting of Loan Two that two of his restaurant locations were currently closed. Oztreves Trial Testimony (Oct. 24, 2023).

161.    Agbodjogbe's businesses also had generated significantly lower revenues than what he projected to WBL during the underwriting for Loan One. *Id.*

162.    Oztreves considered these inconsistencies commonplace and typical among WBL's borrowers, and when he examined the overall credit risk to WBL based on Agbodjogbe's explanations and updated projections for Loan Two, Oztreves found the risk acceptable. *Id.*

163.    WBL subjected its approval for Loan Two to certain closing conditions, including a long form attorney opinion letter to the satisfaction of Pardes. Def's Trial Ex. 30.

164.    On August 26, 2016, WBL obtained a long form attorney opinion letter from a Baltimore law firm, Saller & Bishop, which Pardes approved on the same day. Among other representations, the attorney letter opined that N&A Kitchen had been duly organized, was validly existing as a corporation in good standing, and had the power and authority to perform its obligations under the loan. Pl's Trial Ex. 782; Pardes Trial Testimony (Oct. 24, 2023).

165.    The same day, WBL funded the $1.2 million loan to N&A Kitchen, secured with a first position lien on the NYC Condo and guaranteed by Agbodjogbe and 9 Jewels. Def's Trial Ex. 30.

166.    In December, 2016, Agbodjogbe refinanced Loan Two with a new loan from a
different commercial lender. As a result of this refinance, WBL was paid in full for
Loan Two. Oztreves Trial Testimony (Oct. 24, 2023); Fakioglu Dep. Testimony 62:22–
63:3 (July 19, 2021).

### I.  WBL's Third Loan to Agbodjogbe

167.    In March, 2017, WBL began underwriting a new loan application ("Loan Three")
in an amount of $360,000 for N&A Kitchen and a new entity, N&A Kitchen II, LLC
("N&A Kitchen II"). Loan Three was to be secured by Agbodjogbe's residential
property at 103 Mount Wilson Lane, Pikesville, MD 21208 (the "Pikesville Property").
Oztreves Trial Testimony (Oct. 23, 2023); Def's Trial Ex. 31.

168.    On March 22, 2017, a company named World Wide Land Transfer provided to
WBL a Report of Title for the Pikesville Property (the "Title Report"). The Title Report
included a title commitment and notified WBL that "[t]itle is vested in Jean
Agbodjogbe and discloses no mortgages and (7) judgments/liens." Fakioglu Dep. Ex.
39; Fakioglu Dep. Testimony 80:12–22 (July 19, 2021).

169.    The Title Report listed, among the seven judgments/liens, a case filed in Maryland
state court on March 20, 2017, captioned *Al Sabah vs. Agbodjogbe et al*. The Title
Report identified the existence of a Notice of Lis Pendens from Baltimore County
associated with the case, *Al Sabah vs. Agbodjogbe et al*. Fakioglu Dep. Ex. 39.

170.    The Notice of Lis Pendens alleged that Plaintiff Al-Sabah "entrusted Mr.
Agbodjogbe with millions of dollars of her money for various real estate investments
and charitable endeavors in and around Baltimore City, Maryland," and "[i]nstead of
using these monies for their intended purposes, Mr. Agbodjogbe, in confederation with

his wife . . . misappropriated the money for their personal benefit." Pl's Trial Ex. 872.[15] The Notice of Lis Pendens also stated: "In particular, Mr. Agbodjogbe used $469,990 of Ms. Al-Sabah's money to purchase a home located at 103 Mt. Wilson Lane, Pikesville, Maryland, 21208 . . . where Mr. Agbodjogbe and [his wife] currently live." *Id.*

171.    The Notice of Lis Pendens further stated that Al-Sabah brought an action in the U.S. District Court for the District of Maryland "alleging fraud, breach of contract, breach of agency duties, civil conspiracy, conversion, unjust enrichment, and detrimental reliance" and among her requests for relief, Al-Sabah sought "to obtain title to the [Pikesville] Property, which was purchased using her money." *Id.*

172.    Exhibit 1 to the Notice of Lis Pendens attached a copy of Al-Sabah's complaint filed in the U.S. District Court for the District of Maryland and detailed Al-Sabah's factual allegations and claims for relief against Agbodjogbe and several of his business entities, including N&A Kitchen, N&A Kitchen II, and 9 Jewels. *Id.*

173.    WBL employees took notice of Al-Sabah's complaint and the lis pendens on the Pikesville Property. For example, Fakioglu (who reviewed the Title Report and understood title policies) directly asked Agbodjogbe about the lis pendens and Al-Sabah's suit while she facilitated his loan renewal. Fakioglu Dep. Testimony 80:23–81:14, 82:13–15, 97:15–16 (July 19, 2021).[16]

---

[15] The parties jointly stipulated to the admission of this exhibit for any purpose. ECF 178 at 37.

[16] The Court overrules WBL's hearsay objections to these specific portions of Fakioglu's deposition testimony because there is no hearsay issue with Fakioglu's own recollection of why she contacted Agbodjogbe in March, 2017.

174.   Fakioglu learned from her discussion with Agbodjogbe that he and his attorneys were working on resolving the lis pendens and other judgments identified in the Title Report. *Id.* at 115:1–16 (July 19, 2021).[17]

175.   Fakioglu relayed the information about the lawsuit and lis pendens to at least two WBL employees: Momtaj Malik, a closer on the loan, and Yasmin Karamete, a processor on the loan. *Id.* at 82:18–82:21,[18] 83:2–9, 85:13–18, 114:22–115:11; Fakioglu Dep. Ex. 49.

176.   According to Fakioglu, Karamete would have looked further into the details of the complaint and collected additional documentation about it. Fakioglu Dep. Testimony 83:23–25, 85:19–22 (July 19, 2021).

177.   A WBL employee named Martin Viva reviewed and signed a title review form internal to WBL that identified the seven judgments / liens on the Pikesville Property, including one associated with "AL SABAH, ALIA SALEM" dated March 20, 2017. The title review form, dated March 22, 2017, stated: "JUDGMENTS/LIENS ARE BEING REVIEWED." Def's Trial Ex. 68.[19]

178.   Additionally, on March 23, 2017, Fakioglu discussed the lis pendens with WBL's title department manager, Jaime Hayden. Fakioglu expressed to Hayden that the lis

---

[17] The Court overrules WBL's hearsay objections to these specific portions of Fakioglu's deposition testimony because they are not being offered for their truth, but rather what Fakioglu understood from Agbodjogbe and what she would relay to others at WBL. *See* Fakioglu Dep. Testimony 115:7–9 (July 19, 2021) ("I don't know if [Agbodjogbe] spoke to his attorney, I don't know if any of this is accurate, I'm just relaying what he told me.").

[18] For the reasons described above, the Court also overrules WBL's hearsay objections to this portion of Fakioglu's deposition testimony.

[19] The parties jointly stipulated to the admission of this exhibit for any purpose. ECF 178 at 37.

pendens could risk closing or funding of the loan. Fakioglu Dep. Testimony 105:13–107:2 (July 19, 2021); *see* Fakioglu Dep. Exs. 44, 45.

179.   WBL generally does not close on a property with an active lis pendens. Pardes Dep. Testimony 263:6–9 (July 7, 2021).

180.   Hayden escalated the issue of the lis pendens to Pardes, who did not investigate the specifics because "shortly after" Hayden escalated the issue, the title company removed the lis pendens from the Title Report. Pardes Trial Testimony (Oct. 24, 2023).

181.   As they had for Loan Two, WBL's underwriting documents for Loan Three included a note that "[l]arge deposits are observed coming from ALIAH SALEM ALALI ALSABAH." Def's Trial Ex. 31.

182.   Additionally, the underwriting review form WBL prepared for Loan Three reflected that a "prior owner judgment" dated 3/20/2017 under the name "AL SABAH, ALIA SALEM" was "to be removed [because] this is prior owner." *Id.*

183.   On March 23, 2017, WBL's investment committee approved Loan Three in the amount of $360,000 to N&A Kitchen and N&A Kitchen II. *Id.*

184.   WBL approved Loan Three with a 79% "loan to value" ("LTV"). *Id.*

185.   LTV is the percentage of the loan amount relative to the value of the collateral. Oztreves Trial Testimony (Oct. 23, 2023).

186.   WBL's internal guidelines set a maximum 75% LTV for residential properties, meaning that WBL does not finance a loan that is worth more than 75% of the value of the home. Pl's Trial Ex. 745.

187.    WBL went above its LTV guidelines in this case because of "the free and clear nature of the collateral" and Agbodjogbe's positive payment history with WBL. Def's Trial Ex. 31; Oztreves Trial Testimony (Oct. 23, 2023).

188.    On March 24, 2017, before closing on Loan Three and before it received a new title policy without the lis pendens, WBL's closing department separately conducted a PACER search to identify the pending litigation related to the lis pendens to determine whether there was an amount in judgment that could be escrowed if the lis pendens could not be removed from the Title Report. Pardes Dep. Testimony 264:14–265:1 (July 7, 2021).

189.    The PACER search identified Al-Sabah's fraud suit against Agbodjogbe in federal court. Fakioglu Dep. Ex. 48.[20]

190.    Notwithstanding the lis pendens, WBL received a new title policy on the Pikesville Property about "a day or two later," after WBL's investment committee approved Loan Three. Oztreves Trial Testimony (Oct. 24, 2023); *see* Oztreves Trial Testimony (Oct. 23, 2023); Fakioglu Dep. Ex. 54.[21]

191.    According to Pardes, the title company removed the lis pendens because it was filed against another property and not the Pikesville Property that served as collateral for Loan Three. This fact, along with the title company's willingness to insure title,

---

[20] The Court overrules WBL's objections to the admission of this deposition exhibit because there is no foundation, hearsay, or Rule 403 problem.

[21] The Court overrules Al-Sabah's objections to the extent she objects to the admission of this deposition exhibit because there is no best evidence, personal knowledge, or expert opinion problem with the exhibit itself.

allowed WBL's closing department to close the loan. Pardes Trial Testimony (Oct. 24, 2023); Pardes Dep. Testimony 263:16–264:13 (July 7, 2021); Fakioglu Dep. Ex. 54.

192.    However, WBL itself asked the title company to "take another look and omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." Oztreves Trial Testimony (Oct. 23, 2023); *see also* Pardes Trial Testimony (Oct. 24, 2023) ("[I]t's a title company who's asked to clear the exceptions to title.").

193.    WBL did not question or assess the wisdom of issuing Loan Three to Agbodjogbe despite uncovering the pending litigation because Loan Three had already been approved and was moving forward to closing. Pardes Dep. Testimony 265:17–266:17 (July 7, 2021).[22]

194.    WBL had a "rush to fund" the deal before Agbodjogbe backed out. Oztreves Trial Testimony (Oct. 24, 2023); *see* Fakioglu Dep. Ex. 50; Fakioglu Dep. Testimony 118:11–24 (July 19, 2021).

195.    Because of its "rush to fund," WBL funded Loan Three before conducting its customary primary residence additional diligence ("PRAD") call with Agbodjogbe. Oztreves Trial Testimony (Oct. 24, 2023).

196.    The purpose of a PRAD call is to conduct a "comprehensive review with a guarantor pledging their principal residence as collateral so they fully understand what

---

[22] The Court overrules WBL's objections to these lines of deposition testimony based on lack of foundation because Pardes had personal knowledge about WBL's policies and practices generally, as well as the issue of the pending litigation specifically. Pardes Dep. Testimony 264:16–265:1 (July 7, 2021) ("It's my understanding that Jaime [Hayden] - - well, I know that they did a PACER search, but that was not credit operations. That's closing operations, did a PACER search to identify the litigation mostly for purposes of determining whether there's an amount that could be escrowed if it could not be removed."). The Court also overrules WBL's objections that this testimony assumes facts not in evidence, because the record reveals that someone at WBL pulled a PACER docket and uncovered Al-Sabah's fraud suit against Agbodjogbe.

they're doing [and] the risk they endure." Naidus Dep. Testimony 213:16–20 (Aug. 10, 2021). WBL's PRAD committee then reviews the PRAD call and evaluates its own lending risks before funding the loan. *Id.* at 209:20–210:11.

197.     In this case, however, Oztreves recommended, and Naidus approved, waiving the PRAD call requirement before funding because Agbodjogbe was "a repeat customer" and "paid [WBL] multiple times on bigger loans." Naidus Dep. Ex. I; Naidus Dep. Testimony 216:10–217:6 (Aug. 10, 2021);[23] *see* Pl's Trial Ex. 861 (noting the PRAD call with Agbodjogbe was a condition to be satisfied prior to Loan Three closing).

198.     On March 30, 2017, WBL received an attorney's opinion letter from Saller & Bishop. That letter opined, among other things, that "[t]o our knowledge, after due inquiry, there is no . . . threatened or pending litigation against Borrower [N&A Kitchen, LLC / N&A Kitchen II LLC], Corporate Guarantor, Guarantor [Agbodjogbe], and Collateral Owner [Agbodjogbe] that could adversely impact the ability of Borrower, Corporate Guarantor, Guarantor and Collateral Owner to perform the obligations under the terms of the Loan Documents." Def's Trial Ex. 31.

199.     After receiving the attorney opinion letter and updated title insurance on the Pikesville Property, WBL "got comfortable" funding Loan Three. Oztreves Trial Testimony (Oct. 23, 2023).

200.     On March 30, 2017, the same day it received the attorney opinion letter, WBL funded Loan Three in the amount of $360,000 to N&A Kitchen and N&A Kitchen II secured with a first position lien on the Pikesville Property. Def's Trial Ex. 31.

---

[23] The Court overrules WBL's Rule 401 and Rule 403 objections to these lines of deposition testimony.

201.    To date, Agbodjogbe has not repaid Loan Three to WBL, and WBL has not sold the Pikesville Property. Oztreves Trial Testimony (Oct. 23, 2023).

## II.    Conclusions of Law

### A.  Aiding and Abetting (Count II)

Al-Sabah alleges that WBL aided and abetted Agbodjogbe's fraud by issuing the three loans, secured by properties purchased with her funds. The elements of a claim for aiding and abetting are "(1) a tortious act committed by a primary actor, (2) the defendant's knowledge of that tortious act, and (3) the defendant's substantial assistance in the commission of that tortious act." *Lathan v. Sternberg*, No. 0988, 2015 WL 6125427, at *7 (Md. Ct. Spec. App. Sept. 30, 2015); *see Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995).

### i.  The Underlying Fraud (Element One)

The first element requires Al-Sabah to prove, by clear and convincing evidence, that Agbodjogbe defrauded her. *See Hooker v. JN Prop. Sols., LLC*, No. 1151, 2021 WL 4306899, at *15 (Md. Ct. Spec. App. Sept. 22, 2021). To prevail on her fraud claim, Al-Sabah must show, among other things, that she justifiably relied on Agbodjogbe's false representations and omissions.[24] *See, e.g.*, *Sass v. Andrew*, 832 A.2d 247, 267 (Md. Ct. Spec. App. 2003); *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 653 (D. Md. 2012). "A party is justified in relying on another's factual assertions *unless*, 'under the circumstances, the facts should be apparent to one of [her] knowledge and intelligence from a cursory glance or [s]he has discovered something which

---

[24] WBL did not challenge the other elements of Al-Sabah's underlying fraud claim, specifically, (1) that Agbodjogbe made false representations to Al-Sabah; (2) Agbodjogbe knew of the representations' falsity or made them with reckless indifference as to their truth; (3) Agbodjogbe made the misrepresentations for the purpose of defrauding Al-Sabah, and (4) that Al-Sabah suffered compensable injury resulting from Agbodjogbe's misrepresentations. *See Nails v. S & R, Inc.*, 639 A.2d 660, 669 (Md. 1994).

should serve as a warning that [s]he is being deceived, that [s]he is required to make an investigation of [her] own.'" *Moseman v. Van Leer*, 263 F.3d 129, 132 (4th Cir. 2001) (emphasis added) (quoting *Gross v. Sussex Inc.*, 630 A.2d 1156, 1166 (Md. 1993)); *see also Schmidt v. Millhauser*, 130 A.2d 572, 594 (Md. 1957) (explaining that plaintiffs had a right to rely on misrepresentations regarding roof conditions where "[t]he alleged defects in the roof were not so obvious or apparent that the purchasers must have known of such defects").

Except for the final two wire transfers to Agbodjogbe in April and July, 2016, Al-Sabah has proven that she justifiably relied on Agbodjogbe's misrepresentations and that Agbodjogbe defrauded her of over $7 million. Prior to her engagement with Agbodjogbe, Al-Sabah never invested in businesses or charitable enterprises in the United States, never completed any educational degrees in business-related disciplines, and never reviewed U.S. corporate tax documents. Al-Sabah is also a high-net worth individual with access to money from the Kuwaiti royal family who found, through Agbodjogbe, an opportunity to donate and invest some of her extensive resources into Baltimore and its Muslim community. The Court thus considers Al-Sabah's specific background and experience in reviewing each subset of wire transfers. *See Dierker*, 888 F. Supp. 2d 645 at 653–54 ("In determining if reliance is reasonable, a court is required to view the act in its setting, and [to] consider such factors as the background and experience of the party that relied upon the representation." (internal quotation marks omitted) (quoting *Sass*, 832 A.2d at 267)).

### a. Funds Al-Sabah Transferred to Agbodjogbe for N&A Kitchen and for the Purchase of, and Investment in, Various Properties in the Name of 9 Jewels

From June, 2014 to December, 2015, Al-Sabah justifiably relied on Agbodjogbe's representations that he would use her money to (1) expand his restaurant operations as N&A Kitchen and (2) revitalize various properties in Baltimore in the name of 9 Jewels. Agbodjogbe's

misrepresentations and omissions related to these transfers were not so obvious or apparent to Al-Sabah. *See Schmidt*, 130 A.2d 572 at 594. During and after her initial meeting with Agbodjogbe, Al-Sabah reasonably developed a level of trust in Agbodjogbe based on his willingness to help her donate food to the local mosque and the photos and videos of the donated food he sent to her via WhatsApp. Her trust deepened when Agbodjogbe offered to undergo a background check and provided her with identification documents, copies of his business licenses and credit cards, and a federal income tax return. And when Agbodjogbe emailed Al-Sabah a professionally prepared draft articles of organization and operating agreement for N&A Kitchen that appeared to give Al-Sabah 50% interest in the business, along with the IRS notice and bank account information for N&A Kitchen, Al-Sabah had justifiable reason to believe Agbodjogbe in fact set up the joint business venture she envisioned.

Al-Sabah also justifiably relied on Agbodjogbe's representations that he would help her invest in and revitalize Baltimore properties through an entity she would wholly own, called 9 Jewels. Al-Sabah received some information which, to her, corroborated Agbodjogbe's representations. For example, for the 400 N. Howard Street project, she received pictures from Agbodjogbe depicting poor building conditions at the existing property, an email from a developer requesting proof of funding available to complete the project, and a booklet with pictures demonstrating how the project would look after renovations. Outside of this information, Al-Sabah took Agbodjogbe at his word based on the trust she had already developed months earlier. Although one might argue, as WBL has, that Al-Sabah should have done more to verify her sole ownership in 9 Jewels or Agbodjogbe's need for additional funds, the record convincingly shows Agbodjogbe's representations were not obviously false in a way that would render Al-Sabah's reliance unjustifiable.

WBL also suggests that Al-Sabah's failures to perform various investigatory steps before sending Agbodjogbe large sums of money preclude her from establishing justifiable reliance. However, WBL has failed to show how performance of these investigatory steps would have alerted Al-Sabah to Agbodjogbe's fraud or why Al-Sabah should have performed these steps at some specific time. For example, WBL faults Al-Sabah for rejecting Agbodjogbe's offer to conduct a background check in July, 2014, before agreeing to become his business partner. But at this early point, there were no warning signs that would or should have prompted Al-Sabah to perform the detailed background check she would later conduct in November, 2016—when Agbodjogbe's fraud became apparent to her. *See* Al-Sabah Trial Testimony (Oct. 25, 2023) (answering "Yes" to WBL's question, "[i]f you had done [the November, 2016] background check at that time, you never would have gone into business with him, right?"). The documents Agbodjogbe sent in 2014 contained no warning signs that would have been apparent to Al-Sabah. In particular, although the 2013 U.S. federal income tax return revealed that Nailah's Kitchen experienced a gross loss of $17,735 that year, Pl's Trial Ex. 604, Al-Sabah had never seen such a tax form before and would not have understood whether the business experienced profit or loss. *See* Al-Sabah Trial Testimony (Oct. 25, 2023) (answering "No" to the question, "have you seen at that point in time any sort of United States tax return form like that?" and adding, "I wouldn't know that this [tax document] is loss or this is a profit"). Similarly, WBL faults Al-Sabah for failing to ask for any of the deeds for the Baltimore properties Agbodjogbe bought and for failing to ask for or receive financial records for the companies she was investing in. But even if she had received those documents, the record demonstrates that any errors or misrepresentations in those documents would not have been obvious or apparent to Al-Sabah, given her limited understanding of U.S. business records and legal requirements. *See* Al-Sabah Trial Testimony (Oct. 25, 2023)

(answering "No" to the question, "[d]id it cause you concern that your name was not going to be visible to the authorities to whom the [IRS employer identification number] application was submitted?" and explaining, "[b]ecause I'm not a citizen[]"). Al-Sabah instead relied on her trust, her direct communications from Agbodjogbe, and the other corroborating information to verify his representations regarding her business investments. Given Al-Sabah's sparse business knowledge and experience, she reasonably relied on those representations.

Al-Sabah's reliance continued to be justified after her May, 2015 visit to Baltimore, which showed her that active renovations were underway. During that trip, she met with representatives from Curry Architects, the Baltimore mayor's office, Rogyom, and contractors to discuss the construction projects Agbodjogbe had initiated. She also attended a presentation about the projects at the offices of Curry Architects, where she learned that the 400 N. Howard Street project had been placed under the name of N&A Kitchen, not 9 Jewels. She immediately informed Rogyom and Agbodjogbe that the 400 N. Howard Street project should be in the name of 9 Jewels, and she agreed to pay additional money to have Rogyom correct the title. Later that day, Al-Sabah informed Rogyom that she had unsuccessfully attempted to meet with the accountant, Leichter. At all times prior to and during these meetings, Al-Sabah believed Rogyom to be her lawyer and relied on him to honor her requests and protect her business interests. Therefore, Al-Sabah had no reason to think Agbodjogbe deceived her when she wired additional money for business purposes several weeks and months later.[25]

---

[25] Even though Al-Sabah learned from Agbodjogbe that he terminated Rogyom over demands for legal fees, she continued to believe (with no evidence to the contrary) that the next lawyer Agbodjogbe hired would continue to represent both of them in their joint business pursuits. *See* Al-Sabah Trial Testimony (Oct. 25, 2023).

For these reasons, Al-Sabah justifiably relied on Agbodjogbe's misrepresentations when she wired him over $5.2 million[26] from June, 2014 to December, 2015.[27]

### b. Funds Al-Sabah Transferred to Agbodjogbe to Purchase an Apartment in New York City

Al-Sabah also justifiably relied on Agbodjogbe's representations that he would find and purchase an apartment in New York City on her behalf so that her daughter could live there while she attended CUNY. While one may fairly doubt that Agbodjogbe's "range of expertise included not only Senegalese cuisine, restaurant management, and Baltimore commercial real estate, but also the New York personal estate market," ECF 213 at 13, Al-Sabah still had no reason *herself* to doubt Agbodjogbe's representations given her limited experience and knowledge of U.S. business or real estate investing. Thus, when Agbodjogbe sent Al-Sabah a video of the NYC Condo and a signed contract of sale that identified 9 Jewels as the buyer of the NYC Condo, Al-Sabah had no indication that Agbodjogbe misrepresented her ownership interest in 9 Jewels. To the contrary, Agbodjogbe apparently successfully procured the NYC Condo for Al-Sabah's daughter's residence, further demonstrating his ability to do what he said he would do. Accordingly, the Court is convinced that Al-Sabah had justifiable reason to rely on Agbodjogbe's representations regarding his misleading purchase of the NYC Condo.

---

[26] This amount also includes money Al-Sabah transferred to Agbodjogbe to build an Islamic cemetery. The Court similarly finds no indication or evidence that Al-Sabah unjustifiably relied on Agbodjogbe's representations related to the cemetery project.

[27] In its closing arguments and post-trial briefing, WBL emphasizes the large sums of money Al-Sabah wired to Agbodjogbe as an additional reason why she should have sought more accounting, information, and verification from Agbodjogbe. *See* ECF 213 at 10. However, the Court does not find the amount of money particularly useful in this unique situation, where Al-Sabah has a relatively high personal net-worth of $24.8 million and further access to the Kuwaiti royal family's immense assets. *See* Al-Sabah Trial Testimony (Oct. 25, 2023). Amounts that are meaningful to an average investor may be insignificant to a much wealthier one, and a subjective reasonableness inquiry must take such considerations into account.

WBL argues that Al-Sabah's earlier discovery that 400 N. Howard Street had been purchased by N&A Kitchen instead of 9 Jewels and her concern over a lack of documentation regarding 9 Jewels' ownership in the Baltimore properties presented "conflicting information" that put her "on notice of possible deception" with respect to the NYC Condo. ECF 213 at 14 (citing *Kiddie Acad. Domestic Franchising LLC v. Faith Enters. DC, LLC*, Civ. No. WDQ-07-705, 2009 WL 2169060, at *4 (D. Md. July 17, 2009)). But WBL's reliance on *Kiddie Academy* is misplaced. In that case, this Court found that two companies unjustifiably relied on pro formas of the franchises they purchased, when the companies also possessed tax returns that contradicted the pro formas and "acknowledged that they were aware of the discrepancies." *Id.* By contrast, Al-Sabah had no knowledge that Agbodjogbe put 9 Jewels in his own name instead of hers. Indeed, WBL has not presented any conflicting information known to Al-Sabah that would render her reliance on Agbodjogbe's representations with respect to the NYC Condo unjustifiable.

For these reasons, Al-Sabah justifiably relied on Agbodjogbe's misrepresentations when she wired him a total of $2.1 million in July and August, 2015 to purchase the NYC Condo.

### c. Funds Al-Sabah Transferred to Agbodjogbe in April and July, 2016

Al-Sabah's reliance on Agbodjogbe's representations became less tenable when Agbodjogbe's story began to unravel before her in the spring of 2016. Al-Sabah testified that in early 2016, Agbodjogbe "was pushing one more investment" in commercial shops near Johns Hopkins. Al-Sabah Trial Testimony (Oct. 25, 2023). But Al-Sabah refused to send any more money to Agbodjogbe until she received paperwork documenting her ownership interests in the existing commercial properties. She told Agbodjogbe, "Enough." *Id.* Nonetheless, Agbodjogbe convinced Al-Sabah to send another $325,000 because contractors were "going to do harm [to] him unless he finishe[d] the last payment" for the ASA foundation. *Id.*

The Court is persuaded that under this set of circumstances, Al-Sabah had discovered something which should have warned her of Agbodjogbe's deception. Al-Sabah discovered that Agbodjogbe's story changed dramatically when she told him "Enough," and that she needed to see documentation of her ownership in the properties. Even with Al-Sabah's limited business experience and knowledge, Agbodjogbe's shifted representations should have alerted her to ask follow-up questions of Agbodjogbe or to explore the possibility that she could pay the contractors directly to satisfy Agbodjogbe's alleged debts. Al-Sabah may have been well-intentioned wanting to ensure Agbodjogbe's physical safety, but her failure to ask follow-up questions or investigate Agbodjogbe's representations at this point rendered her reliance unreasonable in wiring him an additional $325,000.

Al-Sabah's reliance remained unjustified when she wired Agbodjogbe one final $150,000, which she intended as a loan to cover Agbodjogbe's alleged impending foreclosure on his home. Up to that point, in July, 2016, she still had not received the documentation she had been requesting for months and had left at least two voicemails for Agbodjogbe renewing her requests for his cooperation. Yet, on July 18, 2016, she wired him another $150,000 based on an email that claimed to be from Agbodjogbe's wife, requesting the money to avoid foreclosure. There is no evidence that Al-Sabah ever met Agbodjogbe's wife. Thus, Al-Sabah did not have the kind of relationship with her that she had with Agbodjogbe. Moreover, Agbodjogbe himself continued evading Al-Sabah's calls and her requests for documentation. Because these communications (and lack thereof) should have served as a warning to Al-Sabah, the Court finds that Al-Sabah had no reasonable justification to believe Agbodjogbe (or possibly his wife's) representations before she sent him one final wire for $150,000.

For these reasons, Al-Sabah unjustifiably relied on Agbodjogbe's misrepresentations when she wired him a total of $425,000 in April and July, 2016.

### ii.   WBL's Knowledge of Agbodjogbe's Fraud (Element Two)

The second element of Al-Sabah's aiding-and-abetting claim requires proof that WBL knew about, or was willfully blind to, Agbodjogbe's fraud on Al-Sabah. *See Lathan v. Sternberg*, No. 0988, 2015 WL 6125427, at *7 (Md. Ct. Spec. App. Sept. 30, 2015). "[W]illful blindness to fraudulent activity . . . suffices as actual knowledge" when "a person has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance." *Hoffman v. Stamper*, 867 A.2d 276, 302 (Md. 2005) (internal quotation marks omitted) (quoting *State v. McCallum*, 583 A.2d 250, 253–54 (Md. 1991) (Chasanow, J., concurring)). "The subtle gradient that makes [a willfully blind person] more culpable is that the person actually suspects that the representation is false and chooses not to investigate, whereas [a recklessly indifferent person] simply does not know and does not care." *Id.* In other words, "[w]illful blindness is a standard that 'surpasses recklessness and negligence.'" *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 345 (S.D.N.Y. 2013) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). As detailed below, the Court finds that WBL was willfully blind to Agbodjogbe's fraud on Al-Sabah as to its processing of Loan Three, but not as to Loans One and Two.

### a.   WBL's Knowledge of Agbodjogbe's Fraud as to Loans One and Two

The evidence elicited at trial failed to show that WBL had knowledge of, or was willfully blind to, Agbodjogbe's fraud during its underwriting of Loans One and Two. WBL's lower-level employees first discovered several large wires in Agbodjogbe's bank accounts during WBL's

underwriting of Loan Zero,[28] arousing a suspicion that the wires might evidence money laundering. However, there is no evidence that WBL deliberately omitted making further enquiries about these concerns. *See Hoffman*, 867 A.2d at 302. Rather, WBL independently sought answers about the large wires from Agbodjogbe's loan broker, from Agbodjogbe's accountant, and from Agbodjogbe himself. WBL also sought and independently reviewed Agbodjogbe's 2014 IRS Form 3520, which reported the wires as gifts from a foreign source. These actions, replicated in some fashion during the underwriting of Loans One and Two,[29] did not reveal to WBL any evidence of money laundering or wrongdoing. Instead, they assuaged WBL's concerns and supported its understanding that Agbodjogbe received the wires as gifts from a wealthy overseas friend.

Despite a record devoid of any evidence that WBL deliberately avoided learning about Agbodjogbe's fraud as to Loans One and Two, Al-Sabah advances two principal reasons for why the Court should nonetheless find willful blindness regarding those loans. First, Al-Sabah argues that WBL's business model and internal procedures are predicated on a "collective willful blindness," which allowed WBL to accept contradictory, inconsistent, and counterintuitive representations regarding Agbodjogbe's business operations. According to Al-Sabah, Agbodjogbe's "facially implausible" representations aroused suspicions of fraud and set off "flashing red lights" because "nothing about [Agbodjogbe] . . . made any actual sense." ECF 212

---

[28] Although Loan Zero did not ultimately fund, WBL's activities during its underwriting of Loan Zero are highly relevant to the issue of knowledge and willful blindness of Agbodjogbe's fraud on Al-Sabah.

[29] For example, Jon Pezzino re-inquired about the large wire transfers during his merchant interviews with Agbodjogbe during the underwriting of Loans One and Two. Additionally, WBL received an accountant representation letter before closing Loan One and an attorney opinion letter before closing Loan Two to confirm that Agbodjogbe owned the proposed collateral (the NYC Condo) and the associated business entities as Agbodjogbe represented he did. At no point during the underwriting for Loans One and Two did WBL uncover any other suspicious bank activity that created any new questions about the source of the large wires into Agbodjogbe's bank accounts.

at 24–25. Al-Sabah then argues that WBL deliberately "stopped short of asking the right question[s]" of the right people because WBL knew "they wouldn't like" the answers, Pl's Closing Arg. (Oct. 27, 2023), and did not want to "interrupt the money flow" to WBL, *id.* at 27. Neither argument holds weight.

Al-Sabah's first argument fails because there is no evidence that WBL's business model and loan decisions in this case were made "specifically to avoid attributable knowledge of" Agbodjogbe's underlying fraud on Al-Sabah. *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 345 (S.D.N.Y. 2013). While the Court recognizes that WBL takes an unconventional approach to lending and can avoid "the kind of multi-cycle [bank] analysis that would be associated with a long-term credit," Pardes Dep. Testimony 57:4–5 (July 7, 2021), nothing in the record shows that WBL deliberately structures its business to avoid uncovering suspected fraud by its borrowers.[30] Further, that WBL is "willing to lend essentially where no other lender will go" by issuing loans to borrowers with "very difficult complex credits" reflects only WBL's own high-risk tolerance. Naidus Trial Testimony (Oct. 24, 2023). WBL exemplified its high-risk tolerance with Agbodjogbe—a borrower with a low credit score, inconsistent representations, unproven business revenue projections, and exceedingly high payment-to-deposit ratios. Although Al-Sabah may fairly wish to criticize WBL for making risky, negligent, or perhaps even reckless business decisions, these decisions do not evidence WBL's knowledge or suspicions of fraud.

Al-Sabah's second argument similarly fails because the standard for willful blindness asks not what an alleged aider and abettor should have done, but rather what the actor actively did "to

---

[30] In fact, as the process for Loan Three illustrates, sometimes WBL does acquire such information during its underwriting.

avoid confirming a high probability of wrongdoing." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Al-Sabah faults WBL for failing to ask Al-Sabah herself or her daughter "if the multimillion dollar sums used to purchase the loan collateral were, in fact, gifts as [Agbodjogbe] had told [WBL] they were." Pl's Closing Arg. (Oct. 27, 2023). Al-Sabah further faults WBL for seeking these answers from Agbodjogbe's accountant and for failing to ask specifically what Leichter meant by declaring the gifts were "legitimate." *Id.* And Al-Sabah maintains that WBL failed to ask these questions because it knew what the answers would be— that Al-Sabah did not intend to give Agbodjogbe funds to purchase properties in his own name or in the names of business entities he owned. But again, there is simply no evidence in the record that demonstrates WBL *knew* that Al-Sabah would have contradicted Agbodjogbe or his accountant, and there is no evidence WBL chose not to ask the "obvious question[s]," ECF 212 at 27, of Al-Sabah and Leichter *because* it knew the answers (or wished to remain in ignorance about them). Without such evidence, Al-Sabah's allegations are best couched in terms of negligence or recklessness and fall short of what the willful blindness standard requires. *See Global-Tech Appliances, Inc.*, 563 U.S. at 569; *Hoffman v. Stamper*, 867 A.2d 276, 302 (Md. 2005).

### b. WBL's Knowledge of Agbodjogbe's Fraud as to Loan Three

In contrast to Loans One and Two, the evidence in the record clearly and convincingly shows that WBL was willfully blind to Agbodjogbe's fraud when it elected to fund Loan Three. Prior to Loan Three, in August, 2016, WBL knew that Al-Sabah, a member of the Kuwaiti royal family, had sent Agbodjogbe large sums of money. WBL also knew that Agbodjogbe used at least some of that money to purchase the property he pledged as collateral for Loans One and Two. Then, as WBL processed Loan Three, it became aware that: (1) Agbodjogbe sought a third WBL loan secured by a residential property in Pikesville, Maryland; (2) an initial title report (dated

March 22, 2017) contained a Notice of Lis Pendens against the Pikesville Property, which had been filed in Maryland state court on March 20, 2017, under the case caption *Al Sabah vs. Agbodjogbe et al.*; (3) the Notice of Lis Pendens included Al-Sabah's fraud complaint filed in federal court against Agbodjogbe and several of his business entities, including 9 Jewels, N&A Kitchen, and N&A Kitchen II; and (4) WBL's own closing department conducted a PACER search on March 24, 2017, which identified Al-Sabah's federal fraud suit against Agbodjogbe. All told, at least eight days before WBL funded Loan Three on March 30, 2017, it knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three.

Nevertheless, WBL still proceeded to fund Loan Three because a title company "decided to insure over the lis pendens" and a long form attorney opinion letter stated that "no threatened or pending litigation posed a risk to" Agbodjogbe's ability to perform his loan obligations. ECF 213 at 21 (first citing Pardes Trial Testimony (Oct. 24, 2023); then quoting Def's Trial Ex. 31). Both explanations cannot withstand scrutiny when considering the record in this case. Specifically, after WBL received the initial title policy and report on March 22, 2017, WBL requested that the title company "take another look and omit those [title issues] that had belonged to the prior owner or omit those that don't belong." Oztreves Trial Testimony (Oct. 23, 2023); *see also* Def's Trial Ex. 31 (noting in the collateral information section of WBL's underwriting review form for Loan Three that a "prior owner judgment" dated 3/20/2017 under the name "AL SABAH, ALIA SALEM" was "to be removed [because] this is prior owner").[31] WBL soon thereafter received a new title insurance policy, which omitted the lis pendens from the policy. Importantly, contrary to

---

[31] This notation in the underwriting review form does not make sense because Al-Sabah was not a prior owner of the Pikesville Property and WBL, by that point, knew she was the wealthy individual who sent Agbodjogbe wires from Kuwait.

WBL's representations at trial, this new title policy *did not* purport to insure clean title, unequivocally stating: "THIS DOCUMENT CONSTITUTES A STATEMENT OF THE TERMS AND CONDITIONS ON WHICH A TITLE INSURER IS WILLING TO ISSUE A POLICY OF TITLE INSURANCE . . . . IT IS NOT A REPRESENTATION AS TO THE STATE OF TITLE AND IT DOES NOT CONSTITUTE AN ABSTRACT OF TITLE." Fakioglu Dep. Ex. 54. *But see* Def's Closing Arg. (Oct. 27, 2023) ("WBL cannot be said to have closed its eyes to the effect of [the] lis pendens with multiple professionals telling them they had clear title."); Oztreves Trial Testimony (Oct. 23, 2023) (Q: "Did the title company eventually give WBL a clean title for the property?" A: "Yes.").

Additionally, Pardes testified that "the title company had removed" the lis pendens from the new title policy "because the lis pendens was found not to apply to the subject property." Pardes Trial Testimony (Oct. 24, 2023). The glaring problem with Pardes's explanation is that only the last page of the Notice of Lis Pendens contains a recording document for an unrelated address. The first twenty-eight pages, however, clearly identify Al-Sabah as the plaintiff against Agbodjogbe in the lis pendens, describe her fraud allegations, and establish that she was contesting title to the Pikesville Property. *See* Pl's Trial Ex. 872. Indeed, WBL employees Yasmin Fakioglu and Jaime Hayden understood the lis pendens to apply to the Pikesville Property, and Hayden escalated the issue to Pardes himself. Thus, the evidence refutes Pardes's testimony that the title company omitted the lis pendens from the final title policy because it found the lis pendens "not to apply" to the Pikesville Property. The evidence instead clearly shows that WBL was aware that the lis pendens applied to the Pikesville Property and requested a new title policy without the lis pendens. *See also* Def's Trial Ex. 68 (WBL's title review sheet for the Pikesville Property indicating a judgment / lien dated March 20, 2017, under the name "AL SABAH, ALIA SALEM"). WBL

thereafter relied on the new title policy (which did not actually resolve the issue) and proceeded

without any further investigation of the fraud claim so that it could close on the loan:

> Q: Did you investigate the specifics of that lis pendens?
> A [Robert Pardes]: No.
> Q: Why not?
> A: Almost - - most of our files come in with title reports that contain blemishes to title that are ultimately cleared up . . . . It's only after the items that are not resolved are remaining items that there is a deep inquiry into what's remaining and can the deal be structured around it or is it a hard stop to processing the loan.
> Q: And did you at some point in time find out that that blemish had been resolved?
> A: It was after - - shortly after the issue was escalated to me, I was informed that the title company had removed it because the lis pendens was found not to apply to the subject property.
> . . . .
> Q: After you found out that there was a lis pendens that was - - that the titling company insured over because it was not on the collateral, did you do anything else to further investigate the merits of that lis pendens?
> A: Of course not.
> Q: Why?
> A: If I followed up on everything that was resolved, we'd never close any loans.

Pardes Trial Testimony (Oct. 24, 2023). This is willful blindness. *Compare E.F. Hutton Mortg.*

*Corp. v. Equitable Bank, N.A.*, 678 F. Supp. 567, 577 (D. Md. 1988) (determining that a bank was

not liable in fraud when it made a loan to a tortious actor after completing a due diligence

investigation and uncovering indicia of fraud because the bank did not have "concrete knowledge"

of the fraud), *with Hoffman v. Stamper*, 867 A.2d 276, 302 (Md. 2005) (establishing, several years

after *E.F. Hutton*, that willful blindness suffices as actual knowledge to fraudulent activity).

The Court also declines to ascribe any meaningful weight to the form attorney opinion

letter WBL obtained the same day it funded Loan Three. The letter opined: "To our knowledge,

after due inquiry, there is no . . . threatened or pending litigation against" Agbodjogbe or his

business entities "that could adversely impact the ability" of Agbodjogbe or the business entities

"to perform the obligations under the terms of [Loan Three]." Def's Trial Ex. 31. However, there

is no evidence that the attorney who signed the letter possessed information about the lis pendens

or Al-Sabah's fraud suit. For example, the attorney represented that he reviewed "title

commitments," *id.*, but it is unclear whether he reviewed the one that included the lis pendens and information about the related fraud suit or the one WBL later obtained that omitted the lis pendens. There is also no evidence that the attorney knew what WBL knew about Al-Sabah, including that she wired Agbodjogbe "very large unusual deposits," Pl's Trial Ex. 957, beginning in 2014 and that Agbodjogbe purchased prior collateral with some of that money, *see* Pardes Trial Testimony (Oct. 24, 2023) (answering "No" to the question of whether the "disclosure package include[d] anything that would have alerted [the attorney] to the existence of these [large] deposits happening in the background with respect to the collateral"). Yet, WBL felt the form attorney opinion letter sufficiently vetted any potential litigation against Agbodjogbe to the extent it would impact his loan obligations and accepted the representations at the eleventh hour of funding without any subsequent follow up.[32] *See* Oztreves Trial Testimony (Oct. 24, 2023). This makes no sense, given WBL's knowledge of the pending fraud suit, and also demonstrated willful blindness.

Finally, WBL claims that it could not be willfully blind because "nobody at WBL" read Al-Sabah's complaint or connected the dots between her as the sender of the wires and as the plaintiff suing Agbodjogbe for fraud. ECF 213 at 21–22. WBL explains that this happened because "the division of labor between the underwriting and closing department" meant that those at WBL who actually possessed the lis pendens and docket sheet were not those who "actually decided to make the loan connecting the dots." *Id.* at 22. Even assuming that is true, the entirety of the record

---

[32] The evidence in the record more convincingly establishes that WBL supplied the form letter as a template to the attorney, and the attorney signed the template without much, if any, substantive change. *See* Pardes Trial Testimony (Oct. 24, 2023) (Q: "This is the attorney approval letter for loan three. Do you see that?" A: "Yes." Q: "Now is this language that WBL requires?" A. "Yes" Q: "And is this attorney approval letter substantially the same as what you required for loan two?" A: "Yes."); *compare* Pl's Trial Ex. 782 (August 26, 2016, attorney opinion letter associated with Loan Two), *with* Def's Trial Ex. 31 (March 30, 2017, attorney opinion letter associated with Loan Three).

convinces the Court that WBL had the infrastructure in place to connect the dots and investigate the matters further, but it chose not to. Notably, Fakioglu, who oversaw all loan renewals at the time of Loan Three,[33] Fakioglu Dep. Testimony 62:4–7 (July 15, 2021), had familiarity with title policies, read the original Title Report, and became aware that Al-Sabah, the person who wired large sums of money to Agbodjogbe, had also just sued him. Fakioglu also spoke directly to Agbodjogbe about the lawsuit and learned that Agbodjogbe and his attorneys were trying to resolve the lis pendens. Most importantly, Fakioglu relayed the information she learned from Agbodjogbe to at least two other employees at WBL, one in the closing department and one who was processing the loan. And although she only worked in a sales capacity and did not have decision-making authority over Loan Three, Fakioglu expressed concern to the head of WBL's title department that the lis pendens would stop Loan Three from closing.[34]

---

[33] Even before this point, Fakioglu oversaw aspects of WBL's loan procedures as a vice president and director, responsible for ensuring that loans made it from sales to funding and overseeing the work of credit processors before scheduling loans for investment committee review. Fakioglu Dep. Testimony 42:14–43:10, 61:4–7 (July 15, 2021). Furthermore, throughout the relevant time, Fakioglu not only worked with WBL's sales branches, but also "train[ed] them . . . not to look the other way" when conducting due diligence on the loans related to N&A Kitchen. Fakioglu Dep. Testimony 151:12–24 (July 19, 2021).

[34] The Court is also unpersuaded by WBL's suggestions that it could not stop or question Loan Three after learning of the lis pendens because by that point, the loan already received investment committee approval. *See* Oztreves Trial Testimony (Oct. 24, 2023) (Q: "[I]s there some reason why, having found out about the lis pendens, WBL couldn't have put brakes on this loan?" A: "So when the title company omits it, there's no breaks."); Pardes Dep. Testimony 265:17–266:10 (July 7, 2021) (explaining that Loan Three was already moving towards closing). First, the evidence shows that WBL had in its files information about the lis pendens and was in the process of reviewing it before the investment committee approved Loan Three on March 23, 2017. *See* Def's Trial Exs. 31, 68. Second, WBL's policies require that certain conditions must be met or waived after a loan is approved, but before a loan closes. *See* Oztreves Trial Testimony (Oct. 23, 2023) (discussing the concept of closing conditions in an investment committee approval form). In other words, just because the investment committee may approve a loan does not mean that WBL automatically proceeds to close it. The process can stop when WBL wants it to stop.

Fakioglu's knowledge of, and attention to, Al-Sabah's lis pendens and fraud suit created the conditions for WBL to pursue further investigation. As detailed above, WBL's title department escalated the issue to Pardes, WBL's Managing Director and Chief Operating Officer, but Pardes declined to investigate the specifics of the lis pendens any further based on a questionable and improbable belief that the lis pendens applied to a different property. Furthermore, Pardes testified that when WBL's closing department independently conducted the PACER search to identify pending litigation related to the lis pendens, it did so "mostly for purposes of determining whether there's an amount [of judgment] that could be escrowed if [the lis pendens] could not be removed." Pardes Dep. Testimony 264:20–265:1 (July 7, 2021). Then, if the lis pendens could be removed from the title policy (which it was), "it would be irrelevant what the research was from [WBL's] point of view." *Id.* at 265:2–5. In the Court's view, this is the essence of willful blindness.

In sum, the totality of all evidence elicited at trial and at depositions convince the Court that WBL was willfully blind to Agbodjogbe's underlying fraud during its processing of Loan Three. WBL's personnel had knowledge of Agbodjogbe's alleged wrongdoing and could make the requisite connections to Al-Sabah and the Pikesville Property, but WBL chose not to investigate so that it could quickly close and fund Loan Three. *See* Pardes Trial Testimony (Oct. 24, 2023) (explaining that he did not further investigate the merits of the lis pendens because "[i]f I followed up on everything that was resolved, we'd never close any loans"); Oztreves Trial Testimony (Oct. 24, 2023) ("[T]here was a rush to fund [Loan Three]."); Fakioglu Dep. Testimony 106:2–5 (July 19, 2021) (explaining the concern of "los[ing] a deal over something that can't be resolved right away . . . [b]ecause when something takes longer, the client walks away"); *id.* at 118:22–24 ("[E]very weekend that you don't close is a risk of losing the client generally in our industry.").

The Court thus finds that Al-Sabah has proven the second element of her aiding-and-abetting claim with respect to Loan Three.

### iii.   WBL's Substantial Assistance of Agbodjogbe's Fraud (Element Three)

The final element of Al-Sabah's aiding-and-abetting claim requires proof that WBL "gave substantial assistance or encouragement to [Agbodjogbe] to engage in tortious conduct." *Christian v. Minn. Mining & Mfg. Co.*, 126 F. Supp. 2d 951, 960 (D. Md. 2001) (quoting *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1043 (Md. 1995)). Substantial assistance is not an easy concept to define; it "can come in many forms, including abetting, inducing, encouraging, soliciting, or advising the commission of the offense, such as through words of encouragement or driving the getaway car." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023); *see also Purdum v. Edwards*, 141 A. 550, 553 (Md. 1928) ("When several participate, they may do so in different ways at different times, and in very unequal proportions. One may plan, another may procure the men to execute, others may be the actual instruments in accomplishing the mischief, but the legal blame will rest upon all as joint actors." (citation omitted)). As such, elements and factors of substantial assistance articulated in other cases "should 'not be accepted as immutable components'" nor "taken as inflexible codes." *Twitter, Inc.*, 598 U.S. at 487 (first quoting *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983)). Rather, a court should rest its analysis of substantial assistance "on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participated' in a wrongful act so as to help 'make it succeed.'" *Id.* at 493 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)); *see also id.* at 494 (explaining how secondary liability "imposes liability for a wrong on those who 'help another to complete its commission'" (emphasis omitted) (quoting *Rosemond v. United States*, 572 U.S. 65, 70 (2014))). With these principles in mind, the Court finds that WBL consciously and culpably helped Agbodjogbe's fraud succeed by funding Loan Three, despite Al-

Sabah's lis pendens, and putting Al-Sabah's money, presently in the form of equity in the Pikesville Property, beyond her reach.

The Court's analysis begins with WBL's unpersuasive contention that Agbodjogbe's fraud was complete as soon as Al-Sabah transferred her money to him or sued him for fraud. *See* ECF 213 at 26 ("[B]y the time WBL funded the third loan on March 30, 2017, Ms. Al-Sabah had already sued Mr. Agbodjogbe for fraud. Accordingly, there was no fraudulent conduct by Mr. Agbodjogbe for WBL to substantially assist in those transactions."). A wrongdoer's fraud may not be complete unless and until damage to a plaintiff occurs, such as when the plaintiff "would be entitled, but was denied the opportunity, to assume sole ownership" of fraudulently transferred property. *Kafka v. Hess*, Civ. No. JKB-16-1757, 2017 WL 2439142, at *9 (D. Md. June 6, 2017) (citing *James v. Weisheit*, 367 A.2d 482, 484 (Md. 1977)). Such is the case here. Agbodjogbe had purchased the Pikesville Property back in 2015 with $469,990 of Al-Sabah's money, and he still owned it free and clear of any mortgages when he came to WBL in March, 2017 seeking a third loan. By March 20, 2017, Al-Sabah had filed a lis pendens against the Pikesville Property, but WBL denied her the opportunity to claim title when it secured a first priority lien. Therefore, WBL substantially assisted Agbodjogbe's fraud even though, by this point, Agbodjogbe had already obtained Al-Sabah's money and purchased the Pikesville Property without her knowledge. *See also Twitter, Inc.*, 598 U.S. at 486, 495 (noting that an aider and abettor can substantially assist by "facilitating the sale of . . . stolen goods" and "transforming them into usable wealth" (citing *Halberstam v. Welch*, 705 F.2d 472, 474, 488 (D.C. Cir. 1983))).

This Court's opinion in *In Re Rood* well illustrates this point. 482 B.R. 132 (Bankr. D. Md. 2012). There, two individuals appealed from a bankruptcy court judgment finding a debtor-corporation's chief operating officer liable for aiding and abetting a CEO's fraud. The bankruptcy

court found that the corporation's CEO, Robert F. Rood IV, misappropriated money from a pension plan and spent "it according to his whims." *Id.* at 143. The court also found that the chief operating officer, Charles Jewell, provided Rood substantial assistance in his fraud scheme because he "was working closely" with Rood to refinance a loan using proceeds Rood had surreptitiously and fraudulently obtained from the pension plan. *Id.* at 148. Although Jewell did not work on the transaction until two years after Rood had misappropriated the funds, did not directly communicate with the victim of the fraud, and did not participate in the scheme, the bankruptcy court nevertheless found—and this Court agreed—that "Jewell's efforts with respect to the . . . loan, at the very least, provided substantial assistance" to Rood's scheme. *Id.* at 147–48 (internal quotation marks omitted) (discussing 459 B.R. 581 (Bankr. D. Md. 2011)). Like Jewell in *In Re Rood*, WBL substantially assisted Agbodjogbe's fraud even though Al-Sabah had already wired Agbodjogbe all of the $7.8 million before WBL's knowledge or involvement.

Indeed, the evidence in this case shows that WBL was not a passive bystander; it consciously and affirmatively loaned Agbodjogbe $360,000 in exchange for first lien priority on the Pikesville Property, which denied Al-Sabah the opportunity to recoup her money from the home. *See Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991) (explaining that an entity who "actively participates in [a] transaction by inducing or soliciting sales or by negotiating terms of the deal . . . may be held liable for substantially assisting" a wrongdoing); *Twitter, Inc.*, 598 U.S. at 486, 489 (noting that there is generally no aiding-and-abetting liability for "mere omissions, inactions, or nonfeasance"); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258 (S.D.N.Y. 2005) ("Mere presence, and passive receipt of email, cannot, by definition, constitute affirmative assistance."). The evidence also shows that WBL hastily funded Loan Three to secure the business opportunity and arranged for the removal of the lis pendens from the updated title

policy to do so. *See also* Fakioglu Dep. Testimony 105:10–107:2 (July 19, 2021) (discussing how removal of the lis pendens was going to take some time and expressing concern that the lis pendens "[j]eopardized" the deal with Agbodjogbe); Fakioglu Dep. Exs. 44–45 (same). WBL thus "had much to gain" by forging ahead on Loan Three without further investigating Agbodjogbe's fraud. *SEC v. Aragon Cap. Advisors, LLC*, No. 07 Civ. 919 (FM), 2011 WL 3278907, at \*18 (S.D.N.Y. July 16, 2011); *see Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 512 (S.D.N.Y. 2001) (noting that "participation in a symbiotic fraudulent scheme" may be enough to find substantial assistance), *amended on reconsideration in part on unrelated grounds*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated on other grounds by Casey & Merck & Co., Inc.*, 653 F.3d 95, 100 (2d Cir. 2011); *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (explaining that substantial assistance may be based on a broker's processing of fraudulent transactions to generate commissions). WBL's funding of Loan Three effectively drove Agbodjogbe's getaway car, allowing him to permanently siphon away the money he fraudulently obtained and used to purchase the Pikesville Property. *See Twitter, Inc.*, 598 U.S. at 490.

The Court also rejects WBL's contention that it did not substantially assist Agbodjogbe's fraud because its loan did not proximately cause Al-Sabah's damages. As a threshold matter, the Court is not convinced that substantial assistance requires proximate cause in every case. *See id.* at 493 (rejecting a lower court's view that it "hew tightly to the precise formulations" that other cases may use to articulate substantial assistance). Even the case on which WBL principally relies expressed "some doubt about whether 'substantial assistance' can be equated with proximate cause" because "[a] person can make a meaningful contribution to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results." *JP Morgan Chase Bank*, 406 F. Supp. 2d at 256 n.6; *see also Twitter, Inc.*, 598 U.S. at 494 (rejecting the argument that a

defendant is liable only if "a strict nexus" existed between its assistance and the wrongdoing).[35]

But in any event, the evidence clearly shows that Loan Three *was* the proximate cause of Al-Sabah's damages with respect to the Pikesville home, because it placed a first lien priority ahead of Al-Sabah's claim against the title. While WBL tries to shift the blame to a docketing error, claiming that "[i]f the lis pendens were properly docketed, it would have created a first priority lien against the Pikesville home, and WBL never would have funded the Third Loan without clean title," ECF 213 at 27, WBL still knew about the Notice of Lis Pendens and had in its files a PACER search identifying the underlying litigation. Not only did the Notice of Lis Pendens clearly establish the grounds for Al-Sabah's lis pendens against the Pikesville Property, but it also implicated WBL's policy against closing on a property with an active lis pendens.[36] The Court thus funds that WBL's failure to follow its own policy with respect to Al-Sabah's active lis pendens proximately caused Al-Sabah's harm associated with Loan Three.

Finally, the Court is unpersuaded by WBL's argument that it did not substantially assist Agbodjogbe's fraud because it provided nothing more than routine services to Agbodjogbe. True,

---

[35] The Maryland cases WBL references to support its conception of substantial assistance did not hold that substantial assistance requires proximate cause. In *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*, this Court granted summary judgment on the plaintiff's aiding-and-abetting claim because there was no evidence that the defendant possessed the requisite knowledge of the fraud or that it participated in the fraudulent activities. 678 F. Supp. 567, 580–81 (D. Md. 1988). Although the Court recognized that causation factors into a plaintiff's general fraud claim, it did not explicitly equate causation with the substantial assistance element of a plaintiff's aiding-and-abetting claim. *Id.* And in *Empire Realty Co. v. Fleisher*, the Maryland Court of Appeals did not adjudicate an aiding-and-abetting claim and thus did not discuss the concept of substantial assistance. *See* 305 A.2d 144, 147 (Md. 1973).

[36] Relatedly, WBL maintains that "[t]he docketing error likely contributed to the title insurance company's decision to issue a policy despite the lis pendens, which WBL relied on in choosing to move forward with Loan Three." ECF 213 at 27. For reasons described above, the Court's rejects this contention because it contradicts evidence that WBL actively requested removal of the lis pendens from a new title policy. Moreover, the new title policy did not insure clean title.

in many cases, "tasks routinely performed in the course of business—such as maintaining bank accounts and authorizing transfers—were held not to constitute substantial assistance." *JP Morgan Chase Bank*, 406 F. Supp. 2d at 257 (collecting cases); *see also Twitter, Inc.*, 598 U.S. at 500 (holding no substantial assistance could be found where a defendant's relationship with a terrorist group was merely "arm's length, passive, and largely indifferent"); *Texas Star Nut & Food Co., Inc. v. Truist Bank*, 632 F. Supp. 3d 664, 671 (D. Md. 2022); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 471 (S.D.N.Y. 2001). But WBL "overstates the relevance of whether the transactions were routine" because "[t]he critical test is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud." *JP Morgan Chase Bank*, 406 F. Supp. 2d at 257; *see Primavera Familienstiftung*, 130 F. Supp. 2d at 511 ("[E]xecuting transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid the fraud."); *Twitter, Inc.*, 598 U.S. at 502 ("There may be . . . situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a [tortfeasor] could constitute aiding and abetting a foreseeable [wrong].").

Besides, the evidence sufficiently shows that WBL's relationship with Agbodjogbe at the time of Loan Three was more than "arms-length, passive, and largely indifferent." *Id.* at 500. WBL's representatives testified that during WBL's lending activities with Agbodjogbe, it held a favorable view of him as a "very high net worth borrower" and "[a] very sophisticated borrower," given "the size of the assets that he owns relative to most of [its] borrower[s]." Naidus Dep. Testimony 110:11–20 (Aug. 10, 2021). WBL's view of Agbodjogbe was even more favorable when it underwrote Loan Three because he was a repeat customer that paid off WBL "perfectly." Oztreves Trial Testimony (Oct. 24, 2023). While these facts, standing alone, may not suffice to

show a favorable relationship, the Court considers them in context of several notable exceptions WBL granted to Agbodjogbe's third loan under its lending guidelines and policies. For example, WBL exceeded its LTV maximum of 75% on the misguided notion that Agbodjogbe owned the collateral "free and clear";[37] approved Loan Three before holding the standard PRAD call with Agbodjogbe; and most importantly, proceeded to close and fund Loan Three with knowledge of an active lis pendens. The totality of this evidence demonstrates that WBL did not just paper Agbodjogbe's loan application in its normal course, *see Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991), nor was Agbodjogbe's "ability to benefit" from WBL "merely incidental to [WBL]'s services and general business model[]," *Twitter, Inc*., 598 U.S. at 504. Rather, WBL considerably deviated from its normal business practices to close another deal with Agbodjogbe and gain a first lien priority against the Pikesville Property. This constituted substantial assistance to Agbodjogbe's ongoing fraud.

For the foregoing reasons, the Court finds that Al-Sabah has established that WBL aided and abetted Agbodjogbe's fraud by closing and funding Loan Three. The Court next turns to an appropriate award of damages.

### iv.  Al-Sabah's Damages Under Count II

As related to Loan Three, Al-Sabah claims compensatory damages in the amount Agbodjogbe paid for the Pikesville Property, as well as prejudgment interest. Al-Sabah never intended to own the Pikesville Property, nor does she seek the current market value of the property, which she acknowledges would result in "rank speculation." ECF 212 at 31 & n.13; *see Brock Bridge Ltd. P'Ship v. Dev. Facilitators, Inc.*, 689 A.2d 622, 628 (Md. Ct. Spec. App. 1997) ("To recover compensatory damages, the amount must be proved with reasonable certainty and may not

---

[37] While Agbodjogbe owned the Pikesville Property free and clear of any mortgages, he did not own the Pikesville Property free and clear of any judgments or liens.

be based upon speculation or conjecture."). Instead, she only seeks to recover her actual losses related to that property. For its part, WBL maintains that the proper measure of damages is the difference between the fair market value of the Pikesville Property before Al-Sabah's injury and after her injury. Thus, because Al-Sabah did not adduce evidence of the fair market value at either time, WBL argues her damages claim is impermissibly speculative. For reasons explained below, the Court finds WBL conditionally liable for $469,990 with prejudgment interest.

### a.  WBL's Liability for Al-Sabah's Out-of-Pocket Loss

"In determining 'the proper measure of damages in fraud and deceit cases,' Maryland applies the 'flexibility theory.'" *Goldstein v. Miles*, 859 A.2d 313, 324 (Md. Ct. Spec. App. 2004) (quoting *Hinkle v. Rockville Motor Co.*, 278 A.2d 42, 47 (Md. 1971)). The flexibility theory posits:

> [A] victim of fraudulent . . . misrepresentation may elect to recover either out-of-pocket expenses or benefit-of-the-bargain damages. The former will permit the plaintiff to recover his or her actual losses; the latter puts the defrauded party in the same financial position as if the fraudulent representations had in fact been true by awarding as damages the difference between the actual value of the property at the time of [the injury] and the value that it would have possessed if the representations had been true.

*Id.* (internal quotation marks and citations omitted); *see Beardmore v. T.D. Burgess Co.*, 226 A.2d 329, 331 (Md. 1967) (explaining that if a victim of a fraud could only recover benefit-of-the-bargain damages, "the assumed wrongdoers[] would be relieved from paying compensation" and [s]uch a result . . . would be fundamentally unjust"). Where, as here, "the defrauded party is content with the recovery of only the amount that [s]he has actually lost, [her] damages will be measured under that rule." *Goldstein*, 859 A.2d at 324 (quoting *Hinkle*, 278 A.2d at 47).[38] Given WBL's role in consummating Agbodjogbe's fraud by extending Loan Three, the Court finds WBL conditionally liable for $469,990, which represents Al-Sabah's out-of-pocket loss for the

---

[38] Thus, contrary to WBL's contentions, Al-Sabah did not need to provide evidence of the Pikesville Property's fair market value before or after her loss to secure out-of-pocket damages.

Pikesville Property.[39] The Court conditions this liability upon Al-Sabah's relinquishment of her

lis pendens on the Pikesville Property to avoid the potential for double recovery. *See United States*

*v. Rachel*, 289 F. Supp. 2d 688, 697 (D. Md. 2003).

### b. Prejudgment Interest

Al-Sabah also seeks prejudgment interest on her damages. "In a case based on diversity

jurisdiction, prejudgment interest is a matter of state law." *Fields v. Walpole*, Civ. No. DKC 11-

1000, 2013 WL 2154798, at *3 (D. Md. May 16, 2013) (citing *Hitachi Credit Am. Corp. v. Signet*

*Bank*, 166 F.3d 614, 633 (4th Cir. 1999)). In Maryland, "pre-judgment interest is allowable when

the obligation to pay and the amount due had become certain, definite, and liquidated by a specific

date prior to judgment so that the effect of the debtor's withholding payment was to deprive the

creditor of the use of a fixed amount as of a known date." *Id.* at *3 (quoting *First Va. Bank v.*

*Settles*, 588 A.2d 803, 807 (Md. 1991)). Although the right to prejudgment interest typically arises

under written contracts, *see Pa. Nat'l Mut. Cas. Ins. Co. v. Kirson*, 525 F. Supp. 3d 628, 637 (D.

Md. 2021), Maryland courts have also recognized the right to prejudgment interest in tort cases

where the value of damages is readily ascertainable, *see Buxton v. Buxton*, 770 A.2d 152, 162–63

(Md. 2001) (noting that prejudgment interest in a tort action "compensates the judgment creditor

for his or her inability to use the funds that should have been in his or her hands at some earlier

time and usually does not depend on what the debtor might have done with the money) (emphasis

omitted); *Fields*, 2013 WL 2154798, at *3. Prejudgment interest is to be calculated at the legal rate

of six percent per annum. *Id.* at *3 (citing MD. CONST. ART. III, § 57).

The Court will award Al-Sabah prejudgment interest, which it will calculate from the

date Al-Sabah secured her judgment against Agbodjogbe (February 3, 2020) until it enters a

---

[39] The Court derives this exact amount from the parties' Joint Stipulations of Fact. ECF 178 at 34.

complete Order of Judgment against WBL. *See* ECF 178 at 39 (requesting prejudgment interest calculated from the date Al-Sabah secured judgment against Agbodjogbe).

### c. Punitive Damages

Al-Sabah also seeks punitive damages against WBL. "Punitive damages are available under Maryland law in tort actions to punish a defendant for egregiously bad conduct toward the plaintiff, and also to deter the defendant and others from contemplating similar behavior." *Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *3 (D. Md. Sept. 10, 2021) (internal quotation marks omitted) (quoting *Allen v. Kavasko Corp.*, Civ. No. WMN-15-1839, 2015 WL 8757799, at *1–*2 (D. Md. Dec. 15, 2015)). A plaintiff may be awarded punitive damages if she demonstrates that a defendant possessed "evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual malice.'" *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1125 (Md. 1995); *Quan*, 2021 WL 4129115, at *3. Evidence that sufficiently demonstrates willful blindness to fraudulent activity suffices as actual malice for purposes of assessing punitive damages. *See Hoffman v. Stamper*, 867 A.2d 276, 301–02 (Md. 2005) ("[A] defendant cannot shut his eyes or plug his ears when he is presented with evidence of a [fraud] and thereby avoid liability for punitive damages." (quoting *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 6633, 654 n.23 (Md. 1992))); *Ellerin*, 652 A.2d at 1126 & n.10. However, even if "there is clear and convincing evidence of a defendant's actual malice, the Court has discretion to award punitive damages." *Quan*, 2021 WL 4129115, at *3. "In exercising this discretion, the Court is guided by several factors, including 'the minimum amount of damages that will deter the defendant and others from similar misconduct, the proportion of punitive damages to compensatory damages, and the financial circumstances of the defendant.'" *Id.* (quoting *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 630 (D. Md. 2003)).

In light of these guideposts and the minimal discussion of the issue at trial and in the parties' post-trial briefs, the Court requests expedited briefing on the appropriate amount of punitive damages. The parties are hereby directed to jointly propose and file an expedited briefing schedule within three business days of this Memorandum of Decision and Order.

### B.  Unjust Enrichment (Count VII)

Al-Sabah also alleges that WBL was unjustly enriched through its lending activities with Agbodjogbe. A claim for unjust enrichment requires that (1) a plaintiff confers a benefit upon a defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant retains the benefit under circumstances that are inequitable without the paying of value in return. *Benson v. State*, 887 A.2d 525, 546 (Md. 2005). As this Court previously recognized on summary judgment, "[a] bona fide lender who is enriched is not enriched unjustly." ECF 151 at 19 (citing *Plitt v. Greenberg*, 219 A.2d 236, 241 (Md. 1966)). But where a lender's suspicion or knowledge constituted notice of a mortgagor's fraudulent conduct, it may be liable for unjust enrichment. *See id.* at 19–20; *Wash. Mut. Bank v. Homan*, 974 A.2d 376, 396 (Md. Ct. Spec. App. 2009).

Al-Sabah is not entitled to judgment on her unjust enrichment claim as to Loans One and Two because, for the reasons discussed herein, WBL did not have notice of Agbodjogbe's fraudulent conduct. As to Loan Three, Al-Sabah has not demonstrated that she conferred a benefit upon WBL. The evidence in the record shows that WBL lost money on Loan Three because Agbodjogbe still has not repaid the remaining balance on the loan. *See* Def's Trial Exs. 62, 63, 31. Although Al-Sabah contends that "WBL may still collect on the unpaid balance for Loan Three, given that WBL has the primary lien position on the Pikesville property," ECF 212 at 33, this contention is speculative, *see Adams v. Kelley*, No. 29, 2017 WL 944290, at *12 (Md. Ct. Spec. App. Mar. 10, 2017) (affirming a trial court's entry of judgment in favor of defendants on the plaintiff's unjust enrichment claim because there was no way "that the court could measure the

alleged . . . benefit to the [defendants]"). Additionally, because the Court has determined that WBL is liable for Al-Sabah's monetary loss associated with the Pikesville Property, she is not entitled to double recover for the same injury. *See United States v. Rachel*, 289 F. Supp. 2d 688, 697 (D. Md. 2003) ("The one wrong, one recovery rule precludes a party from double recovery for a single injury."); *Fields v. Walpole*, Civ. No. DKC 11-1000, 2013 WL 2154798, at *2 (D. Md. May 16, 2013). For these reasons, the Court finds in favor of WBL on Al-Sabah's unjust enrichment claim for all three loans.

### III.    Conclusion

For the foregoing reasons, this Court finds that Plaintiff has met her burden, in part, to prove that WBL aided and abetted Agbodjogbe's fraud. Therefore, the Court partially rules in favor of Al-Sabah as to Count II in the conditional amount of $469,990, plus prejudgment interest, pending Al-Sabah's relinquishment of her lis pendens on the Pikesville Property. Judgment will be entered as to Count VII against Al-Sabah and in favor of WBL. A separate order follows.


Dated: January 24, 2024                                                    _____/s/_____
                                                                          Stephanie A. Gallagher
                                                                          United States District Judge