IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ALIA SALEM AL-SABAH, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 18-cv-02958-SAG |
| WORLD BUSINESS LENDERS, LLC, | * | |
| Defendant. | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION

On January 24, 2024, this Court partially found in favor of Plaintiff Alia Salem Al-Sabah ("Al-Sabah") on Count II of her Complaint against World Business Lenders, LLC ("WBL") for aiding and abetting a fraud committed by Jean Agbodjogbe ("Agbodjogbe"). ECF 218. The Court must now determine an appropriate amount of punitive damages to award against WBL. The parties have submitted briefs on the issue, ECF 222, 223, 224, 225, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the following reasons, the Court will assess $235,000 in punitive damages against WBL for aiding and abetting Agbodjogbe's fraud on Al-Sabah.

## I.   BACKGROUND

This Court's Memorandum of Decision, ECF 218, fully sets forth the facts establishing WBL's liability. In relevant part, Agbodjogbe defrauded Al-Sabah of over $7 million from June, 2014 to December, 2015, by purchasing various properties in his name, or in the names of corporate entities he owned, without Al-Sabah's knowledge. *Id.* at 33. Agbodjogbe used two of those properties to secure three commercial loans with WBL, *id.* at 22–24, 31, an alternative business lender that provides small businesses with short-term, high-cost loans, *id.* at 14. Agbodjogbe secured his first two loans with WBL using an apartment located at 325 5th Avenue

in New York City as collateral, and he secured his third loan ("Loan Three") using a residential property located at 103 Mount Wilson Lane, Pikesville, MD 21208 (the "Pikesville Property" or "Property"). *Id.* at 20–25, 31. During its underwriting of Loan Three, WBL became aware of a Notice of Lis Pendens that Al-Sabah filed against the Pikesville Property and a related fraud suit Al-Sabah filed in this Court, both of which contested Agbodjogbe's title to the Property. *Id.* at 25–26. Nonetheless, WBL hastily proceeded to close and fund Loan Three before Agbodjogbe backed out of the transaction. *Id.* at 30. In so doing, WBL obtained a first lien priority on the Pikesville Property to the financial detriment of Al-Sabah. *See id.* at 31.

Upon close review of the testimony and evidence elicited at trial, this Court found that WBL was willfully blind to Agbodjogbe's fraud during its processing of Loan Three and substantially assisted the fraud by funding the loan, obtaining a first lien priority on the Pikesville Property and denying Al-Sabah the opportunity to recoup her money from the home. *Id.* at 43–53. The Court conditionally awarded Al-Sabah $469,990 in compensatory damages, plus prejudgment interest, pending the relinquishment of her lis pendens on the Pikesville Property. *Id.* at 57–59. The Court's findings also opened the door for punitive damages, but because the parties had not briefed the issue at trial or in their post-trial filings, the Court ordered expedited briefing on the appropriate amount of punitive damages it should assess against WBL. *Id.* at 59–60.

## II.   LEGAL STANDARDS

"Punitive damages are available under Maryland law in tort actions to punish a defendant for egregiously bad conduct toward the plaintiff, and also to deter the defendant and others contemplating similar behavior." *Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *3 (D. Md. Sept. 10, 2021) (internal quotation marks omitted) (quoting *Allen v. Kavasko Corp.*, Civ. No. WMN-15-1839, 2015 WL 8757799, at *1–*2 (D. Md. Dec. 15, 2015)).

A plaintiff may be awarded punitive damages if she demonstrates that a defendant possessed "evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual malice.'" *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1125 (Md. 1995) (quoting *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 652 (Md. 1992)); *Quan*, 2021 WL 4129115, at *3. Evidence that sufficiently demonstrates willful blindness to fraudulent activity suffices as actual malice for purposes of assessing punitive damages. *See Hoffman v. Stamper*, 867 A.2d 276, 301–02 (Md. 2005) ("[A] defendant cannot shut his eyes or plug his ears when he is presented with evidence of a [fraud] and thereby avoid liability for punitive damages." (quoting *Owens-Illinois, Inc.*, 601 A.2d at 654 n.23)); *Ellerin*, 652 A.2d at 1126 & n.10. However, even if "there is clear and convincing evidence of a defendant's actual malice, the Court has discretion to award punitive damages." *Quan*, 2021 WL 4129115, at *3.

In exercising this discretion, the Court is guided by nine nonexclusive factors: (1) the gravity of the defendant's wrongdoing; (2) the defendant's ability to pay; (3) the deterrence value of the award "under all of the circumstances of the case"; (4) how the award compares to the maximum criminal or civil fine for similar conduct; (5) the amount of the award, in comparison to awards in the jurisdiction or in factually comparable cases; (6) any prior punitive damages awards against the same defendant for the same course of conduct; (7) if the award is based on separate torts, whether the separate torts arose from a single episode of events; (8) the plaintiff's reasonable expenses and costs that "are not covered by the award of compensatory damages"; and (9) whether the award "bears a reasonable relationship to the compensatory damages awarded." *Bowden v. Caldor, Inc.*, 710 A.2d 267, 278–85 (Md. 1998). These factors "are not criteria that must be established but, rather, [are] guideposts to assist a court in determining an award," *CMH Mfg. v. Neil*, 620 F. Supp. 3d 316, 324 (D. Md. 2022) (quoting *Darcars Motors of Silver Spring, Inc. v.*

*Borzym*, 841 A.2d 828, 843 (Md. 2004)), and not all of them are pertinent in every case, *Bowden*, 710 A.2d at 285.

## III.  DISCUSSION

Here, five of the nine *Bowden* factors are at issue: the gravity of WBL's wrong, deterrence value, comparison to other awards, Al-Sabah's legal expenses and costs that are not covered by the award of compensatory damages, and whether a reasonable relationship exists between punitive and compensatory damages. Al-Sabah argues that an award of $2 million is appropriate because WBL's misconduct must be deterred, and the compensatory damages award of $469,990 "does not capture the gravity of WBL's misconduct or the struggle incurred by Al-Sabah in pursuing recompense." ECF 223 at 5–7. WBL claims that an award of punitive damages is inappropriate where the Court's finding of willful blindness "only technically" constitutes actual malice. ECF 222 at 5–6. If any such award is appropriate, then WBL argues that application of the relevant *Bowden* factors supports only a nominal amount of punitive damages. *See id.* at 6–7.

Initially, this Court disagrees with WBL's contention that it should deny punitive damages "where the record technically would support their award." *Id.* at 5 (internal quotation marks and citation omitted). Maryland courts have made it clear that a finding of willful blindness establishes liability for punitive damages. *See, e.g.*, *Hoffman*, 867 A.2d at 301–02. Whether a meaningful award, or perhaps no award at all, "would conflict with the broad policy statements underlying the purpose of punitive damages," ECF 222 at 6, is a question duly answered by applying the relevant *Bowden* factors. And here, application of those factors leads this Court to conclude that WBL's conduct supports an award of $235,000 in punitive damages—approximately half of Al-Sabah's compensatory damages.

**A.  Gravity of the Wrong**

"The most important legal rule in this area, applicable to every punitive damages award, is that the amount of punitive damages 'must not be disproportionate to the gravity of the defendant's wrong.'" *Bowden*, 710 A.2d at 278 (quoting *Ellerin*, 652 A.2d at 1129–30). Engagement in "heinous" or "egregiously bad conduct" is a "prerequisite for *any* award of punitive damages." *Id.* (emphasis in original) (citing *Owens-Corning Fiberglas Corp. v. Garrett*, 682 A.2d 1143, 1161 (Md. 1996)); *see CMH Mfg.*, 620 F. Supp. 3d at 327 ("[T]hose harsh words only open the door to punitive damages."). However, "simply because the defendant has engaged in some 'heinous' or 'egregiously bad conduct' does not necessarily justify a large award of punitive damages." *Bowden*, 710 A.2d at 278. "Accordingly, in determining whether the amount of the award is disproportionate to the gravity of the defendant's conduct, it is the degree of heinousness which is important." *Id.*

WBL's conduct in aiding and abetting Agbodjogbe's fraud during its processing of Loan Three, though troubling, does not strike the Court as particularly heinous, and certainly not so heinous as to assess over four times the compensatory damages awarded to Al-Sabah. *CMH Mfg. v. Neil*, Civ. No. JKB-21-0674, 2021 WL 4290634, at *7 (D. Md. Sept. 21, 2021). That said, WBL consciously acted with willful blindness towards Al-Sabah's claim for equitable title to the Pikesville Property and justified doing so based on (1) an improbable belief that the Notice of Lis Pendens did not apply to the Property; (2) an updated title insurance policy that WBL itself requested so as to omit the Notice of Lis Pendens; and (3) a thin and non-sensical legal opinion regarding the purported absence of pending litigation that could impact Agbodjogbe's loan obligations. *See* ECF 218 at 44–49. The evidence also showed that commercial gain motivated WBL, which "represents an enhanced degree of punishable culpability." *Exxon Shipping Co. v.*

*Baker*, 554 U.S. 471, 494 (2008); *see id.* ("In determining the amount of punitive damages, the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer." (quoting RESTATEMENT (SECOND) OF TORTS § 908 cmt. e (AM. L. INST. 1977))).[1] The Court thus finds WBL's conduct egregious for purposes of assessing punitive damages. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "egregious" as "[e]xtremely or remarkably bad; flagrant").

At the same time, the Court credits WBL's contentions that its conduct "was not life threatening or the type of conduct which would likely lead to permanent physical injuries," and that the evidence fails to show that Al-Sabah "has suffered any serious lasting effects from the events."[2] ECF 222 at 7–8 (quoting *Bowden*, 710 A.2d at 285); *see Van Dusen v. Prywes*, No. 43, 2015 WL 5885236, at *4 (Md. Ct. Spec. App. May 13, 2015) ("Whether the plaintiff 'suffered any serious lasting effects' is relevant to the 'degree of heinousness' of a defendant's conduct." (quoting *Bowden*, 710 A.2d at 278, 285)). The Court also credits WBL on the limited duration (less than two weeks) and isolated nature of its misconduct (one loan). *Compare Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *4 (D. Md. Sept. 10, 2021) (noting the lack of evidence that the defendant engaged in other, similar schemes), *with Mahoney v.*

_____

[1] WBL cites to *Marks v. Dann*, 600 F. App'x 81, 86 (4th Cir. 2015), as reason to discredit WBL's commercial motive, ECF 222 at 6. WBL's citation is unavailing because that case squarely focused on the malice exception to state official immunity under the Maryland Tort Claims Act; it did not discuss Maryland's common law standards on actual malice for purposes of assessing punitive damages.

[2] While Al-Sabah claims a lasting impact to her "reputation and psyche," because of the ensuing litigation, ECF 225 at 4, she has adduced no evidence quantifying or describing the extent of this further harm, *see Van Dusen*, 2015 WL 5885236, at *4 (describing plaintiff's testimony adduced at trial of the lasting psychological effects of defendant's conduct). Additionally, in this case, it would be difficult to divorce psychic litigation-related harms caused by WBL from the psychic litigation-related harms occasioned by Agbodjogbe's acts.

*iProcess Online, Inc.*, -- F. Supp. 3d --, 2023 WL 4457438, at *4 (D. Md. July 10, 2023) (considering the defendant's misconduct over a period of several years). With these mitigating circumstances, the Court concludes that punitive damages amounting to roughly half of Al-Sabah's actual loss appropriately reflect the gravity of WBL's conduct.

### B.  Deterrence Value

A second purpose of punitive damages is "to deter the defendant and others contemplating similar behavior." *Owens-Croning Fiberglas Corp. v. Garrett*, 682 A.2d 1143, 1161 (Md. 1996). "A defendant's taking of remedial or corrective action, promptly after the misconduct . . . should be a mitigating factor" while "repeated or frequent misconduct of the same nature, misconduct of long duration, attempts to conceal or cover-up the misconduct, failure to take corrective action, and similar circumstances, support . . . a significant award." *Bowden*, 710 A.2d at 279. According to Al-Sabah, a pattern of misconduct is inherent in WBL's high-risk lending business model, and a substantial punitive damages award must deter WBL from choosing "maximum profitability over doing the right thing the next time." ECF 225 at 5. Al-Sabah specifically points to the trial testimony of WBL's CEO, Doug Naidus, who stated that he would still have funded Loan Three and that WBL's alternative lending model is "trailblazing" the commercial lending space. *See* Naidus Trial Testimony at 180:2–9, 181:1–3 (Oct. 24, 2023). Finally, Al-Sabah argues that an award would deter not just fraud at WBL, but also among "like-minded high-risk lenders." ECF 223 at 5–6.

The deterrence factor does not justify the significant punitive damages award requested by Al-Sabah. First, the Court cannot agree with Al-Sabah that willful blindness is a standard feature of WBL's business. As the Court observed, "nothing in the record shows that WBL deliberately structures its business to avoid uncovering suspected fraud by its borrowers." ECF 218 at 42. In

fact, with respect to Loan Three, the Court found WBL to have "the infrastructure in place to connect the dots and investigate the matters further, but it chose not to." *Id.* at 48; *see also id.* at 56 (noting that Agbodjogbe's ability to benefit from WBL was not "merely incidental to WBL's services and general business model" and WBL "considerably deviated from its normal business practices to close another deal with Agbodjogbe" (internal quotation marks and citations omitted)). Thus, the Court perceives no regular pattern of misconduct that must be deterred.[3]

The Court is disturbed, however, by Naidus's unequivocal testimony that he still believes it was appropriate to close and fund Loan Three. *See* Naidus Trial Testimony at 180:8–9 (Oct. 24, 2023). Although Naidus did acknowledge that the fraud Agbodjogbe perpetrated on a third party was "concerning," his testimony suggests that if the same fact pattern presented itself, he would still authorize such a loan. *Id.* at 178:14–19. In other words, Naidus would, apparently, still find it appropriate for WBL to lend money to a borrower who had been sued for fraud by the same person who (1) sent him unusually large wires and (2) contested title to the exact same property pledged as collateral for the loan.[4] *See* ECF 218 at 44. In the Court's view, this mindset should be deterred.

One issue, of course, is whether this kind of situation would likely recur. On the one hand, as WBL maintains, the facts of this case present quite an unusual situation where Al-Sabah, a wealthy individual without business or investment experience, entrusted millions of dollars to someone who convinced her that he would invest various properties on her behalf. On the other,

---

[3] For similar reasons, the Court finds no basis to award punitive damages to deter other high-risk lenders where there is no evidence of a pattern or practice of fraud in the industry.

[4] Although WBL argues that Naidus "in no way endorsed entering into transactions that are known or suspected to involve collateral procured by fraud," ECF 224 at 9, Naidus's testimony does not say one way or the other. The question presented to Naidus, asking him to reflect "based on what [he's] seen now," leaves his answer open to interpretation for the fact finder. *See* Naidus Trial Testimony at 180:2–9 (Oct. 24, 2023).

as Al-Sabah argues, WBL is a business that profits off a high-risk lending practice and may very well confront another opportunity to choose between "maximum profitability" and "doing the right thing." ECF 225 at 5. The Court is ultimately persuaded by WBL's characterization and agrees that WBL found itself involved in a highly unique situation that is unlikely to recur. To be sure, WBL prioritized profit when it overlooked a lis pendens and rushed to fund a borrower whose (apparent) assets were much higher relative to most of WBL's borrowers. WBL's choice regarding that specific action is culpable. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008). But the Court cannot say, without speculating, that WBL will likely encounter similar opportunities to fund a "very high net worth borrower" who pledged a residential property that became the subject of a lis pendens and federal fraud suit. ECF 218 at 55 (quoting Naidus Dep. Testimony at 110:11–20 (Aug. 10, 2021)). Because this specific situation is unlikely to recur, the Court finds that greater punitive damages would have little deterrent effect.[5]

## C. Comparison to Other Awards

Comparing awards in the jurisdiction may provide courts additional guidance in determining the appropriate amount of punitive damages. *See Bowden*, 710 A.2d at 280. Such an analysis is not intended "to put a strict, judicially-created cap on the size of a punitive award," *Snyder v. Phelps*, 533 F. Supp. 2d 567, 593 (D. Md. 2008), *rev'd on other grounds*, 580 F.3d 206 (4th Cir. 2009), however, this Court finds it instructive that many punitive damages awards in cases involving fraud range from half to double the compensatory damages award, *Mahoney v. iProcess Online, Inc.*, -- F. Supp. 3d --, 2023 WL 4457438, at *4 (D. Md. July 10, 2023) (assessing

---

[5] There is also no evidence that WBL concealed or exacerbated its misconduct, both of which courts use as evidence of the need for deterrence. *See, e.g.*, *Mahoney v. iProcess Online, Inc.*, -- F. Supp. 3d --, 2023 WL 4457438, at *4 (D. Md. July 10, 2023); *CMH Mfg. v. Neil*, 620 F. Supp. 3d 316, 329 (D. Md. 2022).

punitive damages equal to the compensatory damages amount of $279,652.25); *CMH Mfg. v. Neil*, 620 F. Supp. 3d 316, 324 (D. Md. 2022) (noting prior business fraud cases involved punitive damages in the range of 40-50% of compensatory damages); *see also, e.g.*, *Cap. Fin., LLC v. Rosenberg*, 364 F. Supp. 3d 529, 551 (D. Md. 2019) (awarding $200,000 in punitive damages for fraudulent misrepresentations that resulted in compensatory damages of over $500,000), *rev'd in part on other grounds*, 822 F. App'x 191, 192 (4th Cir. 2020) (per curiam); *Quan v. TAB GHA F&B, Inc.*, Civ. No. TDC-18-3397, 2021 WL 4129115, at *4 (D. Md. Sept. 10, 2021) (awarding punitive damages of $250,000 and compensatory damages were $500,000). *But see nTech Sols., Inc., v. Meta Dimensions, Inc.*, Civ. No. 1:21-cv-00673-JMC, 2023 WL 5671619, at *2, *7 (D. Md. Sept. 1, 2023) (awarding $200,000 in punitive damages where compensatory damages were $99,400); *Legacy Inv. & Mgmt., LLC v. Susquehanna Bank*, Civ. No. WDQ-12-2877, 2014 WL 5325757, at *10 (D. Md. Oct. 17, 2014) (recommending $300,000 in punitive damages relative to $159,293.14 in compensatory damages). While both parties argue that the unique facts of this case warrant a significant departure from these prior cases, neither extreme position is warranted.[6] *Compare* ECF 222 at 6–7 (requesting a nominal amount of punitive damages),[7] *with* ECF 223 at

---

[6] WBL also argues that "[a] relevant data point is the jury verdict against Agbodjogbe, which awarded $1 million in punitive damages." ECF 222 at 9. The Court sees no basis to compare the facts of the Agbodjogbe trial to the facts here, as the defendants are wildly different in both culpability and financial resources.

[7] The Court does recognize, however, that the only instance in which it is aware that a court in this jurisdiction awarded nominal punitive damages was *In re Rood*, which contained a factually comparable situation insofar as a corporate officer aided and abetted a fraud by helping a CEO refinance a loan using fraudulently obtained assets. 459 B.R. 581, 604–05 (Bankr. D. Md. 2011), *aff'd*, 482 B.R. 132 (D. Md. 2012); ECF 218 at 51–52 (discussing the relevancy of *In re Rood*). In that case, the court awarded $500,000 in compensatory damages, and awarded nominal punitive damages because of the defendant's inability to pay. *In re Rood*, 459 B.R. at 609–10. Here, there is no issue regarding WBL's ability to pay.

3–4 (arguing for $2 million in punitive damages). Rather, an award close to or within the low-end of the typical range of comparable cases is appropriate here. *CMH Mfg.*, 620 F. Supp. 3d at 324.

### D.  Al-Sabah's Expenses and Costs

The fourth factor at issue is Al-Sabah's "reasonable costs and expenses resulting from [WBL]'s malicious and tortious conduct, including the expenses of the litigation," which, Al-Sabah argues, "are not covered by the award of compensatory damages." *Bowden*, 710 A.2d at 282. "[E]vidence of the amount of the plaintiff's reasonable attorney's fees" or "any other reasonable expenses which are not covered by the award of compensatory damages" can guide the fact finder by "giving [it] the 'aid of one fairly definite factor which [it] may take into account'" in assessing punitive damages. *Id.* at 283 (quoting *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 568 A.2d 35, 42 (Md. 1990)). To explain how the compensatory damages fail to adequately capture the gravity of her harm, Al-Sabah highlights the over seven years and two trials it took to present her case, incurring legal expenses "that exceed the total amount WBL would be ordered to pay if the Court enters judgment as Al-Sabah proposes." ECF 223 at 3–4.

Because Al-Sabah has provided no evidence supporting the amount of her attorneys' fees, the Court has no factual record upon which to premise a finding of substantial legal expenses. *See St. Luke Evangelical Lutheran Church, Inc.*, 568 A.2d at 42–43; *see also Bowden*, 710 A.2d at 283 ("[T]he matter of the plaintiff's uncompensated reasonable expenses should not be a factor simply to 'enlarge' awards of punitive damages."). This factor, therefore, has not influenced the Court's punitive damages award.

### E.  Reasonable Relationship to the Compensatory Damages Awarded

The final factor at issue is "[w]hether a punitive damages award bears a reasonable relationship to the compensatory damages awarded in this case." *Bowden*, 710 A.2d at 284. In her

request for $2 million in punitive damages, Al-Sabah asks this Court to depart from this principle because WBL's "extremely heinous conduct ha[d] great potential for harm, but because of fortuitous circumstances [Al-Sabah] does not suffer a great deal of compensatory harm." ECF 223 at 8 (quoting *Bowden*, 710 A.2d at 285). Al-Sabah invokes the Court's getaway car analogy, suggesting that if not for Al-Sabah's litigation against WBL, WBL "would still be driving the getaway car." *Id.* (citing ECF 218 at 53).

The Court sees no reason to diverge from the principle requiring a reasonable relationship between punitive and compensatory damages. As stated above, the Court perceives WBL's misconduct on the lower end of egregiousness, and the Court strains to understand what further harm could have befallen Al-Sabah had she not sued and successfully recouped her compensatory loss. A punitive damages award of about half of Al-Sabah's compensatory damages is reasonable.

## IV.  CONCLUSION

For the reasons stated above, this Court finds it appropriate to assess $235,000 in punitive damages against WBL for its role in aiding and abetting Agbodjogbe's fraud on Al-Sabah. Partial judgment will be entered as to Count II of Al-Sabah's Complaint in an amount of $469,990 as compensatory damages; prejudgment interest in an amount of $116,351.50; and $235,000 as punitive damages for a total amount of $821,341.50. A separate Order of Judgment follows.


Dated: March 19, 2024                            /s/
                                        Stephanie A. Gallagher
                                        United States District Judge